**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Southern Division)**

| | | |
|---|---|---|
| PRINCE GEORGE'S COUNTY, MARYLAND<br>1301 McCormick Drive<br>Largo, MD 20774 | ) ) ) ) | |
| and | ) ) | |
| MONTGOMERY COUNTY, MARYLAND,<br>101 Monroe Street<br>Rockville, MD 20850, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 1:18-cv-03576 |
| WELLS FARGO & CO.,<br>2710 Gateway Oaks Dr.<br>Suite 150N<br>Sacramento, CA 95833 | ) ) ) ) ) | |
| **Serve on:**<br>CSC-Lawyers Incorporating Service Co.<br>7 St. Paul St., Suite 1660<br>Baltimore, MD 21202 | ) ) ) ) ) | |
| WELLS FARGO FINANCIAL, INC.,<br>2710 Gateway Oaks Dr.<br>Suite 150N<br>Sacramento, CA 95833 | ) ) ) ) ) | |
| **Serve on:**<br>CSC-Lawyers Incorporating Service Co.<br>7 St. Paul St., Suite 1660<br>Baltimore, MD 21202 | ) ) ) ) ) | |
| WELLS FARGO BANK, N.A.,<br>101 N. Phillips Avenue<br>Sioux Falls, SD 57104 | ) ) ) ) ) | |
| **Serve on:**<br>CSC-Lawyers Incorporating Service Co.<br>7 St. Paul St., Suite 1660<br>Baltimore, MD 21202 | ) | |

and

WELLS FARGO "JOHN DOE" CORPS 1-375,

Defendants.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

# Table of Contents

I. Introduction ...........................................................................................................1

II. Jurisdiction & Venue..............................................................................................5

III. Parties ................................................................................................................6

    A.    Plaintiffs ...................................................................................................6

    B.    Wells Fargo Defendants ..........................................................................6

IV. Background Facts Relevant To All Counts .........................................................10

    A.    The Federal Government Has Found That Discrimination Was Pervasive In
        Subprime Mortgage Lending During 2003  Through 2007...................................10

    B.    Congress Found That Predatory and Discriminatory Lending Caused The
        Foreclosure Crisis ...............................................................................15

    C.    The Predatory, Subprime, and Higher Cost Mortgage Lending and Securitization
        Activities of Defendants and other Industry Participants Caused the U.S. Financial
        Crisis and the Subsequent Economic Collapse .....................................................21

    D.    The Foreclosure Crisis Has Disparately Impacted Minorities ...............................25

V. Defendants' Wrongful Conduct Relevant To All Counts ......................................27

    A.    Defendants Engaged In Predatory & Discriminatory Mortgage Lending &
        Servicing To Drive Revenue Growth & Fuel Their Profitable Securitization
        Operations. ...........................................................................................27

    B.    Wells Fargo's Financial Motivations To Engage In Their Predatory &
        Discriminatory Conduct.......................................................................34

    C.    Wachovia's Financial Motivations To Engage In Their Predatory & Discriminatory
        Conduct ...............................................................................................44

    D.    Defendants Knew, Or Were Grossly Negligent or Reckless In Not Knowing, Of
        The Predatory And Discriminatory Nature Of Their Conduct ..............................47

VI. Defendants Focused Their Discriminatory Conduct on Ethnic Minorities For Non-Prime
        Mortgage Loans  Because They Provided The Easiest Target................................61

VII. Wells Fargo Directly Targeted Minorities For Non-Prime Mortgage Loan Originations, And Incentivized That Conduct Through Its Employee Compensation Scheme and Quotas.................................................................................................................62

VIII. Wachovia Targeted its Pick-A-Pay Loan Originations to FHA-protected Minority Borrowers ..............................................................................................................74

IX. Defendants' Discretionary Pricing Policies Enabled And Incentivized Predatory Non-prime Mortgage Lending on a Discriminatory Basis Through Their Wholesale Lending & Broker Channels .....................................................................................................78

X. Defendants Lowered or Circumvented Their Underwriting Standards, Enabling Predatory Non-Prime Mortgage Loans to Be Made on a Discriminatory Basis .....................84

XI. Defendants' Mortgage Servicing & Foreclosure Practices Are Predatory & Discriminatory.93

    A.    Empirical Data Evidences Defendants' Targeting of, And The Discriminatory Impact on, Minority Borrowers in Plaintiffs' Communities................................104

    B.    The Full Extent of Defendants' Discriminatory Housing Practices are Concealed Through Defendants' Underreporting of Minority Status In HMDA Data And Through MERS.......................................................................................................127

    C.    Defendants' Predatory and Discriminatory Mortgage Lending, Servicing and Foreclosure Practices Have Harmed Plaintiffs. ...................................................134

XII. Wells Fargo Is Liable For The Acts Of Wachovia As A Result Of Its Merger With Wachovia...............................................................................................................144

XIII. Count I Violation of Fair Housing Act 42 U.S.C. § 3601, et seq. ....................................146

    A.    Defendants' Facially Neutral Loan Origination & Servicing Policies and Practices147

    B.    Defendants' Predatory Mortgage Loan Origination Practices and Policies Had A Disparate Impact on Minority Borrowers .............................................................149

XIV. COUNT II (Violation of Federal Fair Housing Act, 42 U.S.C. § 3601, *et seq.*) Defendants' Facially Neutral Mortgage Servicing and Foreclosure Practices Resulted in Disparate Impact in Minority Neighborhoods. ......................................................153

XV. COUNT III Violation of Federal Fair Housing Act 42 U.S.C. § 3601 *et seq.* Defendants' Discriminatory Equity-stripping Scheme Was Intentional and Constitutes Disparate Treatment ...........................................................................................................157

XVI. Demand For Jury Trial.......................................................................................................161

XVII. Prayer For Relief ..............................................................................................................161

# I. INTRODUCTION

1.     Plaintiffs, Prince George's County and Montgomery County, Maryland, brings this action pursuant to the civil enforcement provision of the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq*. and 3613 ("FHA"), which protects communities (and the individuals residing in them) from discriminatory acts, policies and/or practices that (1) make housing unavailable or (2) establish terms and conditions in real estate-related transactions, including real estate financing activities, that discriminate on the basis of race or ethnicity.

2.     Plaintiffs asserts this litigation against Defendants (collectively "Wells Fargo" or "Defendants") because Wells Fargo is legally responsible, either directly, as a control person, or as a successor, for each of the Defendant entities it acquired or merged with.

3.     Plaintiffs seek injunctive relief to remedy, and monetary damages for, Defendants' predatory and discriminatory residential mortgage lending, servicing, and foreclosure activities, which have resulted in--and will continue to cause--unprecedented numbers of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies in Plaintiffs' communities and neighborhoods, particularly those communities with high percentages of FHA-protected minority residents.

4.     The foreclosure crisis was the foreseeable and inevitable result of Defendants' (and other industry participants') equity-stripping schemes which originated and/or funded higher-cost, first lien home mortgage loans (over 70% were for refinances, not purchases, and half of the refinances involved "cash out") and second lien home equity mortgage loans and lines of credit.  This lending activity enabled Defendants to capitalize on a relatively short-term opportunity to earn enormous fee income while home prices, and corresponding home equity levels, were at historical highs before the housing bubble burst.  It also enabled Defendants to

continue to generate fee income from servicing loans, servicing defaulted loans, and/or foreclosing on defaulted loans.

5.      Defendants' entire subprime and higher cost mortgage lending, securitization, and servicing operations were geared to exploit borrowers, particularly FHA-protected homeowner-borrowers, to maximize their corporate profits and their management's compensation.

6.      In particular, Defendants' targeted marketing practices, discretionary pricing policies, credit score override practices, underwriting policies, wholesale mortgage funding and mortgage securitization operations, compensation policies, and mortgage servicing operations each individually, or in combination with each other, authorized, approved, or otherwise encouraged the origination and funding of first and second lien residential mortgage loans with different terms and conditions to similarly financially situated borrowers on the improper basis of race, color, ethnicity, sex and age.

7.      For example, after identifying and targeting FHA-protected minority borrowers using advanced data mining techniques and predictive analysis methodologies, Defendants' various mortgage origination, securitization, and servicing policies and practices allowed or encouraged: (a) unchecked or improper credit approval decisions for minority borrowers, resulting in borrowers being approved for and receiving refinance and home equity loans they could not afford and consequently were likely to become delinquent and/or default on; (b) subjective surcharges on minority borrowers of additional points, fees and other credit and servicing costs over and above an otherwise objective risk-based financing rate for such loan products, increasing the likelihood of delinquencies and/or defaults on such loans; (c) minority borrowers to be steered into higher cost loan products, also increasing the likelihood of delinquencies and/or defaults on such loans; and (d) undisclosed inflation of appraisal values of

minority residences in order to support inflated loan amounts to minority borrowers, further increasing the likelihood of delinquencies and/or defaults on such loans.

8.    As a result of Defendants' stand-alone discriminatory housing practices and interrelated equity-stripping schemes, Plaintiffs' communities and neighborhoods with relatively higher concentrations of FHA-protected African America and Latino/Hispanic minority homeowners have disproportionately and disparately received more of such higher cost mortgage loans, and have been disproportionately and disparately impacted by the increased delinquencies, defaults, foreclosures and home vacancies resulting from such loans.  Indeed, both the relative percentage share of such loans--and the resulting increased levels of loan delinquencies and defaults, loan foreclosures, and home vacancies--increase in direct relationship to increases in the percentage concentrations of FHA-protected African American and Latino/Hispanic minorities in Plaintiffs' communities and neighborhoods.  Moreover, Defendants' foreclosure practices in and of themselves are discriminatory, as reflected by the increasingly disproportionate number of foreclosures on African American and Latino/Hispanic minority homes and higher concentrated neighborhoods.

9.    Defendants' discriminatory mortgage servicing and foreclosure activities have directly caused tremendous tangible and intangible damage to Plaintiffs including, but not limited to:  (i) out-of-pocket costs for required eviction and foreclosure notices, judicial and non-judicial foreclosure-related processes; (ii) registration and monitoring of foreclosed properties; (iii) inspecting, securing, cleaning, maintaining and/or demolishing abandoned or vacant properties; (iv) additional municipal police and fire services on specific vacant or foreclosed properties for which Defendants are responsible, as well as other services to the evicted or foreclosed homeowners of such properties; (v) the loss of various property tax and concession

income on specific vacant or foreclosed properties for which Defendants are responsible; and (vi) for the loss of certain property recording and transfer fee income on such properties, all of which is directly tied to specific properties and defaulted non-prime mortgage loans that Defendants originated, funded, and/or serviced.  In addition, Plaintiffs have been damaged as a result of the necessary reallocation of their limited resources, as well as to their missions to provide fair and affordable housing and prevent urban blight. Plaintiffs believe that they will continue to be injured by Defendants' discriminatory housing practices that are about to occur, particularly the continuing home vacancies and foreclosures occurring in higher concentrated minority areas.

10.     As further alleged herein, Defendants have been sued by and settled with federal regulators, including the Federal Reserve Board, the Office of the Controller of the Currency, the Federal Housing Finance Agency, various State Attorneys General, and FHA-protected minority borrower class action plaintiffs, among others, for virtually all of Defendants' actions alleged in this Complaint, but none of those claims have covered Plaintiffs' damages here.  By virtue of Defendants' numerous cash settlements, and entry into consent orders to change their policies and business practices, Defendants have effectively conceded their liability for the matters alleged herein.  For instance, Wells Fargo was sued by, and settled with the United States Department of Justice ("DOJ"), the City of Baltimore, the City of Memphis, and Shelby County, Tennessee, for FHA violations similar to those at issue here.  Indeed, the DOJ concluded that Defendants discriminatorily steered tens of thousands of ethnic minority borrowers across the country into higher cost and subprime mortgage loans that charged higher fees and interest rates than loans made to white borrowers who posed the same credit risk. Wells Fargo employees referred to loans to minorities as "ghetto loans."

11.     Plaintiffs seek to hold Defendants financially accountable under the FHA for Plaintiffs' injuries shown to directly flow from Defendants' actions. These injuries are distinct from the harm caused to individual borrowers and the fines and settlements Defendants have paid in connection with quasi-criminal and civil regulatory actions.  Moreover, these injuries can be directly tied (in time and place) to the specific properties where Defendants discriminatorily originated, funded and/or serviced non-prime mortgage loans to minority borrowers.

12.     As contemplated by the FHA, Plaintiffs also seek to hold Defendants financially accountable for that portion of Plaintiffs' injuries that Defendants' actions are about to cause through additional mortgage delinquencies, defaults, home vacancies and/or foreclosures.

13.     Because of the deliberate, egregious and widespread nature of Defendants' predatory and discriminatory mortgage lending and servicing schemes, efforts to obfuscate their liability, and their callous disregard for the impact of such actions on Plaintiffs' communities, neighborhoods and residents, Plaintiffs also seek the imposition of punitive and/or exemplary damages.

## II.  JURISDICTION AND VENUE

14.     This is an action for violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq*. This Court has original jurisdiction over this action pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331 and 1343 because the claims alleged herein arise under the laws of the United States.

15.     Venue is proper under 28 U.S.C. § 1391 because each Defendant is a corporation subject to personal jurisdiction in Plaintiffs' district. Defendants have transacted business in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district.

### III.  PARTIES

#### A.    Plaintiffs

16.    Plaintiff, Prince George's County, Maryland is a Charter Home Rule county, and the second most populous county in Maryland. Prince George's County is one of the richest African American majority counties in the United States. Prince George's County is an aggrieved person within the meaning of 42 U.S.C. § 3602(i) and brings this action pursuant to the private persons civil enforcement provisions of 42 U.S.C. § 3613.  Prince George's County is not bringing this action in a *parens patriae* role or capacity.

17.    Plaintiff, Montgomery County, Maryland is a Charter Home Rule county, and the most populous county in Maryland.  Montgomery County is an aggrieved person within the meaning of 42 U.S.C. § 3602(i) and brings this action pursuant to the private persons civil enforcement provisions of 42 U.S.C. § 3613.  Montgomery County's Mission Statement sets forth its goals and purpose, among other things of promoting fair and affordable housing: "We pursue the common good by working for and with Montgomery County's diverse community members to provide . . . Affordable Housing in an Inclusive Community."  Montgomery County does not bring this action in a *parens patriae* role or capacity.

#### B.    Wells Fargo Defendants

18.    Defendant, Wells Fargo & Co. ("Wells Fargo") is a nationwide, diversified financial holding company and bank holding company incorporated in the State of Delaware with its principal place of business in San Francisco, California. Wells Fargo provides banking, insurance, investment, and mortgage and consumer finance services through storefronts, the Internet, and other distribution channels across the United States and internationally.  It is the parent company of Wells Fargo Bank, N.A.  As a bank holding company, Wells Fargo is subject

to the regulatory authority of the Board of Governors of the Federal Reserve System, among other federal regulators.

19.     Defendant, Wells Fargo Financial, Inc. ("Wells Fargo Financial") is a subsidiary of Wells Fargo and is a bank holding company with its principal place of business in Des Moines, Iowa.   Prior to September 2008, Wells Fargo Financial conducted home mortgage lending through nonbank subsidiaries located throughout the United States, including Wells Fargo Financial Maryland, Inc.   As used here, and unless otherwise indicated, "Wells Fargo Financial" includes its subsidiary Wells Fargo Financial Maryland, Inc.   By September 2008, Wells Fargo transferred the lending operations of Wells Fargo Financial to Defendant, Wells Fargo Bank, N.A., as part of its reorganization.

20.     Defendant, Wells Fargo Bank, N.A. ("Wells Fargo Bank"), is organized as a national banking association under the laws of the United States, with its corporate headquarters in San Francisco, California.   As a federally insured banking entity, Wells Fargo Bank is subject to the regulatory authority of the Office of the Comptroller of the Currency, among other federal regulators, and, as of July 21, 2011 became subject to the regulatory authority of the Consumer Financial Protection Bureau ("CFPB").   Wells Fargo Bank is one of the nation's largest residential mortgage originators and servicers.   It offers residential mortgage loans to consumers through its Wells Fargo Home Mortgage division, which at one time operated as a separately owned subsidiary of Wells Fargo, but which was merged into Wells Fargo Bank in 2004.   Wells Fargo Bank maintains multiple offices in the State of Maryland and within Montgomery and Prince George's Counties and its municipalities for the purposes of soliciting applications for and making residential mortgages loans, among other banking activities. It has transacted business in this district.

7

21.     On December 31, 2008, in a stock purchase transaction Wells Fargo acquired Wachovia Corporation, then the country's fourth largest diversified financial services and bank holding companies, based in Charlotte, North Carolina.  As a bank holding company, Wachovia Corporation was subject to the regulatory authority of the Federal Reserve, among other federal regulators.   In connection with its acquisition of Wachovia Corporation, Wells Fargo also acquired Wachovia Mortgage and all of the assets of Wachovia Bank, N.A., a national banking association, which totaled $635 billion at December 31, 2008. As a federally insured banking entity, Wachovia Bank was subject to the regulatory authority of the Office of the Comptroller of the Currency.

22.     Prior to the purchase by Wells Fargo, Wachovia itself expanded through a merger with First Union Corp. in 2001, and in 2006 had purchased troubled subprime lender Golden West Financial, which owned World Savings Bank, FSB, then the second largest savings and loan in the United States. In addition, Wachovia owned American Mortgage Network and its related entities.  Wachovia Corporation, Wachovia Bank and their subsidiaries, including World Savings Bank and American Mortgage Network are hereafter referred to collectively as ("Wachovia").

23.     Defendant, Wells Fargo & Co., as the corporate parent of Wells Fargo Bank and its subsidiaries, as well as the corporate parent of its other subsidiaries involved in the wrongful activities alleged herein, had the ability to direct and control the actions and operations of each of its subsidiaries and, in fact, did so through a variety of interrelated, interdependent, centralized and/or coordinated functions, practices and policies involved in their entire mortgage banking operation, particularly retail and wholesale higher cost, subprime, ALT-A or other non-conforming loan origination, funding, purchase, securitization and servicing activities.  As such,

Defendants Wells Fargo & Co, Wells Fargo Financial, Wells Fargo Bank, and any of their subsidiaries or acquisitions involved in the matters alleged herein, are collectively referred to hereafter as "Wells Fargo."

24.     Wells Fargo is legally responsible for, either directly or as a successor in interest to, Wachovia as a result of Wells Fargo's all stock purchase-acquisition of Wachovia in October 2008. Upon its acquisition by Wells Fargo, Wachovia became part of Wells Fargo's common enterprise involving the unlawful acts and practices alleged below.  Wachovia's operations were eventually merged into Wells Fargo's operations.

25.     Wells Fargo and Wachovia have engaged in "residential real estate-related transactions" within the meaning of section 805 of the FHA, 42 U.S.C. § 3605.  Accordingly, at all relevant times Wells Fargo, including Wachovia, have been subject to federal laws governing fair lending, including the FHA, and the fair housing regulations of the Department of Housing and Urban Development ("HUD"), 24 C.F.R. § 100.1, *et seq.*

26.     The term "Defendants" as generally used throughout this Complaint refers to Wells Fargo, Wachovia, and their respectively acquired or controlled subsidiaries and affiliates.

27.     Defendants, Wells Fargo Corps. 1-375, are affiliates or subsidiaries of Defendants here that may be responsible for the conduct alleged herein.  Defendants established and/or maintained some 378 subsidiary and affiliate correspondent lenders throughout the United States as reflected in publicly available data reported pursuant to the Home Mortgage Disclosure Act. Such parties are named in "John Doe" capacity pending discovery in this case.

## IV.   BACKGROUND FACTS RELEVANT TO ALL COUNTS

**A.     The Federal Government Has Found That Discrimination Was Pervasive in Subprime Mortgage Lending During 2003 Through 2007**

28.     In 1975, Congress passed the Home Mortgage Disclosure Act ("HMDA"), implemented under the Federal Reserve Board's Regulation C, requiring all mortgage lenders, including the Defendants here, to compile by census tract and report to the Federal Reserve their mortgage loan origination and purchase information, which includes borrower race, ethnicity and gender.   One of the primary purposes of HMDA reporting is to enable federal regulators to identify discriminatory lending patterns, such as those that violate the FHA.

29.     Concerned with potential discrimination in loan pricing, and recognizing that racial or other types of discrimination can occur when loan officers and mortgage brokers have latitude in setting interest rates, in 2004 the Federal Reserve began requiring lenders to identify loans originated as "high cost" or "rate spread" loans where the annual percentage rate cost of borrowing on such loans, including up-front points and fees, exceeds 3 percentage points above reported yields for U.S Treasury securities of comparable maturities for first mortgage liens and 5 percentage points for subordinate mortgage liens.

30.     At that time, mortgage lending industry groups successfully thwarted efforts by consumer lending groups to require lenders to include borrower credit score and other objective credit risk information in their HMDA reporting.   Thus, HMDA data is the only readily available information, absent review of Defendants' actual mortgage lending data, from which to statistically demonstrate Defendants' discriminatory lending activity.   Regardless, Defendants and other industry participants still collected and maintained borrower credit score and other objective credit risk information for each mortgage loan in connection with their internal and

10

external operations, including for analytical and risk evaluation purposes, the sale and securitization of such mortgage loans, and loan servicing operations.

31.     Based on its own review of all HMDA data, the Federal Reserve Board confirmed that, on a national basis, African American and Latino borrowers were more likely to pay higher prices for mortgage loans than non-minority borrowers during the excessive mortgage lending and refinance activity at issue here.  For example, the Federal Reserve's analysis of 2004 and 2005 HMDA data revealed that "Blacks and Hispanics were more likely . . . to have received higher-priced loans than non-Hispanic whites . . . [which has] increased concern about the fairness of the lending process." Robert B. Avery, Kenneth P. Brevoort and Glenn B. Canner, "*Higher-Priced Home Lending and the 2005 HMDA Data*," Federal Reserve Bulletin, A124, A159 (revised Sept. 18, 2006).  Such findings were echoed by the Federal Deposit Insurance Corporation.  Martin J. Gruenberg, FDIC Vice Chairman, observed that "previous studies have suggested higher-priced, subprime lenders are more active in lower income, urban areas and that minority access to credit is dominated by higher cost lenders." Martin J. Gruenberg, *Address to the Conference on Hispanic Immigration to the United States: Banking the Unbanked Initiatives in the U.S.* (Oct. 18, 2006).

32.     Even after accounting for the differences in borrowers' income, credit scores, property location, and loan amounts in the 2004 HMDA data, a Federal Reserve report found that on average African-American borrowers were 3.1 times more likely than non-minority borrowers to receive a higher-rate home loan and Latino borrowers were 1.9 times more likely to receive a higher rate loan than non-minority borrowers. *See* Congressional Testimony of Keith S. Ernst, Senior Policy Counsel, Center for Responsible Lending, before the Subcommittee on Financial Institutions and Consumer Credit (June 13, 2006) at 2.  Reporting on the Center for

Responsible Lending's study of the HMDA data (the Center is a non-profit research organization) Ernst testified:

> Our findings were striking. We found that race and ethnicity—two factors that should play no role in pricing—are significant predictors of whether a subprime loan falls into the higher-rate portion of the market. Race and ethnicity remained significant predictors even after we accounted for the major factors that lenders list on rate sheets to determine loan pricing.
>
> In other words, even after controlling for legitimate loan risk factors, including borrowers' credit score, loan-to-value ratio, and ability to document income, race and ethnicity matter. African American and Latino borrowers continue to face a much greater likelihood of receiving the most expensive subprime loans—even with the same loan type and the same qualifications as their white counterparts. Across a variety of different loan types, African American and Latino borrowers were 30% more likely to receive a higher-rate loan than white borrowers.

*Id*. at 3.

33.     Similarly, HMDA data for 2005 evidences that "for conventional home-purchase loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2 percent for non-Hispanic whites, a difference of 37.5 percentage points." Avery, Brevoort, and Canner, Federal Reserve Bulletin, at A159.  Similar average discriminatory patterns exist on loan refinancing for the same period, where African Americans were 28.3 percent more likely than similarly situated non-minorities to receive higher priced loans.  *See id.* at A124, A159.  Indeed, a study commissioned by the Wall Street Journal found that in 2005 and 2006 55% and 61% respectively of borrowers who received subprime mortgages could have qualified for traditional mortgages at the lower rates offered to prime borrowers.  "Subprime Debacle Traps Even Very Creditworthy," Wall Street Journal, December 3, 2007.

34.     The U.S. Department of Housing and Urban Development (HUD) found that in neighborhoods where at least 80% of the population is African American, borrowers were 2.2 times as likely as borrowers in the nation as a whole to refinance with a subprime lender and

even higher-income borrowers living in predominantly African American neighborhoods were twice as likely as lower-income non-minority borrowers to have subprime loans. *See* U.S. Department of Housing and Urban Development, Office of Policy Development and Research, "All Other Things Being Equal: A Paired Testing Study of Mortgage Lending Institutions" (2002).

35. In 2006, the Center for Responsible Lending uncovered "large and statistically significant" differences between the rates of mortgage loans offered to African Americans and non-minorities, even when income and credit risk were taken into consideration. Compared to their otherwise similarly-situated non-minority counterparts, African Americans were 31-34% more likely to receive higher rate fixed-rate loans and 6-15% more likely to receive adjustable-rate loans." Gruenstein, Bocian, Ernst and Li, "Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages" (May 31, 2006).

36. Similarly, HMDA Data for 2006 through 2007 evidences that African American and Hispanic borrowers continued to be much more likely to obtain higher-priced loans than non-minority borrowers with the same qualifications.

37. In December 2006 the Consumer Federation of America ("CFA") revealed the results of its extensive study of gender disparity in subprime lending, and their conclusions are evident from the title of their report. *See* Allen J. Fishbein and Patrick Woodall, "*Women are Prime Targets for Subprime Lending: Women are Disproportionately Represented in High-Cost Mortgage Market*," (December 2006) (hereafter, "Women are Prime Targets"). As the CFA found:

> Women are more likely to receive subprime mortgages than men. These gender disparities exist across mortgage product lines. Women with the highest incomes have the highest disparities relative to men with similar incomes than women at lower income levels. The gap is especially pronounced for women of color.

13

African American and Latino women have the highest rates of subprime lending. Moreover, African American and Latino women with the highest incomes have much higher rates of subprime lending than white men with similar incomes. The Consumer Federation of America (CFA) study found these patterns of subprime gender disparity exist for home purchase, refinance and home improvement lending.

38. Thus, the CFA concluded, among other things, that "[t]he prevalence of subprime loans among women borrowers diminishes their ability to fully utilize homeownership as a pathway to build wealth." *Id.* at 3.

39. The CFA's key findings, which findings Plaintiffs specifically incorporate and allege here, include:

- Women are more likely to receive subprime and higher-cost mortgages: About a third (32.0 percent) of women borrowers receive subprime mortgage loans of all types compared to about a quarter (24.2 percent) of male borrowers – making women 32 percent more likely to receive subprime mortgages than men. More than one in ten (10.9 percent) women received high-cost subprime mortgages compared to about one in thirteen (7.7 percent) men – making women 41 percent more likely to receive higher-cost subprime loans with interest rates more than 5 percentage points higher than comparable Treasury notes.

- Women are significantly over-represented in the pool of subprime mortgages. Although women make up 30.0 percent of borrowers for mortgages of all types, they make up 38.8 percent of subprime borrowers – a 29.1 percent over-representation. This over-representation of women in the subprime mortgage pool exists for all types of mortgages but is especially true of refinance and home improvement loans which are more likely to be subprime and predatory mortgages.

- Women are more likely to receive subprime mortgages of all types regardless of income, and disparity between men and women increases as incomes rise. For purchase mortgages, women earning double the median income are 46.4 percent more likely to receive subprime mortgages than men with similar incomes. In contrast, women earning below the area median income are 3.3 percent more likely to receive subprime mortgages. Women earning between the median and twice the median income are 28.1 percent more likely to receive subprime purchase mortgages than men.

- Women of color are the most likely to receive subprime loans and white men are the least likely to receive subprime loans at every income level and the gap grows with income. African American women earning below the area median income are nearly two and a half times more likely to receive a subprime purchase

mortgage than white men and Latino women earning below the area median are nearly twice as likely to receive subprime purchase mortgages as white men. The gap is much higher at incomes above twice the area median income. Upper income African American women are nearly five times more likely to receive subprime purchase mortgages than upper income white men and upper income Latino women are nearly four times more likely to receive subprime loans than upper income white men.

- Women are more likely to receive subprime mortgages than men of the same race and women of color are much more likely to receive subprime mortgages than white men. For purchase mortgages, African American women were 5.7 percent more likely than African American men to receive subprime mortgages; Latino women were 12.7 percent more likely than Latino men to receive subprime mortgages; and white women were 25.8 percent more likely to receive subprime purchase mortgages than white men. African American women were 256.1 percent more likely to receive subprime purchase mortgages than white men and Latino women were 177.4 percent more likely to receive subprime mortgages than white men.

40.     As further alleged below, and consistent with the generalized findings of the federal government and industry watch-dog groups, the HMDA data that Defendants here reported to the federal government reveals profound loan pricing disparities between FHA-protected minority borrowers and similarly-situated non-minority borrowers, even after controlling for borrowers' gender, income, credit scores, property location, and loan amount. Thus, Defendants' own reported HMDA data evidences their discrimination in their mortgage lending activity among minority borrowers who reside in Plaintiffs' communities and neighborhoods. Minority borrowers have been preyed upon by the Defendants here and illegally steered into nonconforming subprime loans and/or higher cost conforming loans, as well as being improperly approved for loans or approved for inflated loan amounts, all of which increases the likelihood of loan delinquencies, defaults, home vacancies, and eventual foreclosures.

### B.     Congress Found That Predatory and Discriminatory Lending Caused the Foreclosure Crisis

41.     According to Congressional findings, the foreclosure crisis throughout the United States, and within Plaintiffs' neighborhoods and communities leading up to the current period,

resulted from the predatory lending activities of the mortgage industry, particularly including the predatory and discriminatory lending activities of Defendants that are alleged here. *Report to Congress on the Root Causes of the Foreclosure Crisis*, Report of Department of Housing and Urban Development (January 2010) (hereafter, the "Root Causes Report").

42.     As explained in the Root Causes Report, housing prices escalated after 2003 and "lenders began offering new mortgage products intended to stretch borrowers' ability to afford ever more expensive homes as a means of keeping loan origination volumes high." Root Causes Report, Executive Summary at ix.

43.     "The leading cause of the problem was the characteristics of the market and mortgage products sold, rather than the characteristics of the borrowers who received those products." Congressional Testimony of Keith S. Ernst, Center for Responsible Lending, "Current Trends in Foreclosure and What More Can be Done to Prevent Them" at 2 (July 28, 2009) ("Ernst Testimony") (Joint Congressional Economic Committee).[1]

44.     The foreclosure crisis was "driven by the very design of the loans at issue. The loan products at the heart of the crisis were structured in a way that made widespread failure virtually inevitable." E. Harnick, The Crisis In Housing and Housing Finance: What Caused It? What Didn't? What's Next?, 31 Western New England L. Rev. 625, 628 (2009).

45.     Nationwide, between 2001 and 2006:

*   Adjustable rate mortgages as a share of total subprime loans originated increased from about 73 percent to more than 91 percent;

*   The share of loans originated for borrowers unable to verify information about employment, income or other credit-related information ("low-documentation" or "no- documentation" loans) jumped from more than 28 percent to more than 50 percent; and

[1]Available at http://www.jec.senate.gov/public/?a=Files.Serve&File_id= 36d87b93-a0a6-47b4-96ad-1475c70dc9ce).

- The share of ARM originations on which borrowers paid interest only, with nothing going to repay principal, increased from zero to more than 22 percent.

*See*, Economic Impact on Wealth, Property Values and Tax Revenues, and How We Got Here, Report & Recommendations by Majority Staff of Joint Economic Committee (Oct. 25, 2007).

46.     The Government Accountability Office ("GAO") has reported that "[m]ortgages originated from 2004 through 2007 accounted for the majority of troubled loans." Statement of William B. Shear, Director Financial Markets and Community Investment, Testimony Before the Joint Economic Committee U.S. Congress, "HOME MORTGAGES Recent Performance of Nonprime Loans Highlights the Potential for Additional Foreclosures" at 5, GAO-09-922T (July 28, 2009):

> Of the active subprime loans originated from 2000 through 2007, 92 percent of those that were seriously delinquent as of March 31, 2009, were from those four cohorts [year-groups]. Furthermore, loans from those cohorts made up 71 percent of the subprime mortgages that had completed the foreclosure process. This pattern was even more pronounced in the Alt-A market. Among active Alt-A loans, almost all (98 percent) of the loans that were seriously delinquent as of March 31, 2009, were from the 2004 through 2007 cohorts. Likewise, 93 percent of the loans that had completed the foreclosure process as of that date were from those cohorts.
>
> Cumulative foreclosure rates show that the percentage of mortgages completing the foreclosure process increased for each successive loan cohort (see fig. 3). Within 2 years of loan origination, 2 percent of the subprime loans originated in 2004 had completed the foreclosure process, compared with 3 percent of the 2005 cohort, 6 percent of the 2006 cohort, and 8 percent of the 2007 cohort. Within 3 years of loan origination, 5 percent of the 2004 cohort had completed the foreclosure process, compared with 8 percent and 16 percent of the 2005 and 2006 cohorts, respectively. The trend was similar for Alt-A loans, although Alt-A loans foreclosed at a slower rate than subprime loans. For example, within 3 years of origination, 1 percent of Alt-A loans originated in 2004 had completed the foreclosure process, compared with 2 percent of the loans originated in 2005, and 8 percent of the loans originated in 2006.

47.     The Office of the Comptroller of the Currency ("OCC") reported that as of June 30, 2011, nationwide 28.1% of subprime and higher cost loans were seriously delinquent or in

foreclosure as compared to only 5.5% of prime loans.  Thus, these loans were more than 5 times more likely to be seriously delinquent or in foreclosure than prime loans.  The OCC subsequently reported in June 2013 that while only 2.5% of prime mortgages were considered seriously delinquent, 8.9% and 15.4% of ALT-A and subprime mortgages loans, respectively, are considered seriously delinquent, reflecting a continuing, massive disparity in such delinquency rates.

48.     Defendants were some of the largest originators and/or purchasers, funders and securitizers of ARM loans and other predatory subprime and higher cost mortgage loan products in the United States.

49.     Increased numbers of foreclosures were known or should have been known to Defendants due to the increased risk of default inherent in the predatory, subprime and higher cost mortgage loan products they originated, funded and/or securitized.  *See* Ernst Testimony.  In particular, these products included the ALT-A and other non-prime, conforming, loan products with predatory features (such as prepayment penalties and adjustable interest rates) that Defendants discriminatorily sold to minority borrowers and that are at issue here.

50.     Defendants further increased the likelihood of delinquencies, defaults, vacancies and eventual foreclosures on all of their mortgage loan products sold to minority borrowers – higher cost, subprime and conforming ALT-A GSE backed mortgage loans – by steering borrowers to "low-doc" or "no-doc" loans (no verification of employment, income or other credit-related information) and "interest only" ARM products, which eventually accounted for more than 50% and 22%, respectively, of all subprime ARM originations by 2006.

51.     The equity-stripping lending activity at issue in and of itself dramatically increased the likelihood of mortgage loan delinquencies, defaults, foreclosures and/or home

vacancies because they undermined the ability of the borrower to repay the loan in the first place, creating a self-destructive lending cycle.

52.    As noted in one recent study issued by the Center for Responsible Lending of mortgage loan originations between 2004 and 2008, "Lost Ground, 2011: Disparities in Mortgage Lending And Foreclosures," D. Gruenstein, Bocian, W. Li, C. Reid and R. Quercia (November 2011) (hereafter the "Lost Ground Report"), "[l]oan characteristics and foreclosures are strongly linked. .  . . Loans originated by brokers, hybrid adjustable-rate mortgages ("ARMs," such as 2/28s), option ARMs, loans with prepayment penalties, and loans with high interest rates (a proxy for subprime mortgages) all have much higher rates of completed foreclosures and are more likely to be seriously delinquent."

53.    Congress has determined that "the incidence of early payment defaults among these loans suggests that much of their poor performance may be related to lax underwriting that allowed borrowers to take on monthly payments that were unaffordable even before interest rate resets occurred." Root Causes Report at 9.

54.    Defendants knew full well of the likely outcome of their predatory lending activity, particularly because of the terms of their loan products combined with lax underwriting. During the 2004-2006 period when more than 8 million adjustable rate mortgage loans ("ARMs") were originated, the subprime mortgage industry (including Defendants) knew that "[t]ypical subprime borrower had a housing-payment-to-gross-income ratio of 40 percent" and upon initial reset of the ARM, 39% of borrowers would face a payment increase of between 25 and 50 percent, 10% of borrowers would face a payment increase of 51 to 99 percent, and15% of borrowers would face a payment increase of 100 percent or more.  *See* Root Causes Report at 29.

Defendants also knew that upon the initial interest rate adjustment in the ARM products, many typical borrowers would face payment shock and be unable to make their mortgage payments.

55.     Congress also has found that the foreclosure crisis was "unusual in that general economic weakness did not play a significant role in producing delinquencies and foreclosures in most market areas—at least not initially."  Root Causes Report at 29.  Instead, as further alleged below, it was the predatory lending practices of Defendants and other industry participants – combined with the related credit risk, deteriorating performance, and lack of transparency in these mortgage loan assets pooled in mortgage backed securities - that foreseeably de-stabilized U.S and global credit markets and, in turn, brought down the economy and increased unemployment.  This, in, turn led to more mortgage loan delinquencies, defaults, foreclosures and vacancies, all as a result of Defendants' predatory and discriminatory lending practices.

56.     Economists at the University of Michigan and elsewhere have found that the high rates of early delinquency and default, which led to the housing market crash, were caused by a deterioration in Defendants' and other lender's credit characteristics.

57.     Nor was the foreclosure crisis caused by borrower behavior or CRA lending.  As explained in the Lost Ground Report:

> Our study provides further support for the key role played by loan products in driving foreclosures.  Specific populations that received higher-risk products—regardless of income and credit status—were more likely to lose their homes.  While some blame the subprime disaster on policies designed to expand access to mortgage credit, such as the Community Reinvestment Act (CRA) and the affordable housing goals of Fannie Mae and Freddie Mac (the government-sponsored enterprises, or GSEs), the facts undercut these claims.  Rather, dangerous products, aggressive marketing, and poor loan underwriting were major drivers of foreclosures in the subprime market.

58.     Simply put, mortgage loans made to minorities pursuant to the CRA and the affordable housing goals of Fannie Mae and Freddie Mac were not a cause of the foreclosure

crisis. *See* Lost Ground Report. However, concentrations of the types of higher cost, higher leveraged, loans at issue in this litigation, which Defendants disproportionately made in minority communities, have been a foreseeable contributing factor to the foreclosure crisis, indeed factor with the highest correlation of foreclosures among other major contributing factors, see Jacob S. Rugh and Douglas S. Massey, *Racial Segregation and the America Foreclosure Crisis*, 75(5) AM. SOCIOL. REV. 629 (2010),[2] including the drop in real estate prices and economic collapse, both of which Plaintiffs allege Defendants' discriminatory and predatory equity-stripping, loan making, loan servicing and foreclosure practices foreseeably caused in the first place.

      C.      **The Predatory, Subprime, and Higher Cost Mortgage Lending and Securitization Activities of Defendants and other Industry Participants Caused the U.S. Financial Crisis and the Subsequent Economic Collapse**

59.      The predatory nature of the terms of the higher cost and subprime mortgage loans themselves, the concealment of the associated and known risk of default on those loan products, and the passing of that risk through the securitization process, all as alleged herein against these Defendants for their own actions (as well as the actions of other industry participants), foreseeably caused the U.S. liquidity crisis, the U.S. financial crisis, and the subsequent economic crisis that has further exacerbated the foreclosure crisis foreseeably caused by their predatory mortgage loan products in the first instance.

60.      Although previously known to or reasonably foreseen by Defendants (and other industry participants), the default risk inherent in the subprime, higher cost, mortgage loan products originated and/or funded by Defendants (and other industry participants) began to materialize in the first half of 2006 when delinquency rates on such products began increasing

---

[2]Available at http://www.asanet.org/images/journals/docs/pdf/asr/Oct10ASR Feature.pdf.

rapidly.  At this point in time, U.S. unemployment rates were low and home values were near their highest.

61.     Delinquency rates rapidly increased further as home prices fell and borrowers of adjustable rate products (the overwhelming majority of mortgage loan products at issue here that were originated during the relevant time period) began facing "payment shock" due to higher monthly payments as the interest rates adjusted upward.  These elements continued to combine to create a downward spiral in home prices and a rapid increase in loan delinquencies.

62.     As loan portfolio delinquencies escalated, third party residential mortgage backed securities ("RMBS") investors began demanding that non-performing subprime and higher cost mortgage loans be repurchased by the financial institutions, such as Defendants here, that pooled, securitized and sold them.   Between the first and third quarters of 2006, demands for loan repurchases tripled within the industry, including the demands that Defendants repurchase the non-performing loans they securitized.   Rapidly increasing loan delinquency rates, repurchase demands and the associated risk at financial institutions, including Defendants, set in motion the financial crisis.

63.     By February 2007, industry-wide increases in subprime and higher cost mortgage loan defaults had become widely known and the cost of insuring pools of mortgages – particularly home equity loans - began increasing.   Through the second quarter of 2007 delinquency rates were exploding beyond anything the mortgage lending industry had ever experienced in its history, causing the demand for securitizations and related structured finance products to dry up.   Simultaneously, unfavorable news of large losses, margin calls, and downgrades at financial institutions related to subprime and higher cost lending occurred.

64.     By the summer of 2007, banking regulators and investors understood that the amount of risk in the RMBS and other structured finance products relating to subprime and higher cost loan products issued by Defendants (and other industry participants) was far greater than the market had previously been led to believe. This directly led to three distinct illiquidity waves – i.e. the underlying cause of the financial crisis and the resulting economic crisis.

65.     The first illiquidity wave began on August 9, 2007 when LIBOR rates spiked, as liquidity and default risk of financial institutions rose because of concerns over large financial institutions' exposure to both counterparty credit risk and their own lending risk with respect to both their securitizations and the high-risk mortgage loans underlying them.

66.     Throughout this period, mortgage delinquency rates continued to increase rapidly as funding for mortgage lending activity dried up and shut down, driving home prices lower.  As home prices fell, much of the remaining equity borrowers had was eliminated when loan amounts exceeded actual home values.  These elements – which were the foreseeable result of Defendants' predatory and discriminatory activities in the first place -- continued to combine to create a downward spiral in home prices and a more rapid increase in loan delinquencies.

67.     In January and February 2008, numerous asset write-downs were reported by large financial institutions relating to their subprime losses incurred during 2007. Throughout the spring and summer of 2008, the mounting losses at financial institutions led to a full-blown liquidity crisis in which financial institutions would not lend funds to each other for fear of the unknown levels of loss exposure with any counterparties.

68.     In the fall of 2008, the U.S. and global credit markets froze leading to a much greater financial crisis.  Specifically, regulators, investors and other market participants realized the full extent of the credit losses, counterparty risk and default risk on subprime and higher cost

mortgage loans underlying RMBS and other securitized debt instruments was unknown and that such unknown levels of risk had infected a wide swath of other investment market segments and U.S and global financial institutions.

69.     It was not until June of 2008, that unemployment levels in the U.S. first began to rise even as foreclosure rates began to explode.   Consequently, the foreclosure crisis was not caused by an increase in unemployment rates.   Instead, increasing unemployment occurred as a foreseeable result of the financial and economic crisis, which was caused by the predatory and discriminatory lending and securitization activities of Defendants (and other industry participants).   That economic crisis, and the increase in unemployment, further exacerbated the foreclosure crisis that was caused by the predatory and higher cost terms of the mortgage loan products themselves and the willfully shoddy way they were underwritten.

70.     Moreover, the Senate Permanent Subcommittee on Investigations ("SPSI") found that financial institutions like Defendants "were not the victims of the financial crisis." Wall Street And The Financial Crisis: Anatomy of a Financial Collapse, Majority and Minority Staff Report (Apr. 13, 2011) at 4.   Instead, the "billions of dollars in high risk, poor quality home loans" that they originated, sold, and securitized and their "unacceptable lending and securitization practices" were "the fuel that ignited the financial crisis." *Id.*

71.     In sum, Defendants' predatory and discriminatory subprime and higher cost mortgage lending (as well as the predatory and discriminatory lending of other industry participants), along with their attempt to conceal and shift the risk of their activities, ultimately caused the financial crisis, economic downturn, and increased unemployment rates. All of these factors, which were the foreseeable result of Defendants' (and other industry participants') original predatory and discriminatory mortgage lending activities, further exacerbated both the

foreclosure crisis and the resulting, foreseeable injuries to Plaintiffs.  Thus, Defendants cannot

rely on general claims of economic downturn or borrower job losses as intervening causes of the

defaults and foreclosures occurring in Plaintiffs' communities on predatory and discriminatory

mortgage loans for which Defendants are responsible.

### D.     The Foreclosure Crisis Has Disparately Impacted Minorities

72.     As the direct result of the terms of the mortgage loan products disproportionately

sold to them, minority borrowers nationwide (and those who reside in Plaintiffs' communities

and neighborhoods) paid materially higher monthly mortgage payments, on higher loan balances,

than similarly situated non-minority borrowers, and face higher rates of mortgage loan

delinquencies, defaults, foreclosures and/or home vacancies on loans for which Defendants are

responsible.  For example, minority borrowers steered into or receiving a higher cost loan may

pay hundreds of dollars more each month in mortgage payments than a similarly situated

borrower who has obtained a conforming loan at market interest rates.

73.     Numerous publicly available studies by reputable industry watchdog groups have

found that the foreclosure crisis has hit African-American and Hispanic neighborhoods and home

owners across the country disproportionately harder than non-minority homeowners and that this

is the result of predatory and discriminatory lending activity.

74.     The percentage share of delinquent loans, loans in the foreclosure process and

loans already foreclosed on, increases in direct relationship to increased concentrations of

minorities in neighborhoods within Plaintiffs' communities.  For example, according to the Lost

Ground Report, although 40% of loan originations in the neighboring Washington, D.C.

metropolitan statistical area ("MSA") between 2004 and 2008 were to Non-minority borrowers

(24.2% were made to African Americans and 10.3% to Latinos), Non-minority borrowers faced

only about 4.2% of the total number of completed foreclosures and 4% of the total number of

seriously delinquent loans (i.e., future foreclosures at the time). In stark comparison, African American and Latino borrowers in the Washington, D.C. MSA disproportionately incurred 6% and 20.2%, respectively, of all completed foreclosures and 10.4%, and 9.9%, respectively, of all seriously delinquent loans.

75.   Other conclusions and findings of the Lost Ground Report, which Plaintiffs also specifically allege here, include:

- "African-American and Latino borrowers are almost twice as likely to have been impacted by the crisis. Approximately one quarter of all Latino and African-American borrowers have lost their home to foreclosure or are seriously delinquent, compared to just under 12 percent for white borrowers."

- "Racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes. Racial and ethnic disparities in foreclosure rates cannot be explained by income, since disparities persist even among higher-income groups. For example, approximately 10 percent of higher-income African-American borrowers and 15 percent of higher-income Latino borrowers have lost their home to foreclosure, compared with 4.6 percent of higher income non-Hispanic white borrowers. Overall, low- and moderate-income African Americans and middle- and higher-income Latinos have experienced the highest foreclosure rates."

- "Loan type and race and ethnicity are strongly linked. African Americans and Latinos were much more likely to receive high interest rate (subprime) loans and loans with features that are associated with higher foreclosures, specifically prepayment penalties and hybrid or option ARMs. These disparities were evident even comparing borrowers within the same credit score ranges. In fact, the disparities were especially pronounced for borrowers with higher credit scores. For example, among borrowers with a FICO score of over 660 (indicating good credit), African Americans and Latinos received a high interest rate loan more than three times as often as white borrowers."

- "Impacts vary by neighborhood. Low- and moderate-income neighborhoods and neighborhoods with high concentrations of minority residents have been hit especially hard by the foreclosure crisis. Nearly 25 percent of loans in low-income neighborhoods and 20 percent of loans in high-minority neighborhoods have been foreclosed upon or are seriously delinquent, with significant implications for the long-term economic viability of these communities."

- "Foreclosures have ramifications that extend beyond the families who lose their homes. Communities with high concentrations of foreclosures lose tax

revenue and incur the financial and non-financial costs of abandoned properties and neighborhood blight . . . ."

- "[L]ow-income neighborhoods in other cities . . . have completed foreclosure rates of over 20 percent. Such high levels of concentrated foreclosures will place a significant burden on these neighborhoods and also the wider communities, which, without substantial interventions, will almost certainly suffer reduced revenues for vital city services, higher rates of crime, and myriad other adverse effects."

## V.   DEFENDANTS' WRONGFUL CONDUCT RELEVANT TO ALL COUNTS

### A.   Defendants Engaged in Predatory and Discriminatory Mortgage Lending and Servicing to Drive Revenue Growth and Fuel Their Profitable Securitization Operations.

76.     Through ongoing, vertically integrated, corporate policies, practices, processes and/or procedures further alleged below, the Defendants are engaging in a nationwide, continuing discriminatory housing practice of equity-stripping involving a variety of necessarily interrelated business operations that: (i) originate, purchase or otherwise acquire first lien and second lien "high cost," higher cost, subprime, non-prime, ALT-A and other non-conforming or conforming residential home mortgage loans (collectively referred to as "non-prime" loans) to FHA-protected borrowers on terms more unfavorable than those offered and made to similarly situated non-minority borrowers; (ii) pool, securitize, sell and retain certain interests in such loans through residential mortgage backed securities; and (iii) service such loans until they default, including foreclosure activity on defaulted loans.

77.     The predatory and discriminatory nature of Defendants' mortgage lending and servicing practices at issue are grounded in Defendants' placement of their own financial interests above the best interests of their borrowers.  This has generated mortgage loans that often are not sustainable by the borrower and are destined to fail.  Defendants have directly engaged in such activities through their loan origination operations and have indirectly engaged

in the same activities by providing the funds to their networks of brokers and wholesale lenders to make loans that conform to Defendants' underwriting standards, or by purchasing such loans.

78.     Defendants' respective business models at issue here are unlike the business model of traditional mortgage lenders, such as savings and loan institutions or community banks. Traditional mortgage lenders typically earn income from the difference in their own cost of borrowing the money they lend and the interest paid by the mortgagor (borrower) over the life of the mortgage loan.  Because they hold the mortgage loans they originate until they are repaid over time, traditional mortgage lenders are concerned with proper loan underwriting, supported asset values and borrower ability to repay the loan over the life of the loan.

79.     In contrast, Defendants' non-prime residential mortgage loan business models developed and originated, or funded, riskier and costlier mortgage loan products that generate much more income and enabled Defendants to re-allocate and reuse their capital repeatedly, while passing the risk of loss on such loans to others by pooling, securitizing and selling to investors the riskier loans they made.  To do so, Defendants intentionally placed African-American, Latino and female borrowers into "high cost," higher cost and non-prime mortgage loans to a greater extent than non-minority borrowers with similar credit qualifications. As a result, such minority borrowers disproportionately paid, on average, tens of thousands of dollars more for a loan, and were disproportionately subject to possible pre-payment penalties, increased risk or credit problems, default, and foreclosure at higher rates.

80.     It was Defendants' business practices to allow their mortgage loan originators and mortgage brokers to place minority applicants into higher cost non-prime loans even when those applicants qualified for a prime loan according to Defendants' own underwriting guidelines.

81.     Under the securitization model utilized by Defendants, after originating a mortgage loan either directly, through a broker or correspondent lender, or purchased from other third-party subprime originators, a tracking number from the Mortgage Electronic Registration Systems ("MERS") may have been assigned and the loan was pooled with other loans, packaged, securitized and sold, with Defendants frequently retaining all of the lucrative servicing rights as additional revenue streams.

82.     Defendants' typical securitization transactions involved the establishment of a special purpose vehicle ("SPV") of Variable Interest Entity ("VIE") such as a trust. When mortgage loans are made by Defendants, or their brokers or correspondent lenders, the loans become negotiable instruments and when assigned to a trust (or other SPV or VIE), the trust becomes a holder in due course under the Uniform Commercial Code.

83.     This enables the assignee of the loan (e.g. the trust and trustee) to hold the note and enforce it without many of the defenses the borrower would have had against the original lender, effectively cleansing the loan note of direct predatory lending claims and obfuscating who owns the loan.  At the same time, the risk of loss on the underlying mortgage loans passes to the trust -- and ultimately onto its private or public investors who purchase RMBS.

84.     Because mortgage borrowers effectively lose their rights with the holder in due course to raise the initial act of the loan originator's predatory or discriminatory lending as a defense to foreclosure, Defendants and other industry participants were able to lend with deliberate indifference as to legality or propriety of the underlying loan origination and in fact were incentivized to engage in such misconduct through the securitization process.

85.     Moreover, unlike traditional mortgage lenders, Defendants' business model extracts as much value as possible from the equity in the residential real estate asset underlying

the mortgage loan over the life of the loan. To generate the most income possible, Defendants' non-prime mortgage lending and funding operations were primarily concerned with making as many purchase money, refinance and home equity loans as possible, at the highest interest rates possible, with the most up-front origination fees possible, and at the maximum loan values possible.  On many loans, Defendants also incorporated loan prepayment and early repayment penalties--at an average of $5,300 per loan according to the Center for Responsible Lending-- making it prohibitively costly for borrowers to refinance their loans with another lender.

86.     In originating, funding or purchasing, securitizing and servicing predatory "high cost," higher cost, or non-prime mortgage loans, particularly those made on a discriminatory basis, Defendants placed their own financial interests above the best interests of their borrowers.

87.     Defendants' business models and the discriminatory practices and policies have resulted in FHA-protected minority borrowers paying higher interest rates, costs and fees, and/or receiving loans on predatory or other more unfavorable terms, such as including prepayment penalties, all resulting in higher loan defaults and foreclosures on such loans to minorities than to similarly situated non-minority borrowers.

88.     While the terms of the non-prime mortgage loan products Defendants directly originated or funded at issue here made those loans predatory in and of themselves, Defendants' (and their correspondent lenders') mortgage pricing, compensation and underwriting practices, policies, and procedures, encouraged employees and brokers to make such loans routinely in a discriminatory and a predatory manner on the basis of the value of the underlying asset, not the borrower's ability to repay the loan over its life, while also making such loans at maximum loan to value ratios, minimum income to debt ratios, unverified or undocumented income levels,

and/or by qualifying adjustable rate loan borrowers based on their ability to make payments based only on the initial teaser interest rates.

89.     For these reasons, Defendants are directly responsible for the loans they originated directly, as well as for the many loans they funded or purchased that were originated through their networks of affiliate and correspondent lenders, including PNC Mortgage LLC, a joint venture Wells Fargo formed with PNC Bank and PNC Mortgage LLC (collectively "PNC") in mid-2005.

90.     Inherently necessary to the fulfillment of Defendants' predatory and discriminatory equity-stripping schemes, Wells Fargo (and Wachovia previously)  serviced and continues to service the predatory and discriminatory loans for which it is responsible (including the Wachovia loans) and has done so in a predatory and discriminatory manner.

91.     Equity-stripping continues by its very nature, extracting value and perpetuating the scheme at each step in the life of the loan, e.g.: at loan origination (improper costs are imposed); upon each monthly loan payment when the loan is being serviced (borrower pays an inflated interest rate); upon payment of a pre-payment penalty when attempting to refinance or payoff a loan when the loan is being serviced; following default on the loan (when the servicer imposes additional costs); and upon foreclosure when the home is taken away during the course of Defendants' loan servicing and risk mitigation activities, ultimately stripping from the borrower every last bit of equity in the home the borrow may then have, or may earn through future home value appreciation.

92.     In this manner, Defendants have continued to strip equity on each outstanding predatory and discriminatory loan at issue and will continue to do so until the last predatory and discriminatory mortgage loan Defendants originate, purchase or otherwise acquire, and/or

service, has been repaid and closed or has been foreclosed upon. Indeed, Defendants' predatory and discriminatory loans at issue will continue to become delinquent and be defaulted on for at least several more years into the future, leading to further property vacancies and foreclosures. Thus, Defendants' discriminatory housing practices in violation of the FHA continue to this day.

93.     Mortgage loan servicers such as Defendants are responsible for managing loss mitigation when a borrower becomes delinquent (e.g., collection and work out activities) or defaults on a loan Defendants hold on their books (e.g., evictions, foreclosures and management of vacant or foreclosed properties, including property maintenance and repairs). As part of their servicing activities, and because Defendants retained the servicing rights – the MSRs - on the mortgage loans underlying their loan originations and purchases, Defendants are actively involved in the entire mortgage servicing and foreclosure process and have a continuing source of revenue and income from such activities.

94.     As further alleged below, Defendants' assets, revenue, and income from such MSRs are very substantial.

95.     Loan servicers, like Defendants, receive a percentage of each mortgage payment a borrower makes as compensation for handling the various administrative aspects of the mortgage loan payment process including, but not limited to, collecting mortgage payments, crediting those payments to the borrowers' loan balance, assessing late charges, establishing escrow accounts for the payment of taxes and insurance, making such payments when due, collecting and making the payments to private mortgage insurance and tax collectors, and making distributions of principal and interest to SPVs, VIEs or other investors who have purchased interests in such loans through securitizations and/or RMBS.

96.     Although the servicing fees paid on an individual loan are relatively small - typically 0.25% (on prime loans) and 0.5% (on subprime loans) of the outstanding principal balance of each mortgage loan each month - when added across the millions of mortgage loans a servicer typically services, the fee revenue is enormous. Mortgage servicers like Defendants also typically earn interest income on the float of borrower mortgage payments to be remitted, as well as late payment fees and other fees.

97.     For home mortgage loans where Defendants have a financial interest in addition to the servicing rights (e.g. they hold the underlying first lien loan or a secondary loan), Defendants have an incentive not to foreclose when home prices are low to avoid a write down of the asset.   In such circumstances, the borrower may be in default and simply vacate the property, leaving it uncared for, unprotected, and vulnerable to vandalism and/or criminal activity, all of which increase the harm to Plaintiffs.   Indeed, when home prices are low, Defendants and other industry participants have become increasingly willing to walk away from foreclosure – refusing to take ownership and possession – where the costs associated with the foreclosure and repair of the property outweigh the financial recovery Defendants can obtain from the foreclosure.   All of this has led to the "shadow inventory" of vacant homes that have not yet been foreclosed upon and which have increased Plaintiffs' damages.

98.     Conversely, when home prices rise, Defendants have an incentive to initiate foreclosures on defaulted loans, including loans in its shadow inventory, to acquire the asset for a price less than or equal to the loan value and, preferably for Defendants, less than its potential resale value.   In this way, Defendants have utilized their financial leverage and "staying power" to complete their equity-stripping, removing any opportunity for the borrower to gain back lost equity resulting from Defendants' predatory and discriminatory lending practices.

99.    For loans they service but do not hold on their books, loan servicers such as Defendants are either indifferent to borrower delinquencies, defaults, home vacancies or foreclosures, or actually may have a financial incentive to cause borrower delinquencies, defaults, home vacancies or foreclosures because Defendants make more net income in those circumstances from the fees they charge and receive that income the sooner that the foreclosure occurs.  This is because servicers, like Defendants, are reimbursed for their servicing fees before any money passes to investors in securitizations as a result of a foreclosure.

100.    Importantly, loan servicers also are paid significant ancillary fees to provide such loss mitigation services such as foreclosures (as well as late fees on overdue mortgage payments) and, because they typically do not bear the risk of loss on the underlying asset where they have sold it into a securitization, they have a further incentive to maximize their servicing fees, including through the foreclosure process itself, where Defendants have actually added upcharges to borrowers.

**B.    Wells Fargo's Financial Motivations To Engage In Their Predatory & Discriminatory Conduct**

101.    Defendants' continuing discriminatory and predatory practices generate the financial gains from their predatory and discriminatory equity-stripping scheme throughout the life of each mortgage loan, and the continuing discriminatory and predatory practices Defendants employed and continue to employ further these gains through each step of their mortgage banking processes, when, e.g.:

- originating on a discriminatory basis high cost, higher cost, near-prime, subprime, ALT-A and other non-conforming mortgage loans in a predatory manner or with predatory terms (that are more profitable than prime loans, thereby increasing assets, revenue and income);

- funding, purchasing or acquiring such discriminatory and predatory loans through its wholesale lending and affiliated broker and correspondent lender network (increasing assets, revenue and income);

- pooling and securitizing such originated and acquired loans for sale as RMBS (also increasing assets, revenue and fee income, but more importantly transferring the credit risk of such loans onto third party RMBS purchasers); and

- creating through originations, retaining from securitizations, and/or purchasing lucrative MSRs on such loans (generating substantial assets); and

- servicing such loans pursuant to its MSRs (generating tremendous revenue and fee income), including initiating and completing forecloses on such loans that have defaulted (generating more income through late charges and ancillary fees, and ultimately stripping any existing equity, as well as the borrower's future equity from home price appreciation, in the foreclosure process).

102.    Indeed, as Wells Fargo explained in Note 21 to its 2002 Annual Report to its stockholders, relevant portions of which are publicly filed with the SEC as an exhibit to Wells Fargo's 2002 Form 10-K (such reports hereafter referred to as "Annual Reports"), "[t]he *Company routinely originates, securitizes and sells mortgage loans* and, from time to time, other financial assets . . . into the secondary market.  As a result the Company *typically retains the servicing rights* and may retain other beneficial interests from the sales.   These securitizations are usually *structured without recourse* to the Company and without restrictions on these retained interests.   The retained interests *do not contain significant credit risks*." (Emphasis added). Wells Fargo repeated similar statements in subsequent Annual Reports.

103.    Over the relevant period Wells Fargo has originated, funded or purchased virtually every type of non-prime mortgage loan product available in the residential mortgage lending market, including "high cost," higher cost, near-prime, subprime, ALT-A and other non-conforming residential home mortgage loans. Such mortgage loan products have: (1) loan application requirements, underwriting requirements or repayment terms less restrictive than traditional "prime" loans (e.g., interest-only loan terms, reduced documentation requirements, or balloon payments); (2) terms not permitted in prime loans (e.g., prepayment penalties or forced placed insurance); and/or (3) have higher costs, fees and interests rates than prime loans.  As a result of these additional terms, costs and risks, such loan products were expected to, did, and continue to generate greater profits for Wells Fargo than prime loans.

104.    The "Interagency Guidance on Subprime Lending," jointly issued on March 1, 1999 ("*Interagency Guidance*") by the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency and the Office of Thrift Supervision (Defendants' federal banking regulators) succinctly states the business rationale for lenders such as Defendants here to engage in subprime and higher cost lending activities:

> Due to their higher risk, subprime loans command higher interest rates and loan fees than those offered to standard risk borrowers. These loans can be profitable, provided the price charged by the lender is sufficient to cover higher loan loss rates and overhead costs related to underwriting, servicing, and collecting the loans. Moreover, the ability to securitize and sell subprime portfolios at a profit while retaining the servicing rights has made subprime lending attractive to a larger number of institutions, further increasing the number of subprime lenders and loans.

105.    To capitalize on this opportunity, by at least 1998 Wells Fargo and its predecessors embarked on a campaign to merge with and acquire other banking institutions to pursue the more profitable, non-prime residential mortgage lending market.  Following its

merger that year with Norwest Corporation (which itself already had significant subprime lending and servicing operations, including through Norwest's prior acquisition of Directors Acceptance Corporation), the combined entity ranked first in the nation in residential mortgage loan originations and loan servicing operations.   Wells Fargo then endeavored to become a dominant player in the subprime lending industry through two separate channels: Wells Fargo Home Mortgage (f/k/a Directors Acceptance Corporation) and Wells Fargo Financial (f/k/a Norwest Financial).   The rebranded Wells Fargo Financial primarily offered higher cost and subprime home refinance mortgages, used for various purposes including debt consolidation, home improvement, and cash needs.   The Wells Fargo Home Mortgage division sold higher cost and subprime mortgages through its retail storefronts and sought growth and non-prime market penetration through an affiliated network of mortgage brokers and correspondent lenders that included at least 140 joint ventures with smaller regional and national banks, realty companies, and builders, including PNC that enabled PNC customers to apply for Wells Fargo mortgages through mortgage consultants based in PNC branches, PNC Advisors' offices, and PNC's call center.

106.   According to a former area manager for Wells Fargo Home Mortgage identified in a separate complaint in Illinois state court, the subprime division of Wells Fargo Home Mortgage was expected to make sufficient profit to cover the fixed costs of the rest of the bank. Thus, managers informed employees in this division multiple times that this was the goal.   To achieve this goal, the company set a quota for the number of subprime mortgages every area had to close. The company kept scorecards for managers that included the number of subprime mortgages coming out of their area.

107.    As a result of this growth strategy, between its two subprime lending channels—
Wells Fargo Home Mortgage and Wells Fargo Financial—Wells Fargo rapidly grew to become
the eighth largest "high cost" and "subprime" mortgage lender in the nation by 2003, with its
subprime lending totaling $16.5 billion in subprime originations that year.  In 2006, Wells Fargo
originated approximately $74.2 billion in subprime loans, more than any other lender in the
nation.

108.    Wells Fargo's non-prime lending operations dramatically grew the amount of
origination fees and income it received by maximizing the volume of mortgage loans originated,
funded or purchased, maximizing the face amount of such loans, maximizing the interest rates
and other fees charged on such loans, and maximizing the price that purchasers of RMBS were
willing to pay for such securitized loans because they generated higher coupon interest rates.  As
reflected in the chart below, over the relevant period Wells Fargo has earned tremendous income
from the net gains on its originations and sales of mortgage loans, and from its closing fees and
costs earned on such mortgage loans:

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Income (rounded) $billions | $1.4 | $2.1 | $3.0 | $.5 | $1.1 | $1.1 | $1.3 | $1.2 | $6.2 | $6.4 | $4.6 | $10.2 | $6.8 |

109.    In addition to the income from fees generated by originating such loans or
providing wholesale funding to others to originate them, Wells Fargo's securitization activities
generated substantial revenue and fee income through the pooling of its originated and acquired
mortgage loans and the sale of residential mortgage backed-securities that were securitized with

the pools of such loans.  This enabled Wells Fargo to re-employ its capital continually to originate or acquire more loans (and therefore generate more fee income).

110.    Most importantly, however, Wells Fargo retained the lucrative residential MSRs assets on the loans it originated, purchased and securitized, while simultaneously transferring the risk of credit losses on the underlying loans to the purchasers of the RMBS created from the securitizations.

111.    Wells Fargo disclosed in its financial statements publicly filed with the Securities and Exchange Commission ("SEC") (*see, e.g.*, page 30 of its Form 10-Q for the third quarter of 2006 ended September 30, 2006),[3] "[w]e have a sizeable portfolio of MSRs. A mortgage servicing right (MSR) is the right to service a mortgage loan – collect principal, interest, escrow amounts, etc. – for a fee. We acquire MSRs when we keep the servicing rights after we sell or securitize the loans we have originated or when we purchase the servicing rights to mortgage loans originated by other lenders."

112.    Wells Fargo's mortgage loan servicing operations generated and continue to generate substantial assets and massive amounts of revenue and income.  As disclosed in Wells Fargo's Annual Reports over the time period shown in the chart below, although the fair value of Wells Fargo's MSRs are subject to a variety of assumptions (*e.g.*, estimated loan prepayment speeds, loan life and discount interest rate) the growth in the fair value of its MSRs generally corresponds to Wells Fargo's predatory and discriminatory non-prime residential mortgage lending activity at issue here and the resulting financial fallout from that activity (including changing pre-payment speed and loan life estimates):

| Year- | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 201 | 201 | 201 | 201 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

---

[3]  A copy is publicly available at  http://www.sec.gov/Archives/edgar/data/72971/000095014906000510/ f24614e10vq.htm#123.

| end | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 0 | 1 | 2 | 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fair Value (rounded) **$billions** | $7.4 | $6.7 | $8.8 | $9.5 | $13.7 | $12.5 | $16.8 | $14.7 | $16.0 | $14.5 | $12.6 | $11.5 | $15.6 |

113.    This growth in the fair value of Wells Fargo's MSRs corresponds to the growth in the amount of Wells Fargo's annual acquisitions of MSRs from its securitizations of residential mortgage loans over the same period (not including the approximate additional $513 million fair value of MSRs Wells Fargo obtained from Wachovia in 2008):

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fair Value (rounded) **$billions** | $1 | $1.5 | $2.1 | $1.4 | $2.7 | $4.1 | $3.7 | $3.5 | $6.2 | $4.1 | $4 | $5.2 | $3.5 |

114.    Similarly, the peak in the growth in the value of Wells Fargo's MSRs also corresponds to the growth in the amount of MSRs Wells Fargo obtained through its origination and purchases of residential mortgage loans over the same time period (also reflecting the general drop off of such activity during the financial crisis to levels not within Wells Fargo's financial reporting materiality threshold) as follows:

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Fair Value (rounded) **$billions** | $1.9 | $2.4 | $3.5 | $1.8 | $2.7 | $3.9 | $.8 | $.2 | $0 | $0 | $0 |

115.    Over a similar time period Wells Fargo's Annual Reports also reflect the tremendous growth in the size of its managed residential mortgage loan servicing portfolio, peaking in 2008 at over **$2.2 trillion** following the peak in the predatory and discriminatory lending at issue here:

| Year-end | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fair Value (rounded) **$trillions** | $.6 | $.7 | $.8 | $1.0 | $1.4 | $1.6 | $2.2 | $1.8 | $1.8 | $1.9 | $1.9 | $1.8 |

116.    As the chart below reflects, the growth in Wells Fargo's MSR assets and its managed residential mortgage loan servicing portfolio is consistent with the tremendous annual income Wells Fargo has received, and continues to receive, from its mortgage servicing operations:

| Year end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Income (rounded) **$billions** | $.7 | $1 | $1.8 | $2.1 | $2.5 | $3.5 | $4.0 | $3.9 | $3.9 | $4.6 | $4.1 | $4.0 | $3.9 |

117.    By 2004, Wells Fargo's income from its mortgage servicing operations (shown in the chart immediately above) began rapidly eclipsing the income Wells Fargo received from the gain on sales of its mortgage originations and closing fees (as shown in the first such chart above), at least until the federal government began purchasing huge numbers of RMBs from Wells Fargo and other subprime lenders in 2009 as part of the financial industry bailout and related economic assistance.

118.    The enormous amount of income Wells Fargo has received and continues to receive from its mortgage servicing operations and RMBs sales reflects both the importance of those operations to Wells Fargo's finances and the continuing nature of its equity-stripping scheme at issue here.

119.    The financial information in the above charts also reflects that, although Wells Fargo's non-prime lending activity peaked at the height of the subprime mortgage lending boom and greatly subsided thereafter, Wells Fargo's predatory and discriminatory equity-stripping scheme continues.   Thus, while Wells Fargo's focus on "subprime" loan originations and purchases subsided by the end of 2008, Wells Fargo's predatory and discriminatory lending practices have continued through its other non-prime lending, and its mortgage banking and securitization activities, including its sales of RMBS and its mortgage servicing, loan default and mortgage foreclosure related activities.

120.    Finally, the financial information in the above charts reflect that Wells Fargo's efforts to maximize revenue and profits from its non-prime mortgage lending, securitization, and particularly its mortgage servicing operations were clearly successful and are still ongoing. Indeed, over the four years between 2010 and 2013, Wells Fargo has earned a total of over ***$2.6 billion in late charges and ancillary fees*** charged to borrowers of mortgage loans for which Wells Fargo holds the MSRs.

121.    Wells Fargo's Form 10-Q public filing, for the second quarter of 2014, ending June 30, 2014, disclosed that it had a total residential mortgage servicing portfolio of approximately ***$1.8 trillion in loans***, $341 billion of which were owned by Wells Fargo and

$1.45 trillion of which were owned by other entities for which Wells Fargo provides servicing.[4] As Wells Fargo further disclosed in the 10-Q, as of June 30, 2014, Wells Fargo's mortgage servicing activities ***generated quarterly net servicing fee income for Wells Fargo in the amount of approximately $1.13 billion***, reflecting annualized net servicing income of approximately ***$4.4 billion***.

122.    In its third quarter 2017 Form 10-Q, Wells Fargo disclosed that it serviced $1.566 trillion in residential mortgages, $340 billion of the loans were owned by Wells Fargo and $1.223 trillion were owned by other entities.  Wells Fargo net servicing fees for this portfolio was $795 million for the third quarter of 2017 and approximately $2.56 billion year to date.[5]

123.    Reflecting the corresponding increases in Wells Fargo's revenues, income and assets over the entire period at issue, the price of Wells Fargo's common stock rose tremendously over the same period, more than doubling from its year-end 1999 adjusted closing price of $13.87 per share to $39.80 per share as of September 19, 2008. Over the past three months, Wells Fargo common stock has been trading in the range of about $52 to $56 per share.

124.    Wells Fargo highly rewarded its top executives for the Company's growth during the run-up in its subprime lending activities and the associated asset growth, revenue and income it generated.  Executive compensation at Wells Fargo began to take off just as the company's non-prime lending operations ramped up. In 2001, John Stumpf, then Group Executive Vice President of Community Banking, received total annual compensation of about $1.4 million. Just one year later, Stumpf's annual compensation nearly tripled to over $3.6 million.  In 2005, Stumpf was promoted to President and Chief Operating Officer and collected total annual

---

[4] A copy is publicly available at http://www.sec.gov/Archives/edgar/data/72971/ 000007297114000518/0000072971-14-000518-index.htm.

[5] https://www.wellsfargo.com/assets/pdf/about/investor-relations/sec-filings/2017/third-quarter-10q.pdf.

compensation of nearly $5.4 million.   Tracking the rapid increase in Wells Fargo's revenue, income and asset growth related to its predatory and discriminatory non-prime mortgage lending, securitization and loan servicing operations at issue here, Stumpf's annual compensation skyrocketed to peak at almost $13.8 million in 2008.   The financial benefit Wells Fargo's Chairman, Richard M. Kovacevich, derived in part from Wells Fargo's predatory and discriminatory lending activities was even greater than Stumpf's.   In 2001, Kovacevich earned approximately $4.9 million in total compensation.   Over just one year, that nearly doubled, reaching approximately $9.1 million in 2002.   By 2007, Kovacevich's annual compensation package from Wells Fargo exploded to just under $30 million, nearly six times his 2001 compensation.   Similarly, Mark C. Oman, Wells Fargo's Senior Executive Vice President in charge of Home and Consumer Finance also benefited substantially as he watched his total compensation more than double from $2.8 million in 2001 to over $6.4 million by 2007.

> **C.    Wachovia's Financial Motivations To Engage In Their Predatory & Discriminatory Conduct**

125.    Like Wells Fargo, and prior to its acquisition by Wells Fargo, Wachovia and its predecessors also originated "high cost," higher cost, subprime, ALT-A, and other conforming and non-conforming non-prime residential home mortgage loans through both retail and wholesale lending channels, and engaged in related securitization and loan servicing activities. As Wachovia disclosed in Note 5 to its 2005 Annual Statement, attached as exhibit 13 to its 2005 Form 10-K filed with the SEC,"[t]he Company originates, securitizes, sells and services primarily commercial and consumer real estate loans, student loans and auto loans. . . . In connection with certain transactions where the Company securitizes and sells originated or purchased loans with servicing retained, servicing assets or liabilities are recorded based on the

relative fair value of the servicing rights on the date the loans are sold. The Company also purchases certain servicing assets."

126.    In 2006, Wachovia acquired Golden West, its subsidiary World Savings Bank, and its portfolio of predatory payment option mortgage loans known as "Pick-a-Payment" loans. Pick-a-Payment loans were non-conforming, higher cost, subprime loans, essentially a "stated income" and "stated asset" mortgage loan product, which included interest-only payment options and negatively amortizing, minimum-payment-only, payment options.  After acquiring Golden West and World Savings Bank, Wachovia continued to originate, indeed push, the Pick-a-Payment loan product on less savvy borrowers.  The product became the focus of Wachovia's mortgage lending operations to such a degree that, by year-end 2007, it accounted for approximately *53% of Wachovia's entire residential mortgage loan portfolio*, with an approximate value of *$120 billion*.

127.    The growth in Wachovia's managed residential mortgage loan portfolio (i.e., its consumer real-estate secured loan portfolio, as disclosed in Financial Table 7 of Wachovia's Annual Reports), is reflected in the chart below:

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| Fair Value (rounded) **$billions** | $72.5 | $79.5 | $80.1 | $97.0 | $110.3 | $240.2 | $250.5 | Consolidated with Wells Fargo |

128.    The chart below reflects Wachovia's income from securitizing its residential mortgage originations (i.e., its proceeds from new securitizations of consumer real-estate, as Wells Fargo disclosed in Note 5 or Note 6 to Wachovia's Annual Reports):

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| Fair Value (rounded) **$billions** | **$2.4** | **$2.7** | **$3** | **$3** | **$4.3** | **$0** | **$3.5** | Consolidated with Wells Fargo |

129. The chart below reflects Wachovia's service fee income from its residential mortgage originations (i.e., its service fees received from consumer real-estate, as Wells Fargo disclosed in Note 5 or Note 6 to Wachovia's Annual Reports):

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| Fair Value (rounded) **$millions** | **$5** | **$1** | **$9** | **$6** | **$8** | **$0** | **$10** | Consolidated with Wells Fargo |

130. Thus, like Wells Fargo, Wachovia generated substantial assets and income from its mortgage origination, securitization and loan servicing operations, particularly those created from the Pick-A-Payment loan product and Wachovia's associated MSR assets. Thus, Wachovia's efforts to maximize revenue and profits from its non-prime mortgage lending, securitization and mortgage servicing operations also were very successful, as reflected in the tremendous corresponding increase in the price of Wachovia's common stock over the same period.

131. Also, like Wells Fargo, Wachovia highly rewarded its top executives for this growth. Executive compensation at Wachovia began to take off just as the company's subprime and higher cost lending operations ramped up. For example, Wachovia President, CEO, and Chairman G. Kennedy Thompson saw his total compensation increase from just under $4.9 million in 2001 to over $16.3 million in 2002, a nearly three-fold increase. By 2006, at the peak

of the lending activity, Mr. Thompson's annual compensation package peaked at over $23.8 million.

132.    By the time Wells Fargo acquired Wachovia in December 2008, Wachovia's Pick-A-Payment mortgage origination activity had largely subsided, but its related and other predatory and discriminatory mortgage lending practices had not.  Indeed, Wachovia continued to service its sizeable $437 billion residential MSRS portfolio (fair value at year end 2007) that included many of the Pick-A-Payment loans it or World Savings Bank had originated and Wells Fargo has since sold RMBS securitized with such loans.

133.    As a result of the merger of Wells Fargo and Wachovia, Defendant Wells Fargo is now responsible for servicing the active residential mortgage loans that both Wells Fargo and Wachovia retained servicing rights to.  In addition to maintaining servicing rights on many of the first lien mortgages Defendants originated or purchased, Defendants also serviced all second lien (e.g., home equity) loans they originated and/or purchased.

> **D.    Defendants Knew, Or Were Grossly Negligent or Reckless In Not Knowing, Of The Predatory And Discriminatory Nature Of Their Conduct**

134.    At all times relevant, the highest levels of the Wells Fargo and Wachovia Defendants' executive management, and their boards of directors, were required to know through Defendants' own risk monitoring and control efforts, and either knew or were reckless in not knowing, of the nature of the risks, the relative amounts of risk, their ability to control such risks, and their exposure to the risks from their non-prime mortgage lending activities, including Defendants' compliance with federal fair lending laws and the Fair Housing Act.

135.    The *Interagency Guidance,* which each Defendant knew, or was grossly negligent or reckless in not knowing, clearly warns against the predatory lending practices Defendants committed: "Institutions that originate or purchase subprime loans must take special care to

avoid violating fair lending and consumer protection laws and regulations.  Higher fees and interest rates combined with compensation incentives can foster predatory pricing or discriminatory 'steering' of borrowers to subprime products for reasons other than the borrower's underlying creditworthiness." Because of the inherent risk to the safety and soundness of regulated banking institutions, the *Interagency Guidance* further explains that:

> Institutions that engage in subprime lending in any significant way should have board-approved policies and procedures, as well as internal controls that identify, measure, monitor, and control these additional risks. . . .   If the risks associated with this activity are not properly controlled, the agencies consider subprime lending a high-risk activity that is unsafe and unsound.

136.    Thus, at all times relevant, federal banking regulators required Defendants to have "board-approved policies and procedures, as well as internal controls that identify, measure, monitor, and control" the risks associated with their subprime and higher cost lending activities, including compliance with fair lending laws and the FHA.  Defendants' holding companies, and their operating subsidiaries, were similarly required to maintain appropriate policies and procedures to ensure that they identified, measured and controlled such risks.

137.    Defendants knew, or were grossly negligent or reckless in not knowing, from the *Interagency Guidance* that an appropriate risk management program required them to "take special care to avoid violating fair lending and consumer protection laws and regulations" because "higher fees and interest rates combined with compensation incentives [could] foster predatory pricing or discriminatory 'steering' of borrowers to subprime products for reasons other than the borrower's underlying creditworthiness."

138.    Defendants knew, or were grossly negligent or reckless in not knowing, from the *Interagency Guidance* that their U.S. banking regulators, primarily concerned with bank safety and soundness issues, considered the avoidance of predatory and discriminatory lending

practices (particularly including violations of the FHA) to be an "essential component of a well-structured risk management program for subprime lenders," such as Defendants here, given the operating, compliance and legal risks involved.  Indeed, at that time U.S. banking regulators were focused on the risks of abusive lending practices such as equity-stripping, incorporating pricing terms that far exceeded the true risk of the loan, loan flipping, and one-way referral practices within a multi-subsidiary organization.

139.    Because Defendants' core customers for their non-prime loan products (including Wachovia's Pick-A-Payment loans) are disproportionately the types of customers protected by the FHA—ethnic minority borrowers typically living in urban areas who have less access to traditional credit, limited credit histories, lower incomes, and homes with lower values but greater untapped equity, and single female borrowers lower incomes and higher personal debt to income ratios – Defendants had every reason to ensure that their mortgage lending, funding, purchasing, securitization and servicing practices did not violate the FHA.

140.    By virtue of the loan level information they are legally required to collect, maintain in their Loan Application Registry ("LAR"), and report to the federal government pursuant to HMDA, 12 U.S.C. §2801, *et seq.*, and implemented by 12 C.F.R. § 203, *et seq.*, all Defendants knew, or were grossly negligent or reckless in not knowing, that the mortgage loan products they originated or funded, securitized and serviced, contained predatory terms, were underwritten in a predatory manner, and were targeted to and/or disproportionately impacted FHA-protected minority borrowers.  Such data includes loan pricing data, location of property (by MSA, State, County and census tract), borrower race and ethnicity, gender, borrower income, borrower credit score, borrower debt to income ratio, loan to value ratio, and various loan terms and features (including interest rates, adjustment periods, index rates, and penalties).

In addition, Defendants also are required to collect and maintain other specific and necessary lending and loan underwriting data in their LAR including, but not limited to, borrower name, the specific street-level property addresses and the type of documentation of borrower income provided (*e.g.*, Full Documentation, Low Documentation or No Documentation).

141.   Defendants collected, have maintained, and reported to their federal regulators on Form FR HMDA-LAR, certain of this and other mortgage loan level information covering all of the mortgage loans Defendants have made during the relevant period at issue.

142.   As explained in 12 C.F.R. § 203.1, the purpose of reporting the HMDA information Defendants are required to collect and maintain is "to provide the public with loan data that can be used," among other things "[t]o assist in identifying possible discriminatory lending patterns and enforcing antidiscrimination statutes."

143.   In addition to the HMDA required data, each Defendant creates, electronically maintains, and utilizes other additional information on each mortgage loan applied for and/or which Defendants purchased, sold, securitized into mortgage backed securities, maintained, and/or serviced at any time, all in connection with Defendants' loan application, loan pricing, loan underwriting, and loan servicing activities.  This data includes loan payment history, among other things, and is maintained in electronic form in Defendants' system of records, particularly including Defendants' LAR and mortgage servicing platforms.

144.   All of the foregoing loan level and loan servicing data that Defendants (and all other banking institutions) collect and maintain in electronic form is critical to Defendants' day-to-day business operations in recording, tracking, and monitoring each of the mortgage loans they make, fund, purchase, and/or service, the disposition of those loans, and Defendants'

monitoring, evaluation, and financial analysis of Defendants' entire mortgage lending and servicing operations including through their respective:

- legally required Management Information Systems, risk management and control functions, internal control and compliance functions, and related board level reporting activities; and

- analytical decisions, and analytical decision making tools, applications, models and data regarding, among other things

  o mortgage loan marketing (originations and wholesale);
  o credit risk scoring and risk scoring overrides;
  o override monitoring;
  o mortgage loan pricing;
  o mortgage loan underwriting;
  o mortgage loan performance, prepayment, delinquency, and loss severity rates
  o asset valuation;
  o compliance with covenants in securitization transactions; and
  o related management compensation decisions.

145.   Each Defendant created, maintained, and utilized such data in connection with their analytical decision-making tools, applications, and models regarding mortgage loan marketing (originations and wholesale), credit risk scoring, credit risk scoring overrides, override monitoring, mortgage loan pricing, mortgage loan underwriting, and related management compensation decisions.

146.   Each Defendant created, maintained, and utilized such data in connection with their mortgage servicing operations.

147.   Each Defendant created, maintained, and utilized such data in connection with their analytical decision-making tools, applications, and models regarding mortgage loan performance, prepayment rates, delinquency rates, loss severity rates, asset valuation, compliance with covenants in securitization transactions, and related management compensation decisions.

148.    Each Defendant created, maintained, and utilized such data in connection with their legally required Management Information Systems, risk management and control functions, internal control and compliance functions, and related board level reporting activities.

149.    For the non-prime mortgage loans Wells Fargo funded, purchased or otherwise acquired from their affiliated brokers and correspondent lenders through their institutional and wholesale business lines, the Pick-A-Payment loans Wachovia originated directly or through its brokers, and any other mortgage loans Defendants purchased, sold, securitized and acquired MSRs, Defendants were provided and have maintained all such loan level and loan servicing data in electronic form.   Like the data Defendants created and maintained through their own mortgage origination activities, the data from wholesale lenders included information about the underlying mortgage loans that had been originated, including loan terms, underwriting characteristics, and borrower race, ethnicity and gender information.

150.    Thus, Defendants knew, or were grossly negligent or reckless in not knowing, of the predatory and discriminatory nature of the non-prime mortgage loans Defendants were purchasing, securitizing and generating MSRs from.   This is particularly the case where such loans followed Defendants' own pricing and underwriting policies and standards.   Indeed, each of the Defendants created, distributed to, and incentivized their employees and correspondent lenders to follow each of the predatory and discriminatory mortgage pricing, underwriting, and loan servicing policies and practices as further alleged herein.   As such, Defendants knew, or were grossly negligent or reckless in not knowing, the predatory and discriminatory contents or those policies and practices, the predatory and discriminatory manner in which they were implemented, and the discriminatory effect they had on FHA-protected minority borrowers in Plaintiffs' communities.

151.   As a result of their federally required risk management and control functions, internal control and compliance functions, corporate policies, and all the data they collected, maintained, utilized, and reported to federal regulators, each of the Defendants knew, or was grossly negligent or reckless in not knowing, that the mortgage loan products they originated, funded, purchased, and/or serviced contained predatory terms, were underwritten in a predatory manner and were targeted to and/or disproportionately made to FHA-protected minority borrowers.

152.   Notwithstanding Defendants' knowledge regarding the predatory and discriminatory nature of their mortgage loan products and lending practices, the illegality of those practices, the risk to the safety and soundness of their federally insured banking operations, and the regulatory guidance warning against such activity, Defendants nevertheless engaged in their discriminatory equity-stripping schemes (through the interrelated predatory and discriminatory mortgage lending, securitization and loan servicing activities alleged herein) for the singular purpose of financial gain, placing their financial interests above the best interests of their borrowers through, among other things, and as further alleged herein:

- targeted marketing of mortgage loans on unfavorable terms to vulnerable borrowers who were unsophisticated or without access to traditional credit sources;

- steering credit worthy minority borrowers to more costly loans;

- incorporating into mortgage loans to minority borrowers unreasonable terms, excessive fees, pre-payment penalties, and/or yield spread premiums to the loan broker (*i.e.* kickbacks) that are not related to borrower creditworthiness or other objective lending criteria;

- including prepayment penalties in minority borrower mortgage loans that inhibit the borrower's ability to refinance;

- basing loan values on inflated or fraudulent appraisals of minority borrowers' property;

- repeated refinancing of loans to minority borrowers that does not benefit the borrower and often jeopardizes the property (loan flipping);

- lending to minority borrowers based on the value of the real estate asset collateralizing the loan, not the borrowers' ability to repay ("equity-stripping"); and

- inclusion of other loan terms and conditions in loans to minority borrowers that make it difficult or impossible for a borrower to reduce their indebtedness (such as credit life or other forced insurance policies).

153.    Indeed, following lengthy parallel investigations of Wells Fargo's mortgage lending practices by the OCC and the DOJ commencing in 2009, DOJ sued Wells Fargo in July 2012 for violations of the FHA, among other federal statutes, for Wells Fargo's nationwide discriminatory and predatory lending activities.  According to the complaint, DOJ's investigation involved reviewing Wells Fargo's internal documents and non-public loan-level data on more than 2.7 million mortgage loans that Wells Fargo originated between 2004 and 2009.  *See United States of America v. Wells Fargo Bank, NA*, No. 1:12-cv-01150-JDB, filed in the United States District Court for the District of Columbia (hereafter "DOJ Complaint").  A July 12, 2012, press release issued by the DOJ contemporaneously with the DOJ Complaint announced that the parties had settled the lawsuit for "$184.3 million in compensation for wholesale borrowers who were steered into subprime mortgages or who paid higher fees and rates than white borrowers because of their race or national origin.  Wells Fargo will also provide $50 million in direct down payment assistance to borrowers in communities around the country where the [DOJ] identified large numbers of discrimination victims and which were hard hit by the housing crisis."

154.    As the DOJ alleged in its Complaint (emphasis added), which allegations Plaintiffs specifically make herein, senior Wells Fargo executives knew of improper

discriminatory steering practices that were occurring within its non-prime mortgage origination

operations but did nothing about it:

> From at least 2004 through mid-2008, Wells Fargo frequently originated short-term hybrid adjustable-rate mortgages (ARMs). These subprime loan products typically featured a relatively low nominal interest rate, sometimes called a "teaser" rate, for the first two or three years of the loan, after which the rate adjusted to a higher rate every six or twelve months.  The most common types of short-term hybrid ARMS were "2/28" loans, with interest rates resetting after two years.  Borrowers with 2/28 ARM loans often faced payment shock when the rate adjusted sharply upward.  Wells Fargo was ***aware that many of these borrowers with 2/28 ARM loans qualified for more standard loans, such as 30-year fixed rate loans or less risky ARMs with more favorable rates that did not carry pre-payment penalties***.

> Wells Fargo had information about each borrower's race and national origin.

> Wells Fargo also ***knew or had reason to know based on its own internal monitoring and reporting that its policies of giving unguided discretion to its loan originators was resulting in discrimination***. For example, Wells Fargo ***knew that its lending policies and practices encouraged the improper placement of qualified applicants into subprime rather than prime loan products*** and that its A-Paper Filter, an internal system designed to ensure that all prime-eligible borrowers were referred to the Bank's prime division, was ineffective and subject to easy manipulation.

> Wells Fargo's internal documents reveal that ***senior officials were aware of the numerous tactics that subprime originators employed to keep loans in the subprime division, and that a significant percentage of borrowers were receiving subprime loans when they could have qualified for prime loans***.

> Wells Fargo did not act to adequately compensate borrowers who were victims of discrimination nor did it take effective action to change its policies or practices to eliminate the discrimination.

> It was Wells Fargo's business practice to allow its HMCs [loan officers] and mortgage brokers to place an applicant in a subprime loan even when the applicant qualified for a prime loan according to Wells Fargo's underwriting guidelines.

> Wells Fargo also gave its HMC's and mortgage brokers originating Wells Fargo loans discretion to request and grant exceptions to underwriting guidelines.

> These policies and practices resulted in the placement of African-American and Hispanic borrowers into subprime loans, when similarly-situated white borrowers were placed into prime loans, both on a nationwide basis and in dozens of geographic markets across the country where Wells Fargo originated a large volume of loans.

Wells Fargo's product placement monitoring efforts, while inadequate to remedy discriminatory practices against African-American and Hispanic borrowers through 2008, were sufficient to *put it on notice of widespread product placement disparities based on race and national origin*.

Even when Wells Fargo had reason to know there were disparities based on race and national origin, however, *Wells Fargo did not act to determine the full scope of these product placement disparities, nor did it take prompt and effective action to eliminate those disparitie*s.

[A]t all times relevant to this action, Wells Fargo had in place a system, called the "A-Paper Filter" or the "Enhanced Care Filter," whose stated purpose was ensuring that all prime-eligible borrowers were referred to the Bank's prime division.

*The A-Paper Filter was highly susceptible to manipulation* because individual subprime loan originators were responsible for entering a borrower's information into the Filter.

[I]nternal Wells Fargo documents indicate that *senior Wells Fargo officers were aware that the Bank's compensation structure incentivized loan originators to manipulate the data* they entered into the A-Paper Filter in order to keep prime-eligible borrowers within the subprime division. Since at least 2005, *senior Wells Fargo officers were aware that this manipulation was in fact occurring on a systematic basis*, but failed to take appropriate corrective action.

In mortgage lending commission structures, loan officers typically receive commissions in terms of "basis points' with one basis point being equivalent to 0.01% of the loan amount.

[A] subprime HMC lost between 25 and 130 basis points for referring a prime-eligible borrower to the prime division rather than originating the loan as subprime. *This policy and practice created a financial incentive for HMCs to originate loans as subprime rather than prime*, even when the applicant could have qualified for a prime loan.

Wells Fargo's cap on the amount of total compensation that a mortgage broker could receive on an individual loan also varied, in part, based on whether the loan was a subprime product or a prime product. From 2004 through 2007, total broker compensation for prime loans was capped at 4.5% of the loan amount. However, total *broker compensation for subprime loans was capped at 5% of the total loan amount, giving brokers a financial incentive to originate a subprime loan where possible*. The higher cap means, for example, that a broker originating a $300,000 loan could make $1,500 more by originating the loan as subprime rather than prime.

*Wells Fargo's compensation structure provided a strong incentive for HMCs and wholesale mortgage brokers to originate a loan as subprime, even if the borrower could qualify for a more favorable prime loan. This compensation structure, combined with the substantial discretion that subprime loan originators had to qualify prime-eligible*

56

*borrowers for subprime loans, resulted in discrimination on the basis of race and national origin against African-American and Hispanic borrowers.*

*Subprime loan originators had the ability to enter incorrect information into the A-Paper Filter to prevent a borrower from being identified as prime-eligible*, thereby ensuring that the loan would remain in the subprime division. The incorrect information included, but was not limited-to: (1) stating a reduced income in order to make a borrower's debt to income ("DTI") appear higher than it actually was; (2) omitting assets to create the appearance that a borrower had no reserves; and (3) misstating the borrower's length of employment.

*Subprime loan originators could also simply state that a borrower was unable to provide income documentation when a borrower had provided, or would have been able to provide, such documentation*; reduced documentation loans were not required to go through the A-Paper Filter process at all.

*Subprime loan originators were not prohibited from encouraging prime-eligible borrowers to take steps that would disqualify them from receiving prime loans*, including, but not limited to: (1) encouraging borrowers to forego providing income and/or asset documentation; and (2) encouraging borrowers to take out additional cash or forego making a down payment, thereby increasing the borrower's loan-to-value ratio ("LTV").

Internal Wells Fargo documents indicate that Wells Fargo *senior managers were aware that loan originators were encouraging borrowers to take these and other steps adverse to borrowers' interests on a systematic basis.*

155.  Not only did senior Wells Fargo management know of the discriminatory steering practices occurring in its subprime operations and incentivize company loan officers and brokers to do so, but they also then took the incredible step of eliminating the very electronic processes that made it easier for management to monitor such activity in the first place, effectively *concealing* this activity at the height of the subprime lending bubble. As alleged in its Complaint (emphasis added), and as Plaintiffs specifically allege here:

Until late 2004, the A-Paper Filter was a manual, handwritten checklist that underwriters were required to apply to every loan originally underwritten in the subprime division. Wells Fargo switched to an automated computerized filter for approximately 15 months, *and then returned to the manual checklist format in January 2006.*

57

156.    Wells Fargo did not limit its improper, and illegal, loan origination activities to its non-prime loan products, but even extended them into its HUD-approved Fair Housing Administration mortgage loans that it originated pursuant to the HUD Direct Endorsement Lending program.  Under HUD's mortgage insurance programs, if a borrower defaults on their loan and the mortgage holder forecloses on the property, HUD pays the mortgage holder the balance of the loan and assumes ownership and possession of the property, covering the expenses in managing, marketing and reselling the foreclosed-upon property. This encourages lenders to make mortgage loans to creditworthy borrowers, who might not otherwise satisfy conventional underwriting criteria, and makes such mortgage loans valuable in the secondary markets for securitizations and RMBS sales because they are secured by the full faith and credit of the United States.

157.    In October 2012, the United States sued Wells Fargo Bank for civil fraud in *United States v Wells Fargo Bank, N.A.*, No. 12-Cv-7527 (hereafter, the "HUD Complaint"),[6] seeking recovery for its losses on the "materially deficient mortgage loans that Wells Fargo recklessly underwrote and falsely certified were eligible for FHA insurance."  Among other things, the HUD Complaint alleged, which allegations Plaintiffs also specifically make here, that:

> Wells Fargo, the largest HUD-approved Federal Housing Administration ("FHA") residential mortgage lender, engaged in a regular practice of reckless origination and underwriting of its retail FHA loans over the course of more than four years, from May 2001 through October 2005, all the while knowing that it would not be responsible when the materially deficient loans went into default. Rather, as explained below, under FHA's Direct Endorsement program, HUD insured the loans that Wells Fargo was originating. During this four and a half year period, Wells Fargo certified to HUD that over 100,000 retail FHA loans met HUD's requirements for proper origination and underwriting, and therefore were eligible for FHA insurance, when the bank knew that a very substantial

---

[6]   A copy of the complaint is publicly available at http://www.justice.gov/usao/nys/pressreleases/October12/WellsFargoLawsuitPR/Wells%20Fargo%20Bank,%20N.A.%20Complaint.pdf.

percentage of those loans - nearly half of the loans in certain months - had not been properly underwritten, contained unacceptable risk, and were ineligible for FHA insurance.

Moreover, the extremely poor quality of Wells Fargo's loans was a function of management's nearly singular focus on increasing the volume of FHA originations (and the bank's profits), rather than on the quality of the loans being originated. Management's actions included hiring temporary staff to churn out and approve an ever-increasing quantity of FHA loans, failing to provide its inexperienced staff with proper training, paying improper bonuses to its underwriters to incentivize them to approve as many FHA loans as possible, and applying pressure on loan officers and underwriters to originate and approve more and more FHA loans as quickly as possible. As a consequence of Wells Fargo's misconduct, FHA was required to pay hundreds of millions of dollars in insurance claims on defaulted loans that the bank had falsely certified met HUD's requirements, and thousands of Americans lost their homes through mortgage foreclosures across the country. Accordingly, the Government seeks recovery for its loss on these materially deficient mortgage loans that Wells Fargo recklessly underwrote and falsely certified were eligible for FHA insurance.

To compound matters, from January 2002 through December 2010, Wells Fargo purposely violated HUD reporting requirements and kept its materially deficient loans a secret. Wells Fargo was well aware that HUD regulations required it to perform monthly reviews of its FHA loan portfolio and to self-report to HUD any loan that was affected by fraud or other serious violations. This requirement permits HUD to investigate the bad loans and request reimbursement or indemnification, as appropriate. But, although the bank generally performed the monthly loan reviews and internally identified over 6,000 materially deficient loans during this period, including over 3,000 loans that had gone into default within the first six months after origination (known as "Early Payment Defaults" or "EPDs"), it chose not to comply with its self-reporting obligation to HUD.

158.   Perhaps worse, the HUD Complaint alleged, which allegations Plaintiffs also specifically make herein, that Wells Fargo's management actively concealed its knowledge of early payment defaults (a red flag of poor underwriting) on the insured loans Wells Fargo had originated from the government:

Prior to October 2005, Wells Fargo, the largest originator of FHA loans in America, did not self-report a single bad loan to HUD. Instead, the bank concealed its bad loans and shoddy underwriting to protect its enormous profits from the FHA program. And when HUD inquired about Wells Fargo's self-reporting practices in 2005, the bank attempted to cover up its misdeeds by falsely suggesting to HUD that the bank had in fact been reporting bad loans. Thereafter, the bank's self-reporting was woefully and purposefully inadequate, all in an effort to avoid indemnification claims from HUD and pushback from wholesale brokers whose materially deficient loans would be reported to HUD. All told,

from January 1, 2002 through December 31, 2010, Wells Fargo internally identified 6,558 loans that it was required to self-report, including 3,142 Early Payment Defaults, but self-reported only 238 loans. As a consequence of Wells Fargo's intentional failure to self-report these ineligible loans to HUD, FHA was required to pay hundreds of millions of dollars in insurance claims when the loans defaulted, with additional losses expected in the future.

159.    In connection with its purchase of Wachovia, Wells Fargo conducted substantial due diligence regarding, and acquired, Wachovia's residential mortgage loan portfolio and related MSR assets.  Wells Fargo had access (and eventually possessed) all of Wachovia's loan level information and reviewed, or should have reviewed, such information precisely to determine the risk exposure in Wachovia's mortgage portfolio and MSR assets to both financial and legal/regulatory risks.  As such, Wells Fargo knew, or was grossly negligent or reckless in not knowing, of the empirical evidence (which Plaintiffs allege below) of the discriminatory and predatory nature of the Pick-A-Payment loans and the discriminatory way in which both Wachovia Mortgage and World Savings Bank originated such loans.

160.    As purchaser of Wachovia, and as a result of the merger of Wachovia into Wells Fargo, Wells Fargo is responsible for all predatory and discriminatory conduct in which Wachovia engaged.  Moreover, Wells Fargo is responsible for the many more loans originated through their affiliate and correspondent lender networks, including the loans PNC originated after mid-2005.

161.    In light of Defendants' knowledge and actions alleged herein, their conduct reflects either a reckless indifference or willful disregard for the consequences of their discriminatory housing practices, or actual intent to cause the harm that Plaintiffs, its communities, neighborhoods, and residents have suffered.  As such, Plaintiffs are entitled to punitive or special damages.

## VI.  DEFENDANTS FOCUSED THEIR DISCRIMINATORY CONDUCT ON ETHNIC MINORITIES FOR NON-PRIME MORTGAGE LOANS BECAUSE THEY PROVIDED THE EASIEST TARGET

162.    FHA-protected ethnic minority mortgage loan borrowers were susceptible to the intentional targeted marketing efforts of the Defendants, as well as predatory subprime and high cost mortgage lenders in each of the Defendants' correspondent and wholesale lending channels. This was because, as generally known to Defendants, such FHA-protected minority borrowers traditionally: (a) lacked access to low cost credit; (b) lacked strong relationships with traditional depository institutions; and/or (c) lacked adequate comparative financial information, access to such information and/or financial sophistication, such that they could not adequately evaluate the terms, conditions and risks of the mortgage loan agreements they were entering into.

163.    Because historical housing patterns and segregation had created communities and neighborhoods of ethnic minority population concentrations -- borrowers who were typically living in urban areas, who have less access to traditional credit, limited credit histories, lower incomes, lower credit scores and homes with lower values but, relatively untapped home equity -- those communities and neighborhoods provided an efficient means for Defendants to target potential borrowers seeking to refinance their home loans, consolidate consumer loans, or obtain credit for consumer spending by utilizing their existing home equity.

164.    Given the traditional lack of competitive mortgage lending availability, the increased demand for such financing, and the concentration of that demand and untapped home equity, Wells Fargo and Wachovia directly targeted ethnic minorities with more profitable non-prime mortgage loan products because these borrowers provided the quickest and easiest path – i.e., the path of least resistance – for Defendants to originate as many loans as possible as rapidly as possible to borrowers most likely to accept the less favorable terms of Defendants' mortgage loan products.  Thus, in the early 2000s, Defendants increased their marketing and lending

penetration into higher ethnic minority concentrated communities across the United States, including in Plaintiffs' communities, where home values were relatively lower, home prices had not appreciated as rapidly as in other market segments (such as California), and minority borrower homes had available untapped equity.

165.    Defendants' predatory and discriminatory subprime and higher cost mortgage lending and servicing is not the result of random or non-discriminatory factors.  Rather, it is the direct and intended result of Defendants' respective business models, their intent to maximize corporate profits pursuant to those business models, and the corporate policies and practices they each put in place in order to effectuate those business models and maximize profits under them.

### VII.  WELLS FARGO DIRECTLY TARGETED MINORITIES FOR NON-PRIME MORTGAGE LOAN ORIGINATIONS, AND INCENTIVIZED THAT CONDUCT THROUGH ITS EMPLOYEE COMPENSATION SCHEME AND QUOTAS

166.    As reflected in the empirical data alleged further below, Wells Fargo targeted minority borrowers for its predatory non-prime mortgage loan products and such borrowers were disparately impacted by such products.   This was the result of Wells Fargo's intentional discriminatory targeting policies and practices, and its discriminatory loan pricing and underwriting policies and practices also further alleged below.

167.    A former Regional Diverse Segments Manager ("RDSM") employed by Wells Fargo from 1999 through 2012 ("CW1"), confirmed that during the time period relevant to this action Wells Fargo maintained a business unit – the "Diverse Segments" unit – "that was specifically tasked" with increasing the number of purchase money mortgage loans Wells Fargo made to two customer groups: (1) ethnic minorities, including African American, Latino, and Asian borrowers, regardless of their income and (2) low to moderate income borrowers (more typically than not, ethnic minority borrowers). According to CW1, to qualify as low to moderate

income, the prospective borrower had to have income at 80 percent or below of area median income.

168.  As described by CW1, the role of RDSMs was to support the loan originator/lenders at Wells Fargo by building relationships with people or organizations that would refer loans to Wells Fargo.  Thus, RDSMs were "relationship managers and partnership developers."

169.  CW1 stated that all the RDSMs reported to their local area sales managers but also had dotted line reporting up to the Wells Fargo National Diverse Segments Manager. Through this position, Wells Fargo was able to orchestrate its targeting of minority mortgage borrowers. Indeed, Wells Fargo had RDSMs all over the country, including in Chicago, Atlanta and Maryland.

170.  To reach minority borrowers, RDSMs had several Wells Fargo tools and resources available to them.  Importantly, the Diverse Segments unit maintained a central Diverse Segments office within Wells Fargo's Silver Spring, Maryland, offices, which produced information for the RDSMs nationally about the minority communities they were to target for potential borrowers. For example, CW1 received from the Wells Fargo Diverse Segments corporate headquarters maps, with color coded census tracts by ethnicity, which showed specific neighborhoods with high concentrations of African American or Latino borrowers.  CW1 confirmed that all of the RDSMs received similar maps, color coded by ethnicity, for their geographic areas of their responsibility.

171.  CW1 explained that the RDSMs, including CW1, "used the maps in a number of different ways."  For example, the maps allowed RDSMs to "see penetration in their markets" as to how many borrowers in the color coded areas had mortgage loans with Wells Fargo.  Then,

the RDSMs were able to decide how best to increase the penetration of Wells Fargo's loans within the ethnic minority communities on which they focused. According to CW1, this included whether Wells Fargo needed to recruit account executives in these markets, advertise in those markets, partner with realtors in those markets, partner with community organizations, or use some combination of each of these options.

172.     Another Wells Fargo RDSM tool that CW1 identified was a database that detailed which local real estate brokers had the largest number of sales in particular ethnic neighborhoods and among targeted minority populations. The RDSMs could use that data to forge "strategic relationships" with realtors who could then recommend or refer minority borrowers to apply for mortgage loans from Wells Fargo. While the RDSMs' databases did not include the names of potential borrowers in the neighborhoods they were targeting, the actual Wells Fargo lenders that the RDSMs worked with often had that information. In addition, CW1 stated that the Wells Fargo Area Manager lender who CW1 worked with had a database that showed the equity in the homes within targeted neighborhoods, and used that data to specifically target and market refinance offers to the targeted potential borrowers. Area Managers and account executives were compensated for both refinances and purchase originations. CW1 did not use this database because RDSMs only targeted customers for purchase money loans, not refinances.

173.     Another former Wells Fargo RDSM ("CW2") confirmed these practices. He worked for Wells Fargo in that position from August 2006 through December 2008, and returned to that role from May 2009 until April 2010, after working in Wells Fargo's mortgage loan servicing operations in the interim. CW2 reported to his regional sales manager at Wells Fargo and to a Divisional Diverse Segments manager.

174.   RDSMs received "color-coded maps" that detailed the concentrations of African American and Latino borrowers in particular neighborhoods and showed the penetration of Wells Fargo loans in those neighborhoods.  The maps were available on the computer desktop for RDSMs.  CW2 could access demographic information when he logged onto his computer at work.

175.   CW2 stated the desktops of RDSMs provided access to "a plethora of demographic information."  This included lists of the top five companies that made the most mortgage loans in several categories, including low- to and moderate-income borrowers, African-American borrowers and Latino borrowers.  CW2 also confirmed that RDSMs had access to a database that showed which realtors had the highest number of purchases "for demographics we were after."  It showed which realtors had the most purchases for particular minorities, such as African Americans.

176.   CW2 explained that the database of realtors was of particular use to the Wells Fargo lender account executives who actually originated the loans.  According to CW2, the account executives used the realtor database to identify "the biggest producers." The account executives would then seek to partner with those "big producers" to gain access to those realtors' clients.  Wells Fargo provided tools that account executives could use to build partnerships with realtors or their clients.  That included marketing materials and "drip campaign" materials, including trinkets such as calendars, or mugs.  CW2 and other RDSMs did less promotional based marketing and instead offered "lunch and learns" with realtors and realtor associations and more direct contacts with realtors, such as taking them to lunch.

177.   CW2 and other RDSMs took a similar approach of direct contacts and educations programs with community groups and faith-based groups.  Thus, as part of his duties as an

RDSM, CW2 established relationships with "non-profits, faith-based organizations and community-based organizations" that could provide another source of minority borrower referrals to Wells Fargo.  CW1 confirmed this practice, explaining that the RDSMs also created relationships with builders and other community organizations that served the ethnic minority neighborhoods and communities that Wells Fargo wanted to target.

178.    To accomplish this, CW2 and other RDSMs encouraged the non-profits they sought as referral sources, including faith-based organizations, to apply for grants from the Wells Fargo Foundation.  Referring entities eligible for such grants included non-profits that promoted homebuyer education, worked with third-party groups to provide such education, or that invited RDSMs and Wells Fargo to provide such information.  Wells Fargo published on its website a list of its charitable foundation "managers" who, in many instances, were also RDSMs or held other positions at Wells Fargo with responsibility for minority lending.[7]  According to CW2, after being approved by the Foundation to receive any grants, it was up to the discretion of the RDSM whether to provide a grant, and in what amount, to any particular recipient.  To that end, each RDSM was given an annual budget of charitable foundation funds, which amount Wells Fargo varied based on how highly Wells Fargo valued the particular region.  According to CW2, RDSMs often had annual grant money budgets of $100,000, although his region only had $65,000 because Wells Fargo did not value his region as highly as others.

179.    CW2 provided grants to churches or other organizations with the expectation that the members of that church or non-profit would apply for mortgage loans from Wells Fargo. These churches included predominantly African-American or predominantly Latino

---

[7] *See e.g.*, https://web.archive.org/web/20140406003823/https://www.wellsfargo.com/about/wfhf/contacts.

congregations and were approached specifically to reach African-American or Latino prospective mortgage borrowers.

180.    CW2 stated that RDSMs also provided training presentations and support to local chapters of an association of primarily African-American real estate professionals, the National Association of Real Estate Brokers.  Similarly, RDSMs forged relationships with local chapters of the National Association of Hispanic Real Estate Professionals.

181.    In addition to the foregoing, CW1 explained that, to achieve their targeting goals, RDSMs also were tasked with recruiting mortgage account executives (i.e., loan originators) for Wells Fargo "based on their community contacts."  For potential recruits, their community contacts and the ability to get minority borrowers within those communities to apply for loans with Wells Fargo was important. While CW1 often recruited employees based on a combination of their mortgage experience and community contacts, she stated that Wells Fargo hired account executives with no previous experience in the mortgage business and based the hiring decision on the prospective employee's connections within a particular ethnic community that Wells Fargo was targeting. Thus, according to CW1, if prospective mortgage account executive recruits could deliver ethnic minority borrowers, Wells Fargo would teach them the mortgage business.

182.    CW2 confirmed the recruiting role of RDSMs, characterizing it as "sourcing" likely candidates and conducting preliminary interviews, with the final decision on hiring left to the appropriate branch or regional managers.  CW2 also sought recruits for Wells Fargo that had relationships in minority communities such that the recruits could supply purchase loans from minority borrowers.  CW2 confirmed that some of these recruits were hired, even though they had no mortgage experience, because their community relationships indicated they could be successful bringing in loans to help meet minority lending goals.

183.    To further maximize originations of mortgage loans to minority borrowers, Wells Fargo imposed on RDSMs, including CW1 and CW2, specific goals regarding the number of mortgage loans to minorities. Wells Fargo financially incentivized RDSMs to meet those goals. Thus, while RDSMs were paid a salary, they were paid an "override bonus" based entirely on the number of mortgage loans made to low to moderate income borrowers and ethnic minorities. RDSMs also received bonuses based on how many mortgage loans newly recruited account executives made to low- or moderate-income borrowers or ethnic minority borrowers in the first year of those new employees' work with Wells Fargo. In addition to these positive incentives, Wells Fargo also utilized a negative incentive approach. According to CW1, Wells Fargo published each RDSM's performance within the Diverse Segments group, based on their achieving loan targets to low- and moderate-income borrowers and minority borrowers, on "one scorecard for the whole country. Everybody saw everybody's numbers."

184.    Indeed, a July 20, 2011, *Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent*, Docket Nos. 11-094-B-HC1, *et al.* ("FRB Consent Order")[8] that the Federal Reserve Board brought against Wells Fargo and Wells Fargo Financial, confirmed that "[u]nder Financial's sales performance standards and incentive compensation programs, Financial sales personnel, called 'team members,' were expected to sell (a) a minimum dollar amount of loans to avoid performance improvement plans that could result in loss of their positions with Financial, and (b) a minimum dollar amount of loans to receive incentive compensation payments above their base salary."

---

[8] A copy is publicly available at http://www.federalreserve.gov/newsevents/press/enforcement/ enf20110720a1.pdf.

185.     While some of the loans Wells Fargo originated through its Diverse Segments division may have qualified as Community Reinvestment Act ("CRA") loans,[9] most of the loans did not.  But, in many cases even if they did so qualify, minority borrowers were steered to higher-cost, non-prime, or less favorable alternatives, including even conforming FHA and Freddie Mac mortgage loans that Wells Fargo could securitize and sell.  Because CRA loans are low cost, the loan must be carefully underwritten, and must be kept on a lender's books even to qualify as a CRA loan. CRA loans are far less profitable to lenders, they tie up the lender's capital because they cannot be sold or securitized, and although subject to regulatory supervision, regulators do not force lenders to make such loans.  Thus, Wells Fargo had a strong financial interest not to make CRA loans and made very few of them.

186.     Other confidential witnesses who were former employees of Wells Fargo but were cited in a separate complaint filed against Wells Fargo in the United States District Court for the Southern District of Florida, have confirmed that Wells Fargo pushed more expensive FHA and Freddie Mac loans on low- to mid-income borrowers instead of explaining the benefit to a qualifying borrower of a CRA loan.

187.     Those confidential witnesses also detailed, among other things, how Wells Fargo targeted its predatory and discriminatory lending practices toward predominantly African American and Latino neighborhoods.  This included Wells Fargo's: (1) community-based ethnic

---

[9] To help overcome the historical reluctance of traditional lenders to make loans in minority communities (whether because of prejudice or lack of profit incentive) – *i.e.*, "redlining" -- the CRA, 12 U.S.C. § 2901, was enacted by Congress in 1977 to incentivize federally regulated banks and savings and loan institutions to make residential mortgage loans, consumer loans and commercial loans into predominantly minority communities.  Because CRA loans are low cost and properly underwritten to avoid and prevent financial loss to the borrower and the lender due to default, *CRA loans typically have much lower default rates than subprime or higher cost loans and certainly loans that are predatory*.  Thus, according to then-Comptroller of the Currency in 2008, John C. Dugan, CRA loans were "not the culprit behind the subprime mortgage lending abuses, or the broader credit quality issues in the marketplace." Indeed, an extensive study of the CRA conducted for the Federal Reserve showed that CRA did not exacerbate the foreclosure crisis in any meaningful way.

minority outreach programs that directly targeted ethnic minority borrowers for non-prime loans at community organization and church gathering; (2) sending only employees of color to make presentations to predominantly African-American or black churches; (3) hosting presentations such as a "wealth building" seminar designed to promote non-prime products in 2005; and (4) refusing to allow a specific former employee to appear before a predominantly African American audience because she was "too white."

188.   Perhaps even more shocking, Wells Fargo utilized a computer function that permitted its employees to customize Wells Fargo marketing materials to target African Americans directly by choosing "African American" in a pull-down menu of "language options," according to a complaint filed in a separate action brought by the Illinois Attorney General against Wells Fargo in Illinois state court.

189.   According to a former Mortgage Consultant Wells Fargo employed from October 2003 through December 2006, and again in 2008 in another capacity ("CW3"), Wells Fargo trained its employees to "scrub" (*i.e.*, review) internal Wells Fargo mortgage data. "Scrubbing" required CW3 to look for "anyone with a LTV [Loan to Value Ratio] that had enough equity that they could pull cash out." "Scrubbing" is how CW3 was trained to find potential borrowers for Wells Fargo's non-prime mortgage loans, particularly for cash-out refinance loans.

190.   CW3 stated that "in sub-prime, we needed to find people to refi." Thus, the majority of the sub-prime mortgages that CW3 wrote were for refinancing existing mortgage loans.   To that end, CW3 was trained to search for Wells Fargo Adjustable Rate Mortgages (ARMs) that were set to expire.   CW3 believes that Wells Fargo purchased loan information for mortgages written by other lending institutions in order to scrub that data for potential Wells Fargo subprime mortgage refinance borrowers.   According to CW3, Wells Fargo's subprime

loans were "set up to fail" because the loans were for customers with approximately a 580 credit score, with stated income who were seeking 100% financing.

191.   At the time they originated many of the loan products at issue, funded others to make them, and/or purchased such loans to pool and resell into securitizations, Defendants all knew or were reckless in not knowing that borrower "payment shock" -- a large increase in borrowers' monthly mortgage payments – would result from the scheduled increases to the interest rate and, in the case of Pay Option ARMs, were further magnified by negative amortization.

192.   Wells Fargo pressed upon FHA-protected borrowers a revolving line of credit secured by their homes, in many cases systematically tacking on home-secured credit cards with high interest rates as junior mortgages that were never requested by the borrowers.  These loans harm borrowers in a number of ways: (1) the higher interest rates on the credit lines generate high interest payments; (2) the home-secured debts inflate borrowers' loan to value ratios, making it more difficult for them to refinance out of their high-cost loans; and (3) borrowers are often not aware that these loans are secured by their homes.

193.   According to former employee of Wells Fargo who provided a confidential witness statement in a separate California action, Wells Fargo loan officers would encourage customers to roll up unsecured debt into adjustable rate mortgages, intentionally misleading the customers about the potential negative effects of turning unsecured debt into a debt secured by the equity in their homes.  The loan officers would tell the borrowers, for example, "they'd save on their monthly payment, and that was good, because they'd need extra money to buy some furniture and pay moving expenses, et cetera."

194.    As the FRB Consent Order confirmed, "in some cases, contrary to Financial's written policies and procedures, sales personnel marketed these loans to customers by representing that the debt-consolidation home mortgage refinancing loans would improve or repair a consumer's credit."

195.    Although Wells Fargo's stated policy was that its credit managers found a "tangible benefit" to refinancing a consumer's mortgage, that policy was not seriously implemented or enforced and Wells Fargo's definition of a "tangible benefit" was so broad as to be meaningless.  According to the Center for Responsible Lending, by Wells Fargo's standards, a tangible benefit would exist so long as the refinanced loan reduced a customer's current monthly debt payments by any amount.  For example, based on this permissive definition, Wells Fargo credit managers could charge over $17,000 in fees to refinance $10,000 in 29% interest credit card debt, and still provide a "tangible benefit" to the borrower.  Thus, under Wells Fargo's definition, a tangible benefit would include increasing a consumer's mortgage balance to pay off unsecured debts, even though the long term cost of financing such debt over the life of the mortgage could exceed the cost to the borrower of just repaying the unsecured debt down more directly.  Wells Fargo also included in its definition of a "tangible benefit," a loan refinance in which the borrower was moved from an adjustable rate mortgage to a fixed rate mortgage, regardless of whether the fixed rate mortgage was less advantageous for the borrower.

196.    Wells Fargo also incentivized the making of non-prime loans through its internal referral systems in its retail operations.  In these retail operations, Wells Fargo drew a clear line between the products prime loan officers originated and subprime loan officers within Wells Fargo Home Mortgage's subprime division could originate.  Wells Fargo did, however, permit loan officers on either side of the business to refer borrowers to loan officers on the other side.

This meant that prime loan officers could refer borrowers to subprime loan officers and vice versa. As Plaintiffs describe below, however, Wells Fargo Home Mortgage's policies created stronger incentives to refer borrowers from prime to subprime.

197.    Wells Fargo Home Mortgage's compensation policy for referrals from prime to subprime loan officers provided significant financial incentives to its prime employees to steer borrowers into subprime mortgages, even if the borrowers could have qualified for prime mortgages. This referral compensation policy initially split the commissions for a subprime mortgage resulting from a referral by a prime loan officer to as subprime loan officer 60/40, meaning the subprime loan officer received 60% of the compensation, and the prime loan officer received 40%. Later, Wells Fargo altered this policy to provide the prime loan officer a flat rate of 50 basis points for mortgages referred to subprime loan officers that resulted in the closing and funding of a subprime mortgage. Under both policies, prime loan officers could do little work and still receive significant compensation for referring a borrower to a subprime loan officer as opposed to spending the time and energy needed to originate a typically more document-intensive prime mortgage for the borrower. Employees at Wells Fargo Home Mortgage predictably took advantage of this compensation policy by steering prime borrowers into subprime mortgages. There was never a reciprocal benefit to refer borrowers to prime loan products.

198.    Wells Fargo also compensated subprime loan officers significantly more per loan – a maximum of 325 basis points – than prime loan officers, who received a maximum of just 65 basis points. Subprime loan officers received 25 basis points for referring a loan to a prime loan officer, while prime loan officers received twice that amount – 50 basis points – for referring a loan to a subprime loan officer.

199.    These referral policies provided virtually no incentive for subprime loan officers to refer mortgages to prime loan officers or for prime loan officers to accept the referrals.   In fact, according to a former employee cited in a separate Illinois state court action, it was difficult to get a prime loan officer to accept a referral from a subprime loan officer because the prime loan officer would have to give away too much of his or her commission to the referring subprime loan officer.

200.    The Wells Fargo Home Mortgage quota system was another consideration for subprime loan officers in determining whether to refer a mortgage to prime loan officers.   The requirement that subprime loan officers close a certain number of loans per month created a strong disincentive to refer loans to prime loan officers.

201.    Wells Fargo Home Mortgage also structured compensation for subprime loan officers so that there was great incentive to close as many subprime loans as possible, with the inevitable result of severely curtailing referrals to prime mortgage loan officers.   Wells Fargo tiered compensation for these employees so that if the loan officers closed enough mortgages in a month to move to the next tier, the loan officers would receive greater compensation per additional loan.

202.    These practices and policies in combination with Wells Fargo's underwriting and loan servicing policies and practices, as Plaintiffs allege below, resulted in the discriminatory conduct alleged herein.

## VIII.  WACHOVIA TARGETED ITS PICK-A-PAY LOAN ORIGINATIONS TO FHA-PROTECTED MINORITY BORROWERS

203.    The empirical data alleged below reflects that Wachovia targeted minority borrowers for its predatory Pick-A-Payment loan product and that the failure of the loan product itself disparately impacted minority borrowers.

74

204.    Wachovia's heavy sales focus on its Pick-a-Payment product, discriminatory loan pricing and underwriting policies and practices, and compensation scheme – also further alleged below – all contributed to the discriminatory manner it was targeted to and disparately minority borrowers. According to a former Mortgage Consultant employed by Golden West Financial and Wachovia until Wachovia was acquired by Wells Fargo in December 2008 ("CW4"), Wachovia pushed its employees in "meeting after meeting" to sell "Pick-A-Payment" loans; "[I]t was ringing in our ears every day there." CW4 stated that Wachovia held state-wide mortgage consultant conference calls to increase the product originations; "It was the biggest thing flying.  They really pushed us to sell it first.  We were forced to push the product."

205.    CW4 stated that her compensation, as well as other mortgage consultant's compensation, was tied to their sales of the Pick-A-Payment product.  CW4 said that Defendants imposed quotas for the number of Pick-A-Payment loans she needed to originate and that she would "get paid a whole lot more" for originating them.   Thus, CW4 estimated that at least 30% of all mortgages she closed in the 2007-2008 time frame for Wachovia were Pick-A-Payment loans. CW4, however, "hated selling it. We were forced to sell it to people that didn't understand it – they didn't grasp what it meant."  She explained that the product was mostly a refinancing tool, as opposed to a mortgage product for home purchases and that because it had four payment options – three of which created negative amortization, they "made the loan bigger."

206.    While CW4 did not market the Pick-A-Payment loan product herself, most of her customers were referred to her by Financial Consultants in the Wells Fargo branches that had been trained by Wells Fargo to send potential Pick-A-Payment borrowers to her. In addition, CW4 and other Wachovia mortgage consultants were trained on selling the product in meetings "a couple of times a month – learning how to pick out the right customers."

207.    CW4 and other mortgage consultants were trained to sell the product specifically to customers "with a lot of debt.  It was basically for people that were struggling, for people that couldn't make ends' meet. It was packaged as a way for people to use the equity in their homes to wipe out their debt – they could use their homes for it. Most minorities did not have money necessarily for the home purchase, but they had some equity in their home." Thus, "most" of CW4's customers were African Americans, constituting a significant part of Wachovia's core customer for Pick-A-Payment loans.

208.    CW4 believed that the Pick-A-Payment product was the reason for so many subsequent foreclosures by Wachovia in her geographic area.

209.    A former mortgage processor employed by World Savings Bank in March 2005 and then employed by Wachovia until October 2008 as a mortgage underwriter ("CW5") stated that most of the loans he processed and underwrote were "Pick-A-Payment" loans.  During the earlier part of his tenure with World Savings Bank and Wachovia, CW5 stated that the foreclosure rate on World Savings Bank and Wachovia mortgage loans was initially lower than the foreclosure rate on competitors' non-prime loans. Thus, according to CW5, World Savings Bank and Wachovia managers saw that as an opportunity, concluding that they "were leaving good loans out there."  In effect, management was pushing to increase, not decrease, the volume of predatory Pick-A-Payment loans even if that meant escalating the respective foreclosure rates on that loan product.  Consequently, CW5's managers instructed underwriters and sales staff to approve more Pick-A-Payment loans.  And, because sales staff at World Savings Bank and Wachovia were "tight with managers all the way up the line," managers would approve mortgage loans that underwriters "didn't think should be approved."

210.     While the maximum LTV ratio that World Savings and Wachovia would loan on a Pick-A-Payment loan product was 80 percent, World Savings Bank and Wachovia often offered a home equity line of credit "to go with it" if the borrower needed a higher LTV ratio. Many of the loans that CW5 worked on were refinance and cash out transactions.

211.     A Mortgage Consultant employed by Wachovia from June 2006 and thereafter by Wells Fargo until April 2012 ("CW6"), confirmed that both Wachovia and Wells Fargo engaged in predatory mortgage lending and that, in her opinion, it was the result of the loan origination and broker compensation policies Wachovia and Wells Fargo utilized.  She believed the yield spread premiums paid to outside mortgage brokers led to the banks issuing mortgage loans that would not be paid back.  For example, CW6 confirmed that Wachovia paid mortgage consultants 100% of the origination fees as a commission for originating a Pick-A-Payment loan.  In comparison, Wachovia only paid mortgage consultants a 50% commission of origination fees for a fixed rate loan.

212.     CW6 confirmed that Wachovia mortgage consultants were "required to make a certain number of these loans." Indeed, CW6, like CW4, also stated that at state-wide mortgage consultant meetings Wachovia "kept preaching to make the loans." CW6 was told at the meeting "if they order steak, you sell them chicken" (meaning steer the borrowers into a higher cost or less beneficial loan product) and commented that "it was the chicken that was the downfall of Wachovia." CW6 reiterated that the "less savvy" borrowers "were getting stuck with this product."

213.     These practices and policies in and of themselves, and further in combination with the Wachovia's underwriting and loan servicing policies and practices as alleged below, resulted in the discriminatory conduct alleged herein.

214.    In sum, Wells Fargo's and Wachovia's compensation scheme, quotas, and various pressure tactics Defendants used to incentivize their loan officers, managers, brokers, and correspondent lenders to make as many non-prime loans as possible, and to make those loans as profitable as possible, as all alleged above, worked hand in hand with Defendants' discretionary pricing policies and underwriting practices as Plaintiffs further allege below, resulting in the discriminatory conduct at issue in this complaint.

## IX.  DEFENDANTS' DISCRETIONARY PRICING POLICIES ENABLED AND INCENTIVIZED PREDATORY NON-PRIME MORTGAGE LENDING ON A DISCRIMINATORY BASIS THROUGH THEIR WHOLESALE LENDING AND BROKER CHANNELS

215.    Defendants' discretionary pricing policies expressly authorized and encouraged discretionary non-prime mortgage loan origination and finance charges, including higher interest rates, increased fees at closing, additional or add-on fees, and/or other discretionary charges, all to maximize the profit on each non-prime mortgage loan. These discretionary charges are collected at the time the loans are originated, and continue to be collected during the life of the loans through Defendants' loan servicing activities.

216.    Once a mortgage loan applicant provided their credit and financial information to Defendants through a mortgage consultant, loan officer, mortgage broker, or correspondent lender, Defendants performed an initial objective credit analysis.  At this point, Defendants evaluated various traditional, objective, risk-related credit variables relating to the prospective borrower, including the borrower's debt-to-income ("DTI") ratio, the borrower's home's LTV ratio,[10] the borrower's credit bureau history, FICO scores, and other credit information such as bankruptcies, automobile repossessions, prior foreclosures, and payment histories, among other

---

[10] Loan to value ratio is one of the most important factors in assessing default risk.  It is the amount of the loan divided by the value of the home as of the date of the loan origination.  The higher the ratio, the less equity borrowers will have, the more likely borrowers will be to default during times of financial hardship.

things.  From these objective factors Defendants derived a risk-based financing rate for each borrower applicant, which is referred to in the mortgage industry as the "par rate" or the "base rate."  Defendants then communicated the par or base rate back to the loan officer, branch manager, broker, or correspondent lender seeking to originate the mortgage loan.

217.    Via "rate sheets" and other written communications made in conjunction with the par rates, however, Defendants regularly communicated, simultaneously encouraged, and automatically authorized their mortgage consultants, loan officers, branch managers, brokers, and correspondent lenders to mark up the par rate and impose additional discretionary or subjective charges, yield spread premiums, and other fees and costs on non-prime mortgage loans offered to FHA-protected minority borrowers that were not based on any particular or appropriate credit risk factor – *i.e.*, "overages."

218.    Defendants' internal rate sheets for its mortgage consultants, loan officers, and branch managers informed them of Defendants' retail interest rates (*i.e.*, that already included Defendants' own profit margins) and charges or adjustments for any risk factor or type of loan product other than a prime, conforming 30-year fixed rate mortgage loan, where the borrower's DTI is less than 45%, has a FICO score above 720, and the value of the home and amount of the loan create an LTV at or below 80%.

219.    Defendants' external rate sheets for its brokers and correspondent lenders informed them of Defendants' different wholesale interest rates and charges for any risk factor or loan type and the associated profit margins for the broker or correspondent lender, including any additional yield spread premium that they could earn by charging the borrower interest rates higher than the Defendants' wholesale rates to the broker or tacking on additional origination fees and costs.

220.    Wells Fargo communicated its non-prime mortgage loan product prices to its brokers through rate sheets available to brokers on a weekly daily basis via email or the "Brokers First."  According to Wells Fargo's Wholesale Pricing Policy, Wells Fargo's Capital Markets Group initiated price changes as a result of rate movements.  In addition, the Wholesale Pricing Group initiated price changes to adjust profit expectations or alter competitive position.

221.    Wells Fargo and Wachovia benefitted financially from the loans they or their brokers made at interest rates above the par rates set by its rate sheets, and benefitted even more if loans were made at rates above its wholesale rates creating yield spread premiums. For those loans that it sold or securitized, higher interest rates meant sales at prices higher than it otherwise would have obtained.  For loans it retained, higher interest rates meant more interest income over time and, therefore generating greater MSR asset valuations.

222.    Defendants compensated brokers through origination fees and other direct costs charged to the borrower, which Wells Fargo directed its closing agents to pay to brokers out of borrowers' funds at the loan closing.  Defendants also compensated brokers via yield spread premiums, or overages, by increasing the amount of the interest rate on a borrower's loan above the wholesale and par rates Defendants charged.

223.    From approximately 1999 to 2003, Wells Fargo did not cap the amount of fees or the rate its brokers could charge on a non-prime mortgage loan. While this policy was in place, there was no impediment to such brokers charging as much over the rates quoted as they wanted. During the remainder of the subprime lending boom, Wells Fargo imposed a cap on total broker compensation of brokers of 4.5% (450 basis points) of the loan amount on prime loans but allowed a higher cap of 5% (500 basis points) on non-prime loans, further incentivizing brokers to make non-prime loans.

224.     Defendants were fully informed of all broker fees charged with respect to each individual residential loan application presented to them.  Indeed, Defendants required brokers to disclose to the borrower all compensation and all other fees the broker expected to receive in connection with the mortgage loan on the Good Faith Estimate, the HUD-1, and other disclosures as applicable. And, the total fees brokers charged raised the annual percentage rate on a loan above the par and wholesale rates that Defendants provided to such brokers.

225.     Other than these caps, Wells Fargo did not establish any objective criteria, or provide guidelines, instructions, or procedures for brokers and correspondent lenders in its wholesale channels to follow in setting the amount of direct fees they should charge or in determining to charge an interest rate for a loan above that set by its rate sheet, which in turn determined the amount of yield spread premium (YSP) that Wells Fargo would pay the broker.

226.     While Wells Fargo authorized brokers to inform prospective borrowers of the terms and conditions under which a Wells Fargo residential loan product was available, Wells Fargo did not require the mortgage brokers to inform the prospective borrower of all available loan products for which the borrower qualified, of the lowest interest rates and fees for a specific loan product, or of specific loan products best designed to serve the interests the applicant.  Upon receipt of a completed loan application from a broker, Wells Fargo evaluated the proposed loan using its underwriting guidelines and determined whether to originate and fund the loan.

227.     Defendants' discretionary pricing and related compensation policies monitored, authorized, and provided financial incentives to Defendants' loan officers, branch managers, and correspondent lenders to make subjective price adjustments to the loans they generated.

228.     In addition, Defendants put in place the pre-payment penalties and fees they included in many of their subprime mortgage loan products either to control the borrowers'

refinance of the loan or to generate additional fee income when borrowers refinanced their loans with other lenders.

229.    Defendants' mortgage consultants, loan officers, mortgage brokers, and correspondent lenders exercised the pricing discretion that Defendants gave them on every non-prime mortgage loan applied for by a minority borrower and did so in a discriminatory manner. Indeed, according to a confidential witness statement provided by a former employee of Wells Fargo in a separate action currently pending in California, "[s]teering was rampant," because a higher commission was paid on subprime loans.  Regarding first-time home buying programs, the confidential witness stated that they "were pushed heavy, heavy in lower-income neighborhoods . . . . They steered more into subprime lending."

230.    According to the DOJ's investigation, outlined in its complaint against Wells Fargo, these disparities in total broker fees mean, for example, that in 2007, Wells Fargo charged the average prime wholesale customer borrowing $300,000 about $2,064 more in broker fees if she were African-American, not based on borrower risk, and an average of about $1,251 if she were Hispanic, than the average amount charged to a white prime wholesale customer.  In specific MSAs, these disparities in total broker fees mean that in 2007 Wells Fargo, on average, charged a prime wholesale customer borrowing $300,000 on average about $2,064 more in broker fees if she were African-American, not based on borrower risk, and an average of about $1,271 more if she were Hispanic, than the average amount charged to a white prime wholesale customer. These disparities in total broker fees also mean, for example, that in 2005, Wells Fargo charged the average subprime wholesale customer borrowing $300,000 about $1,212 more in broker fees if she were African-American, not based on borrower risk, than the average amount charged to a white subprime wholesale customer.

231.    Defendants knew, or were grossly negligent or reckless in not knowing, that their mortgage consultants, loan officers, mortgage brokers and correspondent lenders exercised the pricing discretion that Defendants gave them, and did so in a discriminatory manner. Defendants had in their possession all the information to make that determination.  Defendants had the legal obligation to make that determination and ensure it did not happen. Defendants had incentivized its mortgage consultants, loan officers, mortgage brokers and correspondent lenders to use their discretion in way that made the most non-prime loans as possible and for the highest profit possible. And Defendants' core customers for their non-prime loan products (including Wachovia's Pick-A-Payment loans) are disproportionately FHA-protected minority borrowers who are frequently the target of predatory lending activity.

232.    Indeed, Wells Fargo was directly and extensively involved in setting the complete, final terms and conditions of wholesale loan applications generated by mortgage brokers that Wells Fargo approved and originated.  At the time of originating each loan, Wells Fargo was fully informed of the loan terms and conditions, including the fees it passed along to brokers, and it incorporated those terms and conditions into the wholesale loans it originated.

233.    Despite their knowledge that their discretionary pricing and compensation policies were leading to the discriminatory practices Plaintiffs complain of here, Defendants did not undertake to stop or prevent this conduct, but instead approved, affirmed, or ratified these discretionary pricing decisions for each non-prime mortgage loan Defendants originated, funded, purchased, or otherwise acquired that were subject to such discretionary pricing practices.

234.    Defendants' predatory, discretionary and discriminatory loan pricing policies - which by design imposed differing finance charges on persons with the same or similar credit profiles – were targeted on and have disparately impacted FHA-protected minority borrowers in

Plaintiffs' communities and neighborhoods. As the empirical data reflecting Defendants' lending patterns further alleged herein (and the HMDA data analyzed by the Federal Reserve) indicates, ethnic/racial minorities – even after controlling for credit risk – have been substantially more likely than similarly situated non-minorities to pay such higher charges that are built into Defendants' "high cost," higher cost, and non-prime mortgage loans.

235.    Because of Defendants' increased fees and costs built into such loans, along with Defendants high loan to value lending practices (particularly in cash out refinance transactions and home equity loans), FHA-protected minority borrowers in Plaintiffs' communities and neighborhoods often had little equity, no equity, or negative equity in their home upon the closing of Defendants' mortgage loans to them.

## X.   DEFENDANTS LOWERED OR CIRCUMVENTED THEIR UNDERWRITING STANDARDS, ENABLING PREDATORY NON-PRIME MORTGAGE LOANS TO BE MADE ON A DISCRIMINATORY BASIS

236.    Underwriting guidelines are designed to enable mortgage lenders like Defendants to determine the risk of offering a loan to a borrower applicant based on the standard "three Cs" of lending:  Credit (of the borrower), Capacity (of the borrower to pay the loan), and Collateral (the value of the underlying asset).  Uniform application of underwriting standards minimizes the risk of credit losses to the lender, and compliance and legal risks of discriminatory lending practices, among other things.

237.    At all times relevant, Defendants established and maintained uniform written underwriting standards or guidelines that purported to identify the objective criteria that an applicant had to meet to qualify for a particular type of loan product Defendants offered. Defendants made these underwriting guidelines available to their underwriting departments, mortgage consultants, loan officers, and branch managers, as well as their third-party loan originators (brokers and correspondent lenders) who originated the mortgage loan products that

Defendants funded, purchased, or otherwise acquired, and these underwriting departments, mortgage consultants, loan officers, and branch managers, as well as their third-party loan originators (brokers and correspondent lenders) that originated the mortgage loan products that Defendants funded, purchased or otherwise acquired utilized these underwriting guidelines.

238.    As Defendants' demand for more profitable, non-prime or subprime mortgage loans grew in the mid-2000s time period, to feed their mortgage securitization and RMBS activities while home prices increased or remained at historical highs, Defendants lowered their underwriting standards and/or engaged in various practices to circumvent or override them.  In this way, Defendants were able to increase their revenue, income, and assets from originating, purchasing, securitizing, and servicing non-prime mortgage loans.

239.    Defendants' relaxed their underwriting policies to authorize and encourage Defendants' underwriters and brokers or correspondent lenders to approve greater numbers of non-prime mortgage loans on riskier terms to under-qualified or unqualified borrowers, steer otherwise prime-eligible borrowers to non-prime loans, or improperly increase loan amounts, interest rates, and other costs.  Defendants did this to make as many loans as possible and at the highest profit levels possible.

240.    Defendants knew, or were grossly negligent or reckless in not knowing, that their underwriting standards were declining or being circumvented. Defendants had in their possession all the information to make that determination and had the risk management "safety and soundness" regulatory obligations to make that determination and ensure it did not happen.

241.    In response to public and regulatory criticism of Wells Fargo's steering practices, in 2005 Wells Fargo Financial put in place a system called the "A-Paper Filter" or the "Enhanced Care Filter," the purposes of which included enhancement of automation in providing borrower

information to underwriting (a written checklist was previously used, among other things), to ensure that prime-eligible borrowers were referred to the Bank's prime division, and to provide prime pricing to borrowers that qualified for debt consolidation cash-out refinancing mortgage loans.

242.    If an applied-for transaction "passed" the filter and a further underwriting process, the prospective borrower should have been offered prime pricing from Wells Fargo Financial. In early 2006, however, to increase the number of originated non-prime loans, Wells Fargo modified the A-Paper Filter so that borrower applicants potentially qualifying transactions instead would be referred to Wells Fargo Home Mortgage.  At the same time, and as Plaintiffs further allege above, Wells Fargo Financial revised its performance standards and compensation programs so that it generally was less advantageous to sales personnel to sell a prime loan to the customer than a non-prime loan.

243.    The A-Paper Filter was highly susceptible to manipulation because individual loan originators (subject to compensation incentives and quotas) were responsible for entering a prospective borrower's information into the Filter.  Loan originators had the ability to enter incorrect information into the A-Paper Filter to prevent a borrower from being identified as prime-eligible, thereby ensuring that the loan would remain in the subprime division.   The incorrect information included, but was not limited to: (1) stating a reduced income to make a borrower's debt-to-income ratio appear higher than it actually was; (2) omitting assets to create the appearance that a borrower had no reserves; and (3) misstating the borrower's length of employment.

244.    As the DOJ Complaint confirmed, internal Wells Fargo officers indicated that senior Wells Fargo officers were aware that the Bank's compensation structure incentivized loan

originators to manipulate the data they entered into the A-Paper Filter to keep prime-eligible borrowers within the subprime division.

245.    Indeed, internal Wells Fargo audits of the A-Paper Filter identified multiple problems. These audits indicated that data input into the Filter was often inconsistent with the information contained in the loan files and that that many loans were originated as subprime although no subprime qualifiers existed in the loan files.

246.    Moreover, Wells Fargo did not prohibit loan originators from encouraging or upselling prime-eligible borrowers to take steps that would disqualify them from receiving prime loans, including, but not limited to, the following:   (1) encouraging borrowers to forego providing income and/or asset documentation; and (2) encouraging borrowers to take out additional cash or forego making a down payment, thereby increasing the borrower's loan-to-value ratio.   While borrowers received certain disclosures regarding the non-prime rates they were being charged, they were not advised that they may have qualified for prime priced loans or that it was generally more advantageous for the salesperson to sell a non-prime, rather than a prime loan, such that this cost the borrower more.

247.    Another way in which originators could circumvent Wells Fargo's underwriting guidelines—and steer borrowers into costly and inappropriate mortgages -- was to have borrowers apply with "stated income" even if they could document their income, or having borrowers put no money down on a mortgage even when they had the funds available to do so. Either of these tactics could turn what otherwise would have been a prime mortgage into a subprime—and more costly—mortgage.

248.    In addition, if the underwriting department questioned why a mortgage was subprime and not prime, loan officers could simply state that the borrower did not want to

provide documentation or that the borrower had no "sourced and seasoned" assets. With these simple explanations, the underwriter could override guidelines and approve the subprime mortgage.

249.    According to the DOJ Complaint, internal Wells Fargo documents indicate that Wells Fargo senior managers were aware that loan originators were encouraging borrowers to take these and other steps adverse to borrowers' interests on a systematic basis.

250.    As the FRB Consent Order confirmed, although Wells Fargo Financial had "written policies and procedures," its "internal controls were not adequate to detect and prevent instances when certain of its sales personnel, in order to meet sales performance standards and receive incentive compensation, altered or falsified income documents and inflated prospective borrowers' incomes to qualify those borrowers for loans that they would not otherwise have been qualified to receive." Thus, in assessing an $85 million civil penalty, the FRB Consent Order confirmed that Wells Fargo's practices had resulted in unsafe or unsound banking practices, unfair or deceptive acts or practices within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), and violations of various state laws pertaining to fraud and false or misleading statements in home mortgage loan-related documents, and to unfair or deceptive acts or practices.

251.    Defendants' improper compensation and quota practices that encouraged the predatory and discriminatory conduct at issue here extended not only to Wells Fargo's loan originators and sales personnel, but to its underwriters as well. As the HUD Complaint alleged, which allegations Plaintiffs also specifically make here:

> Wells Fargo paid its underwriters a bonus (in addition to their salaries) based on the number of loans approved, rather than the number of loans reviewed. This improper *de facto* commission incentivized the underwriters to approve as many FHA loans as possible, regardless of the risk of default or the loan's eligibility for FHA insurance.

Worse yet, the incentive was tied to the total number of loans approved at a particular underwriting site, thereby fostering a group dynamic whereby individual underwriters felt pressure from their peers at the site to approve loans.

Apart from the incentive system, management applied heavy pressure on loan officers and underwriters to originate, approve, and close loans. And management required underwriters to make decisions on loans on extremely short turnaround times and employed lax and inconsistent underwriting standards and controls.

252.    Moreover, as loan originations increased throughout the period, Wells Fargo lacked an adequate number of well-trained underwriters and, accordingly, its underwriting staff was overwhelmed with loan applications, leading to numerous quality control issues.  While Wells Fargo's management knew of these issues through reports of its Quality Assurance departments' review of loan files, management did nothing to prevent or remedy them.

253.    Indeed, as the HUD Complaint alleged, which allegations Plaintiffs also specifically make here, in 2003 Wells Fargo responded to the shortage of FHA loan underwriters and tremendous material deficiency rates in its loan files by "slash[ing] the number of its FHA underwriters from 919 to 401," while leaving in place "the bank's improper bonus system for underwriters . . . ."

254.    Not surprisingly, Wells Fargo also made a practice of making loans to people who clearly could not afford them, but did so using fictitious or manipulated income data. According to a confidential witness statement given by a former Wells Fargo employee in a separate action in California, loan officers would routinely place two to three people on a loan to ensure that there was adequate income to qualify. "I would work with them to get them ready, even if we had to put 2 to 3 people on the loan." According to the witness, Wells Fargo had a program "called '125' or something like that" that allowed a borrower to document some portion of his income, then state 25% more. "It took into account what they used to call 'mattress

money,'" she explained. This allowed "Hispanics or other minorities" to obtain loans based on income they received but could not document.

255.    Wells Fargo loan officers encouraged minority borrowers who had family members living in their houses to inflate their income when applying for home equity loans by generating documents that said those family members paid a certain amount in rent.  A former Wells Fargo employee who provided a confidential witness statement in the California action stated" Let's say you own a property, and you want to do [a home equity loan].  What they would ask for, let's say you have a family member living in your home.  Even though they were not paying rent, you would come up with some sort of paper document saying so-and-so pays me so much . . . .  That would be the kind of stuff that I saw that did occur, other than also bringing in additional family members to cosign."  Furthermore, according to a confidential witness in the California action, Wells Fargo would often doctor credit histories to qualify a customer for a first time home loan.  "There were zillions of loans that should never have been approved according to what was written in [Wells Fargo's] guidelines."

256.    Indeed, according to confidential witness statements provided by former employees, Wells Fargo employees would enter fraudulent income data into Wells Fargo's underwriting program to approve a loan:  "If a guy told you he made $3000, you'd put in $5000" into the underwriting software program.  There was no backstop system at Wells Fargo to prevent this kind of blatant income inflation.  Loan officers were "putting people into loans that they didn't qualify for.  Obviously, it would put them [the borrowers] into a bad predicament."

257.    Also critical to the underwriting process is the establishment of the value of the underlying real estate asset through property appraisals.  The appraised home value is required to determine adequate LTV ratios.

258.    Like their underwriting policies, Defendants' standards for property appraisals became increasingly lax, if not willfully fraudulent, during the relevant period to maximize loan amounts to meet even Wells Fargo's loosened underwriting requirements.

259.    Since the early 2000s, and during much of the relevant time period, Wells Fargo controlled the appraisal process (and other settlement processes) through its subsidiary's joint venture ownership of Valuation Information Technologies, LLC, doing business as Rels Valuation ("Rels"). Wells Fargo owns 49.9% of Rels and First American Real Estate Solutions (a subsidiary of First American Financial Corp, the second largest title insurer in the US) owns 50.1% of Rels.

260.    In connection with the underwriting process, Wells Fargo required borrowers to use Rels' appraisal services. Rels then provided purportedly independent appraisers with a predetermined figure supporting the desired loan amount (the "Borrower Estimated Value") and supplied predetermined comparable properties to support that value. Rels and Wells Fargo then expected the local independent appraiser to deliver an appraisal report with a property value exceeding the figures supplied by Rels. If the independently appraised value came in below what Rels and Wells Fargo wanted, Rels pressured the appraiser to revalue the property. Rels and Wells Fargo effectively blacklisted appraisers who refused.

261.    Following its merger with Wells Fargo, Wachovia also required its mortgage borrowers to utilize Rels' appraisal and other closing services.

262.    Finally, when other avenues to circumvent underwriting standards were unavailable or unsuccessful, Wells Fargo's branch managers and wholesale managers frequently made "business decisions" to override Defendants' underwriters to approve unqualified loans. This was particularly the case in the wholesale channel when such loans originated from brokers

and correspondent lenders that were responsible for a significant amount of originations for Wells Fargo or Wells Fargo bulk purchases of originated loans.

263.    Thus, in many instances where a loan applicant still could not meet relaxed underwriting standards, Defendants' branch managers and wholesale managers had discretion to grant "exceptions" to the underwriting guidelines and approve the loans anyway.    Because Defendants' entire mortgage lending compensation system rewarded loan volume (and quotas penalized lack of volume), there was tremendous incentive to grant underwriting exceptions on non-prime loans or circumvent the underwriting system through a variety of mechanisms.

264.    To the extent Defendants would rely on any compliance training for its loan officers, loan processors, underwriters, managers and correspondent lenders, to demonstrate that Defendants' written underwriting or other corporate policies prevented, discouraged or identified the discriminatory and predatory lending practices at issue here, Defendants' corporate culture, training practices, actual operating policies and practices, quota system, and compensation structure all ran counter to any such compliance training that Defendants may have conducted rendering such compliance training irrelevant or perfunctory.

265.    Because of Wells Fargo's extensive involvement in establishing (and abandoning) the underwriting guidelines its correspondent and affiliate lenders were to use in originating residential mortgage loan products, Wells Fargo is responsible for the many loans it funded or purchased that were originated through its correspondent and affiliate networks, including the loans originated by PNC after mid-2005.

266.    As the direct result of the predatory terms of the mortgage loan products disproportionately sold to them, and/or the predatory and discriminatory manner in which those loans were underwritten, minority borrowers nationwide (and those who reside in Plaintiffs'

communities and neighborhoods) paid materially higher costs, discretionary fees, materially higher monthly mortgage payments on relatively higher LTV percentage balances, and did so on more unfavorable terms than similarly situated non-minority borrowers.

267.    As the direct result of the predatory terms of the mortgage loan products disproportionately sold to them and/or the predatory and discriminatory manner in which those loans were underwritten, minority borrowers nationwide (and those who reside in Plaintiffs' communities and neighborhoods) experienced higher rates of mortgage loan delinquencies, defaults, foreclosures, and/or home vacancies on loans for which Defendants are responsible.

268.    Also, as the direct result of the predatory terms of the mortgage loan products disproportionately sold to them and/or the predatory and discriminatory manner in which those loans were underwritten, minority borrowers nationwide (and those who reside in Plaintiffs' communities and neighborhoods) face higher rates of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies on loans for which Defendants are responsible and have not yet defaulted or been foreclosed upon.

269.    As Plaintiffs further allege below, Plaintiffs have been damaged as a direct result of the predatory terms of the mortgage loan products disproportionately sold and/or the predatory and discriminatory manner in which those loans were underwritten to minority borrowers who reside in Plaintiffs' communities and neighborhoods.

## XI.  DEFENDANTS' MORTGAGE SERVICING AND FORECLOSURE PRACTICES ARE PREDATORY AND DISCRIMINATORY

270.    Wells Fargo is one of the largest mortgage loan servicers in the United States, operating eight mortgage servicing/customer centers and nine specialized loss mitigation centers across the country and headquartered in Des Moines, Iowa.  By virtue of its acquisition and

merger with Wachovia, Wells Fargo now holds and services Wachovia's prior servicing pool of mortgage loans and MSRs.

271.    Defendants have engaged in predatory and discriminatory mortgage loan servicing and foreclosure activities that are part and parcel of their predatory and discriminatory equity-stripping scheme and which further increased the number of FHA-protected minority borrowers' mortgage delinquencies, defaults, and ultimately home vacancies and foreclosures on loans for which Defendants are responsible.

272.    Defendants continue to service the predatory, higher cost and subprime mortgage loans they originated or acquired (or service for others), which enables them to charge loan servicing fees. Defendants' loan servicing practices includes the evaluation and processing of borrower requests for loan modifications and refinances, servicing loans that enter into default and charging fees and increased interest, default work outs and foreclosure proceedings, activities. At issue are the each of Defendants' decisions and practices in the chain of a foreclosure event; namely, whether or not to modify a defaulted or high cost loan at the borrower's request and whether to foreclose on a particular defaulted borrower's home or maintain it in their shadow inventory. While these activities serve to continue and perpetuate Defendants' discriminatory lending conduct, more importantly they reflect stand-alone discriminatory housing practices that also are continuing.

273.    Pursuant to their mortgage servicing strategy, Defendants typically maintain control over the loan servicing, loan default and loan foreclosure processes involving the mortgage loans they originated or purchased. Defendants routinely charged marked-up fees to minority borrowers through various means, including in connection with repayment plans, reinstatements, payoffs, bankruptcy plans, and foreclosures.

273.    With full control over the loan servicing, modification, default and foreclosure processes, Defendants have the power to maximize their servicing fees. As explained in a July 29, 2009, New York Times article, "Lucrative Fees May Deter Efforts to Alter Loans," by Peter S. Goodman, J. Emilio Flores, reporting on the rationale behind financial institutions' failure to modify higher cost mortgage loans:

> Even when borrowers stop paying, mortgage companies that service the loans collect fees out of the proceeds when homes are ultimately sold in foreclosure. So the longer borrowers remain delinquent, the greater the opportunities for these mortgage companies to extract revenue — fees for insurance, appraisals, title searches and legal services. Mortgage companies, some of which are affiliated with the nation's largest banks, are paid to manage pools of loans owned by investors. The companies typically collect a percentage of the value of the loans they service. They extract their share regardless of whether borrowers are current on their payments. Indeed, their percentage often increases on delinquent loans. Legal experts say the opportunities for additional revenue in delinquency are considerable, confronting mortgage companies with a conflict between their own financial interest in collecting fees and their responsibility to recoup money for investors who own most mortgages.

274.    Defendants' interrelated discriminatory and predatory mortgage loan servicing, foreclosure, and loan modification activities are a critical part of Defendants' equity-stripping scheme, enabling that scheme to be fulfilled (i.e., continuing to generate income for Defendants) until the last discriminatory and predatory loan is either repaid or foreclosed upon. More importantly, however, and as reflect in the empirical allegations below concerning Defendants' foreclosure practices, these activities by Defendants also are stand-alone discriminatory.

275.    The predatory and discriminatory mortgage servicing practices engaged in by Defendants have included, and in a number of instances continue to include (but are not limited to):

- Continuing to service until default, each predatory mortgage loan that was made on a discriminatory basis and that has not been repaid and closed (or modified or refinanced in a non-predatory manner), and then foreclose upon the home securing such loan;

- Failing to properly and/or timely respond to, process, and underwrite borrower efforts to modify or refinance predatory mortgage loans;

- Failing to properly and/or timely notify borrowers of required and/or missing documentation necessary for a requested loan modification and/or failing to provide adequate time for borrowers to submit such documentation before denying a loan modification;

- Failing to adequately notify borrowers of reasons for denial of a modification request and/or the opportunity to demonstrate the request was denied in error;

- Wrongfully denying loan modification applications;

- Failing properly and/or timely respond to, process, or mitigate borrower delinquencies or defaults, including failure to apply payments made by borrowers and failing to maintain accurate account statements in a timely and accurate fashion;

- Providing false or misleading information to borrowers while referring loans to foreclosure during the loan modification application process, while initiating foreclosures where the borrower was in good faith actively pursuing a loss mitigation alternative Wells Fargo offered, and or while scheduling and conducting foreclosure sales during the loan modification application process and during trial loan modification periods;

- Misrepresenting to borrowers that any loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts;

- Failing in monthly billing statements to identify accurately unpaid principal loan balances, total payment amounts due, assessed fees and charges, and allocation of payments including whether to a suspense or unapplied funds account ;

- Imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage;

- Failing to respond in a sufficient and timely manner to the increased level of loss mitigation activities by increasing management and staffing levels to ensure timely, effective, and efficient communication with borrowers with respect to loss mitigation activities and foreclosure activities and full exploration of loss mitigation options or programs prior to completion of foreclosure activities;

- Falsifying or manufacturing, and filing, documents during the mortgage servicing and foreclosure process that falsely or recklessly asserted ownership, amounts due, and fees and expenses chargeable to the borrower

- Charging excessive or improper fees for default-related services and foreclosures, including in connection with repayment plans, reinstatements, payoffs, bankruptcy plans, and foreclosures;

- Failing to notify borrowers of the identity of the foreclosing party in an adequate or timely fashion;

- Preparing, executing, notarizing or presenting (either directly or through third parties and agents) false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments that falsely represented they made pursuant to personal knowledge when they were not (otherwise known as the "robo-signing" scandal), including those activities Wells Fargo conducted pursuant to its internal manual designed to enable Wells Fargo to foreclose on properties quickly;

- Inappropriately dual-tracking foreclosure and loan modification activity, and failing to communicate with borrowers with respect to foreclosure activities, and

- Failure to maintain accurate HAMP underwriting tools relating to a borrower's ability to obtain mortgage loan modifications.

276. The above predatory mortgage servicing and foreclosure practices have been the subject of investigations and civil lawsuits by the DOJ, State Attorneys General, and Defendants' federal banking regulators.

277. For example, on March 14, 2012, the DOJ, forty-nine state Attorneys General, and the Attorney General for the District of Columbia sued Wells Fargo (and several other major financial institutions) for, among other things, unfair and deceptive practices in their mortgage origination, loan servicing, loan modification, and loss mitigation (e.g., foreclosure) activities, particularly regarding FHA insured mortgage loans ("Robosigning Complaint").  As to its mortgage loan originations, the complaint alleged that Wells Fargo "engaged in a pattern of unfair and deceptive practices" that "caused borrowers in the Plaintiff States to enter into unaffordable mortgage loans that led to increased foreclosures in the States."

278.   The Robosigning Complaint alleged, which allegations Plaintiffs specifically incorporate and make herein, that Wells Fargo unfairly, deceptively and unlawfully discharged its mortgage loan servicing activities by, among other things:

- failing to apply payments made by borrowers and failing to maintain accurate account statements timely and accurately;

- charging excessive or improper fees for default-related services;

- failing to properly get third party vendors involved in servicing activities on behalf of the Banks;

- imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage;

- providing borrowers false or misleading information in response to borrower complaints; and

- failing to maintain appropriate staffing, training, and quality control systems.

279.   The Robosigning Complaint also alleged, which allegations Plaintiffs specifically incorporate and make herein, that Wells Fargo unfairly, deceptively and unlawfully failed to "engage in loss-mitigation efforts to avoid the foreclosure of HUD-insured single family residential mortgages . . . where a default could be addressed by modifying the terms of the mortgage or other less-costly alternatives to foreclosure were available." For example, Wells Fargo:

- failed to perform proper loan modification underwriting;

- failed to gather or losing loan modification application documentation and other paper work;

- failed to provide adequate staffing to implement programs;

- failed to adequately train staff responsible for loan modifications;

- failed to establish adequate processes for loan modifications;

- allowed borrowers to stay in trial modifications for excessive time periods;

- wrongfully denied modification applications;

- failed to respond to borrower inquiries;

- provided false or misleading information to consumers while referring loans to foreclosure during the loan modification application process;

- provided false or misleading information to consumers while initiating foreclosures where the borrower was in good faith actively pursuing a loss mitigation alternative offered by the Bank;

- provided false or misleading information to consumers while scheduling and conducting foreclosure sales during the loan application process and during trial loan modification periods;

- misrepresented to borrowers that loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts;

- failed to provide accurate and timely information to borrowers who are in need of, and eligible for, loss mitigation services, including loan modifications;

- falsely advised borrowers that they must be at least 60 days delinquent in loan payments to qualify for a loan modification;

- miscalculated borrowers' eligibility for loan modification programs and improperly denied loan modification relief to eligible borrowers;

- misled borrowers by representing that loan modification applications would be handled promptly when it regularly failed to act on loan modifications in a timely manner;

- failed to process borrowers' applications for loan modifications properly, including failing to account for documents submitted by borrowers and failing to respond to borrowers' reasonable requests for information and assistance;

- failed to assign adequate staff resources with sufficient training to handle the demand from distressed borrowers; and

- misled borrowers by providing false or deceptive reasons for denial of loan modifications.

280.    The Robosigning Complaint further alleged, which allegations Plaintiffs specifically incorporate and make herein, that Wells Fargo "engaged in a pattern of unfair and deceptive" foreclosure practices including:

- failing to identify the foreclosing party properly;

- charging improper fees related to foreclosures;

- preparing, executing, notarizing or presenting false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments);

- preparing, executing, or filing affidavits in foreclosure proceedings without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits. This practice of repeated false attestation of information in affidavits is popularly known as "robosigning." Where third parties engaged in robosigning on behalf of Wells Fargo, they did so with the knowledge and approval of Wells Fargo;

- executing and filing affidavits in foreclosure proceedings that were not properly notarized in accordance with applicable state law;

- misrepresenting the identity, office, or legal status of the affiant executing foreclosure-related documents;

- inappropriately charging servicing, document creation, recordation and other costs and expenses related to foreclosures; and

- inappropriately dual-tracking foreclosure and loan modification activities, and failing to communicate with borrowers with respect to foreclosure activities.

281.    Perhaps most disturbing, the Robosigning Complaint highlights the duplicity in Wells Fargo's unfair, deceptive, and illegal treatment of borrowers defaulting on its predatory mortgage loan products while in receipt of an investment of tens of billions of dollars of U.S.

taxpayer funds to help bail it out of the very same financial disaster it helped create through its predatory subprime mortgage lending activities, including some of those activities at issue here.[11]

282.   On April 4, 2012, Wells Fargo entered into a Consent Judgment, agreeing to remediation and restitution of approximately *$5 billion*, and a variety of modifications to its mortgage servicing and foreclosure practices.  In particular, the settlement required Wells Fargo to make direct civil penalty payments to the plaintiff governments of $1,005,233,716; provide mortgage loan consumer relief to distressed borrowers, including principal forgiveness, refinancing, and other forms of relief; and to change its mortgage servicing practices by complying with certain mortgage servicing standards.

283.   Wells Fargo did not timely comply with all of its obligations under the Consent Judgment to implement the servicing standards, failing to comply with the requirement to respond in a timely manner to borrowers regarding missing information or documentation relating to borrower loan modification packages it had received.

284.   Defendants' predatory mortgage servicing and foreclosure practices have occurred both on a direct discriminatory basis and, necessarily, on a disparate impact basis as a result of the relatively greater numbers of predatory and discriminatory mortgage loans Defendants to FHA-protected minority homeowners.   Empirical and statistical data, which

---

[11] On or about October 28, 2008, Wells Fargo received a $25 billion cash investment from the United States Treasury pursuant to the Troubled Asset Relief Program ("TARP").   TARP was created through the Emergency Economic Stabilization Act of 2008 ("EESA") to help prevent a deepening of the liquidity and financial crisis (which resulted from Wells Fargo's subprime mortgage lending conduct alleged herein and the conduct of other industry participants), to stabilize the housing market, and to assist troubled homeowners.   As alleged in the Robosigning Complaint, that investment was conditioned in part on Wells Fargo's commitment to modify defaulting borrowers' single family residential mortgages pursuant to a variety of federal programs created in conjunction with EESA and TARP, including the Making Home Affordable Program, the Home Affordable Modification Program, The Home Price Decline Protection Incentives initiative, The Principal Reduction Alternative, The Home Affordable Unemployment Program, The Home Affordable Foreclosure Alternatives Program, The Second Lien Modification Program, The FHA-HAMP Program, The Treasury/FHA Second-Lien Program, The FHA Refinance for Borrowers with Negative Equity Program, and the Housing Finance Agency Hardest Hit Fund.

Plaintiffs allege below, evidences that Wells Fargo has initiated mortgage foreclosure proceedings in minority communities to a far greater extent than in non-minority communities.

285.    Moreover, in April 2012, the non-profit National Fair Housing Alliance ("NFHA") and four of its member organizations filed a complaint with the Department of Housing and Urban Development against Wells Fargo accusing it of discriminating in the maintenance of its bank-owned real estate ("REO"), *i.e.*, the properties it had foreclosed upon on otherwise acquired ownership following borrower default.[12]  Plaintiffs specifically incorporate and make the same allegations herein with respect to Wells Fargo's REO properties in its neighborhoods and communities.

286.    Based on NFHA's undercover investigation of 218 properties in eight cities (Atlanta, GA; Baltimore, MD; Dallas, TX; Dayton, OH; Miami/Fort Lauderdale, FL; Oakland/Richmond/Concord, CA; Philadelphia, PA; and Washington, DC), there are "stark racial disparities in the maintenance and marketing of REO properties between communities of color and predominantly White communities" where Wells Fargo's has REO properties. Increased maintenance deficiencies with significant differences in communities of color compared to white communities include substantial amounts of trash; dead grass; broken doors, door locks, and windows; damaged roof or physical structures including holes; peeling or chipped paint and damaged siding; missing gutters and water damage.

287.    These actions individually and/or collectively with Defendants' other practices alleged herein have further led to disproportionate rates of delinquencies, defaults, home vacancies and/or foreclosures on loans originated, purchased, and/or serviced by Defendants that were made to FHA-protected minority borrowers.

---

[12] A copy of the complaint is publicly available at http://www.nationalfairhousing.org/Portals/33/
Wells%20Fargo%20Second%20Amended%20Complaint%2006%2027%202012.pdf.

288.    As the direct result of the unfair, deceptive and predatory manner in which Defendants have serviced and/or foreclosed upon the predatory and discriminatory mortgage loan products disproportionately made to minority borrowers who reside in Plaintiffs' communities and neighborhoods, those borrowers have experienced higher rates of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies than non-minority borrowers.

289.    Also as the direct result of the unfair, deceptive and predatory manner in which Defendants have serviced and/or foreclosed upon the predatory and discriminatory mortgage loan products disproportionately made to minority borrowers who reside in Plaintiffs' communities and neighborhoods, those borrowers will face higher rates of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies than non-minority borrowers on loans that have not yet defaulted or been foreclosed upon.

290.    As Plaintiffs further allege below, Plaintiffs have been damaged and will continue to be damaged in the future as a direct result of the unfair, deceptive and predatory manner in which Defendants have serviced and/or foreclosed upon the predatory and discriminatory mortgage loan products disproportionately made to minority borrowers who reside in Plaintiffs' communities and neighborhoods.

291.    Defendants have continued to strip equity on each outstanding predatory and discriminatory loan at issue here, and will continue to do so until the last predatory and discriminatory mortgage loan Defendants originate, purchase or otherwise acquire, and/or service, has been repaid and closed or has been foreclosed upon.  Defendants' predatory and discriminatory loans at issue will continue to become delinquent and will be defaulted on for at least several more years into the future, leading to further property vacancies and foreclosures.

Thus, Defendants' discriminatory housing practices in violation of the FHA continue, such that the statute of limitations on Defendants' scheme has not yet begun to run.

        **A.**        **Empirical Data Evidences Defendants' Targeting of, and the Discriminatory Impact on, Minority Borrowers in Plaintiffs' Communities**

292.    Publicly available loan origination data Defendants themselves collect and report pursuant to HMDA evidences Defendants' intentional targeting of FHA-protected minority borrowers in Plaintiffs' communities for non-prime mortgage loans, and the discriminatory impact on those borrowers of Defendants' discretionary pricing and underwriting policies and practices. Additionally, publicly available empirical data regarding the numbers, locations and increased rate of foreclosures in Plaintiffs' communities with higher percentages of minority homeownership evidences Defendants' discriminatory loan servicing and foreclosure activities, as well as the discriminatory impact of the predatory loans themselves.

293.    While the publicly available HMDA data Defendants have reported likely underestimates the number of predatory or higher cost non-prime mortgage loans Defendants made and make on a discriminatory basis (because such HMDA data does not parse out predatory loan features) it nevertheless provides an appropriate factual basis for the empirical and statistical allegations below regarding Defendants' discriminatory mortgage lending and servicing patterns at issue and the discriminatory impact of such activity. Indeed, this is precisely the purpose for which the Home Mortgage Disclosure Act required this data to be collected, maintained and reported.

294.    The loan level data in Defendants' LAR and the information in Defendants' mortgage servicing platforms, which are not available to Plaintiffs absent discovery, contain the critical detailed information to definitively prove Defendants' discriminatory actions alleged herein. In its simplest form, however, the raw HMDA data Defendants and their correspondent

lenders reported clearly demonstrate that Defendants have: (1) targeted FHA-protected minorities within Plaintiffs' neighborhoods and communities for predatory mortgage loans; (2) created compensation, underwriting and other policies and practices that have encouraged and enabled discriminatory lending of predatory mortgages to FHA-protected minorities within Plaintiffs' neighborhoods and communities; and (3) serviced its predatory mortgage loans, including its related foreclosure activity, in a discriminator manner against FHA-protected minorities within Plaintiffs' neighborhoods and communities.

295.   Each of the Defendants made a disproportionately larger number of their total mortgage loans to FHA-protected ethnic/racial minority homeowners in Plaintiffs' communities and neighborhoods than to non-minorities in light of the key comparative demographic—single family, owner-occupied housing units—in Plaintiffs' communities and neighborhoods.   This reflects reverse redlining and targeting.

296.   Each of the Defendants also made a disproportionately high number of their "high cost" and higher cost non-prime mortgage loans to FHA-protected ethnic/racial minority homeowners in Plaintiffs' communities and neighborhoods than to non-minorities in light of the same comparative demographics in Plaintiffs' communities and neighborhoods.   This also reflects reverse redlining and targeting. As further alleged below, this discriminatory conduct is further evidenced in part by the increased rates and clustering of foreclosures on Defendants' mortgage loans in neighborhoods and communities with high minority homeownership percentages.

297.   U.S. Census owner-occupied housing unit data provides the best measure of Montgomery County and Prince George's County's minority homeownership demographics to

compare to Defendants' reported HMDA loan data.  This is because the mortgage loans at issue here were secured on borrowers' single family (1-4 unit) owner-occupied residences.

298.    The increased percentages and numbers of mortgage loans that Defendants made to ethnic/racial minorities in Plaintiffs' communities, when compared to the actual demographics of ethnic/minority homeownership in Plaintiffs' communities, provides direct evidence of Defendants' targeting, reverse redlining and marketing penetration into minority communities. If Defendants had not targeted minority borrowers for their mortgage lending activity, minorities in Plaintiffs' communities would not have received significantly greater numbers and percentages of Defendants' mortgage loan products than the percentages of minority homeownership as reflected in the demographics.

299.    From 2000 to 2016, Wells Fargo, Wachovia, and their subsidiaries collectively originated at least 61,699 mortgage loans in Montgomery County and for which they reported the ethnic/racial minority status of the borrowers.  Approximately 29% of those loans (17,602) were identified in HMDA data by Defendants as being made to ethnic/racial minority borrowers. The total percentage of Montgomery County housing units owned and occupied by ethnic/racial minorities during that time, however, was only approximately 23%.  The increased percentage and number of total loans Defendants made to ethnic/racial minorities compared to the lower demographics of ethnic/minority homeownership reflects Defendants targeting of, and tremendous penetration into, ethnic/racial minority communities to a far greater extent that would be expected based on their percentage of minority homeownership had Defendants not targeted those borrowers and communities.

300.    From 2000 to 2016, Wells Fargo, Wachovia, and their subsidiaries collectively originated at least 30,972 mortgage loans in Prince George's County for which they reported the

ethnic/racial minority status of the borrowers.  Approximately 78% of those loans (24,089) were identified in HMDA data by Defendants as being made to ethnic/racial minority borrowers.  The total percentage of Prince George's County housing units owned and occupied by ethnic/racial minorities during that time, however, was only approximately 65%.  The increased percentage and number of total loans Defendants made to ethnic/racial minorities compared to the lower demographics of ethnic/minority homeownership reflects Defendants targeting of, and tremendous penetration into, ethnic/racial minority communities to a far greater extent that would be expected based on their percentage of minority homeownership had Defendants not targeted those borrowers and communities.

301.    Defendants' discriminatory targeting also is evidenced by its "high cost" lending activities.  For example, of the 61,699 loans that Wells Fargo/Wachovia made in Montgomery County and for which they reported ethnic/racial minority status, Defendants reported that 1,087 of them were "high cost."  However, at least 649 of those "high cost" loans, approximately 60%, were made to FHA-protected ethnic/racial minority borrowers.  Compared to the demographics of just 23% minority homeownership, the increased percentage and number of high cost loans Defendants made to ethnic/racial minorities reflects Defendants targeting of, and tremendous penetration into, ethnic/racial minority communities for such high cost loans.

302.    Of the 30,972 loans that Wells Fargo/Wachovia made in Prince George's County and for which they reported ethnic/racial minority status, Defendants reported that 3,364 of them were "high cost."  However, at least 3,042 of those "high cost" loans, approximately 90%, were made to FHA-protected ethnic/racial minority borrowers.  Compared to the demographics of just 65% minority homeownership, the increased percentage and number of high cost loans

Defendants made to ethnic/racial minorities reflects Defendants targeting of, and tremendous penetration into, ethnic/racial minority communities for such high cost loans.

303.    This discriminatory lending pattern is further reflected in the HMDA data reported by or on behalf of the various individual Wells Fargo and Wachovia subsidiaries and affiliates that originated mortgage loans for, or on behalf of, Wells Fargo and Wachovia.  HMDA data from several of these originators with large numbers of loans are set forth below.

304.    For example, Wells Fargo Bank, NA, originated a total of 33,409 mortgages in Montgomery County between 2000 and 2016 for which it reported minority status.  Of those loans, 18,771 (26%) were to ethnic/racial minority borrowers. Of the total 33,409 loans it originated, 574 were designated "high cost" and which minority status had been reported. 318 of those "high cost" mortgages (approximately 55%) were to ethnic/racial minority borrowers.

305.    Wells Fargo Bank, NA, originated a total of 16,661 mortgages in Prince George's County between 2000 and 2016 for which it reported minority status.  Of those loans, 12,626 (76%) were to ethnic/racial minority borrowers. Of the 16,661 loans it originated, 1,956 were designated "high cost" and which minority status had been reported. 1,769 of those "high cost" mortgages (approximately 90%) were to ethnic/racial minority borrowers.

306.    Wells Fargo Financial Maryland Inc. originated a total of 306 mortgages in Montgomery County between 2000 and 2016 for which it reported minority status.  180 of those loans (59%) were to ethnic/racial minority borrowers. Of the 306 loans it originated, 233 were designated "high cost" and which minority status had been reported. 140 of those "high cost" mortgages (60%) were to ethnic/racial minority borrowers.

307.    Wells Fargo Financial Maryland Inc. originated a total of 910 mortgages in Prince George's County between 2000 and 2016 for which it reported minority status.  828 of those

loans (91%) were to ethnic/racial minority borrowers. Of the 910 loans it originated, 762 were designated "high cost" and which minority status had been reported. 703 of those "high cost" mortgages (92%) were to ethnic/racial minority borrowers.

308.    Wachovia Bank, N.A., originated a total of 2,914 mortgages in Montgomery County between 2000 and 2016 for which it reported minority status.  1,050 of those loans (36%) were to ethnic/racial minority borrowers. While it only originated 30 loans designated "high cost" and which minority status had been reported, 16 of those loans (53%) were to ethnic/racial minority borrowers.

309.    Wachovia Bank, N.A., originated a total of 2,024 mortgages in Prince George's County between 2000 and 2016 for which it reported minority status.  1,687 of those loans (83%) were to ethnic/racial minority borrowers. While it only originated 68 loans designated "high cost" and which minority status had been reported, 52 of those loans (76%) were to ethnic/racial minority borrowers.

310.    Wachovia Mortgage originated a total of 1,217 mortgages in Montgomery County between 2000 and 2016 for which it reported minority status.  407 of those loans (33%) were to ethnic/racial minority borrowers. While it only originated 8 loans designated "high cost" and which minority status had been reported, 7 (approximately 88%) were to ethnic/racial minority borrowers.

311.    Wachovia Mortgage originated a total of 920 mortgages in Prince George's County between 2000 and 2016 for which it reported minority status.  760 of those loans (83%) were to ethnic/racial minority borrowers. While it only originated 16 loans designated "high cost" and which minority status had been reported, 15 (approximately 94%) were to ethnic/racial minority borrowers.

312.     Wachovia subsidiary World Savings Bank originated a total of 2,985 mortgages in Montgomery County between 2000 and 2016 for which it reported minority status.  1,949 of those loans (65%) were to ethnic/racial minority borrowers. Of the 2,985 loans it originated, although only 4 were designated "high cost" and which minority status had been reported, 50% of those "high cost" mortgages were to ethnic/racial minority borrowers.

313.     Wachovia subsidiary World Savings Bank originated a total of 1,897 mortgages in Prince George's County between 2000 and 2016 for which it reported minority status.  1,721 of those loans (91%) were to ethnic/racial minority borrowers. Of the 1,897 loans it originated, only 1 was designated "high cost" and which minority status had been reported.  However, 100% of those "high cost" mortgages were to ethnic/racial minority borrowers.

314.     Wachovia subsidiary World Savings Bank, FSB, originated a total of 1,320 mortgages in Montgomery County between 2000 and 2016 for which it reported minority status. 785 of those loans (59%) were to ethnic/racial minority borrowers. Of the 1,320 loans it originated, 118 were designated "high cost" and which minority status had been reported.  86 (approximately 73%) of those "high cost" mortgages were to ethnic/racial minority borrowers.

315.     Wachovia subsidiary World Savings Bank, FSB, originated a total of 1,682 mortgages in Prince George's County between 2000 and 2016 for which it reported minority status.  1,523 of those loans (90%) were to ethnic/racial minority borrowers. Of the 1,682 loans it originated, 325 were designated "high cost" and which minority status had been reported.  291 (approximately 90%) of those "high cost" mortgages were to ethnic/racial minority borrowers.

316.     The foregoing publicly available empirical data demonstrates that Defendants made substantially greater percentages of their total mortgage loans and of their high-cost mortgage loans to minority borrowers beyond what the racial demographics of Plaintiffs'

communities and neighborhoods would otherwise indicate was appropriate on a non-discriminatory basis. Differences in borrower credit score or other objective and permissible underwriting criteria do not explain or justify these differences.

317. Many, if not the majority, of the "high cost" mortgage loans Wells Fargo discriminatorily made to minorities contained predatory terms, by definition had increased interest rates and other costs for minority borrowers, and/or were underwritten in a predatory manner as alleged herein.

318. On its face, the above empirical data reflects Defendants' discriminatory targeting and discriminatory treatment of FHA-protected minority borrowers relating to Defendants' predatory mortgage lending activities, including the discriminatory housing practices of "reverse redlining," i.e., the intentional targeting of FHA-protected minorities for the extension of credit on unfavorable terms, and steering minority borrowers into loans with more unfavorable terms. This empirical and statistical information provides direct and *prima facie* evidence of the disparate impact, as well as additional evidence of the targeting and disparate treatment, of Defendants' predatory mortgage lending activities in Plaintiffs' communities and neighborhoods.

319. In addition to the tens of thousands of discriminatory and predatory residential home mortgage loans Defendants originated directly, Wells Fargo also is responsible for the many more predatory and discriminatory residential home mortgage loans it funded or purchased that were originated through its correspondent and affiliate networks, including the loans originated by PNC.

320. Findings of studies by non-profit organizations further shine a light on Defendants' discriminatory lending patterns evidenced in the above empirical data. For example, based on its review of Wells Fargo's national HMDA data that included 378 distinct

Wells Fargo subsidiaries and correspondent affiliates, the non-profit organization National

People's Action ("NPA") concluded that "Wells Fargo, and its correspondent lending channels,

issued many types of problematic loans that are now at the center of America's home foreclosure

crisis."  National People's Action Report, "*THE TRUTH ABOUT WELLS FARGO: Racial*

*Disparities in Lending Practices*" (March 2009).  Key findings from the NPA Report include:

- Over 37% of all loans made by Wells Fargo to African American borrowers were high cost loans; compared to 12% of loans received by White borrowers.

- 45% of all refinance loans received by African American borrowers were high cost, compared to19% for White borrowers.

- For low- and moderate-income borrowers, 48% of all Wells Fargo loans to African Americans were high cost loans as compared to 20% of the loans for equivalent White borrowers.

- For middle and upper income African American borrowers, 34% of Wells Fargo loans were high cost loans as compared to 11% for equivalent White borrowers.

- African Americans and Latinos were charged higher interest rates on high cost loans and refinance loans than white borrowers.

- While African American and Latino borrowers together accounted for only of 11% of Wells Fargo's total lending volume, these populations accounted for 25% of Wells Fargo's $47.5 billion high cost refinance lending business.

- Refinance loans accounted for 61% of all the loans Wells Fargo made to African American borrowers and 56% of all the loans made to Latino borrowers. Not only were refinance loans the majority of loans made by Wells Fargo to minority borrowers, African American and Latino borrowers were more likely to pay higher costs for their refinanced debt from Wells Fargo.

321.   Similarly, statistical analyses that the United States DOJ conducted of loan data

for prime and non-prime wholesale loans Wells Fargo from 2004 to 2008 demonstrate that,

measured on a nationwide basis, and after controlling for major risk-based factors relevant to

determining loan product placement, including credit history, LTV, and DTI, African American

and Hispanic borrowers were more likely to receive subprime loans from 2004 to 2008 than similarly situated white borrowers.

322.    For the combined time period of 2004 to 2008, an African American borrower who obtained a wholesale loan from Wells Fargo would receive a subprime loan rather than a prime loan approximately 2.9 times more often a similarly situated white borrower.  For the same time period, an African American borrower who obtained a retail loan from Wells Fargo would receive a subprime loan rather than a prime loan approximately twice as often as a similarly situated white borrower.  During the same time period, Latino borrowers received subprime retail loans rather than prime retail loans approximately 1.3 times as often as a similarly situated white borrower.

323.    The foregoing demonstrates a nationwide pattern of statistically significant differences between African-American and Latino borrowers with respect to their product placement by Wells Fargo, even after accounting for objective credit qualifications, as compared to white borrowers.

324.    This discriminatory national pattern is likewise reflected in Maryland specific data. The 2006 HMDA data compiled by the Maryland State Data Center reflected that African-American borrowers were 2.3 times more likely to have a subprime loan than white borrowers.[13] Hispanic borrowers were 1.9 times more likely to have a subprime loan than white borrowers. Among white borrowers, white Hispanic borrowers were 3.5 times more likely to have a subprime loan than non-Hispanic white borrowers.

325.    Similarly, a 2008 study of the *Mortgage Foreclosure Filings in Maryland* by the Reinvestment Fund for the Baltimore Homeownership Preservation Coalition found that in

---

[13] *See* http://planning.maryland.gov/MSDC/Documents/affiliate_meeting/2008/2008-0617-HMDA-2006-2a.pdf.

"2006, across the state of Maryland Black homeowners were most likely to receive a subprime purchase money mortgage."[14]

326.   In a companion presentation entitled, *Update on Mortgage Originations, Delinquency and Foreclosures In Maryland*, the Reinvestment Fund also found that the percentage of subprime loans increased by census tract, as reflected in the chart below:

| **Percent Minority by Census Tract**[15] | | | | |
|---|---|---|---|---|
| MONTGOMERY COUNTY | < 10% | 10-24% | 25-49% | 50% or More |
| Purchase | **10.6%** | **15.0%** | **34.3%** | **37.5%** |
| Refinance | **17.1%** | **14.8%** | **25.3%** | **29.3%** |

| **Percent Minority by Census Tract**[16] | | | | |
|---|---|---|---|---|
| PRINCE GEORGE'S COUNTY | < 10% | 10-24% | 25-49% | 50% or More |
| Purchase | NA | **35.0%** | **44.9%** | **53.1%** |
| Refinance | NA | **26.3%** | **36.5%** | **42.5%** |

327.   In a 2008 presentation, *Homeownership Preservation in Maryland*, the Maryland Department of Housing and Community Development indicated that 54% of African American borrowers had subprime loans, compared to 18% of White borrowers.[17]

328.   Similar discriminatory lending patterns are apparent in the HMDA data regarding Wells Fargo's and Wachovia's 2000 to 2003, and post 2007 mortgage loan originations, particularly including Wells Fargo's mortgage lending during 2012 and 2013.   While much of Defendants' predatory, higher cost and non-prime mortgage loan making practices at issue (through direct originations, funding and purchases through broker and wholesale lending channels) subsided after the Financial Crisis, such lending activity did not end, but in fact has

---

[14]    *See*    https://www.reinvestment.com/wp-content/uploads/2015/12/Mortgage_Foreclosure_in_Maryland-Report_2008.pdf.

[15]    *See*    https://www.reinvestment.com/wp-content/uploads/2008/12/Mortgage_Foreclosure_in_Maryland-Presentation_2008.pdf.

[16]    *See*    https://www.reinvestment.com/wp-content/uploads/2008/12/Mortgage_Foreclosure_in_Maryland-Presentation_2008.pdf.

[17] *See* http://www.mrdc.net/sts2008/presentations/Vaughn-HomeownershipPreservation.pdf.

continued, albeit to a lesser degree, including through predatory refinancing of previously made predatory mortgage loans.

329.    In the early 2000s, prior to the height of Defendants' predatory and discriminatory mortgage lending alleged herein, Plaintiffs' historical annual foreclosure rates averaged approximately 0.1%.  Plaintiffs had few, if any "high foreclosure risk" ("HFR") census tract areas as defined and designated by the U.S. Department of Housing & Urban Development ("HUD").  HUD designated HFR areas reflect neighborhood characteristics that HUD estimates to have a high level of risk for foreclosure—e.g., those neighborhoods with a relatively high concentration of higher cost loans, subprime, or highly leveraged loans (high LTV and DTI ratios), among other factors.

330.    Subsequent to, and during the predatory and discriminatory lending and servicing practices of Defendants alleged herein, minority borrowers in Plaintiffs' communities received numerous "high cost," higher cost, or non-prime mortgage loans, concentrated in Plaintiffs' neighborhoods and communities with high populations of FHA-protected minority borrowers. This led to a massive increase in the number of foreclosures, the concentrations of those foreclosures in minority communities and HUD's designation of numerous HFR areas that directly correspond to the census tracts in Plaintiffs' communities that have the highest percentages of minority homeowners.

331.    Indeed, the level and severity of the risk of foreclosures across the nation and in Plaintiffs' communities and neighborhoods became so great that HUD changed its HFR ranking system from a scale of 1-10 (10 being the highest foreclosure risk areas) to a scale of 1-20 (doubling the prior risk designation and designating 20 as the highest foreclosure risk areas). During the aftermath of the boom in subprime lending and the failure of many of those

mortgages, the average foreclosure rates in Plaintiffs' communities exploded by a factor of 10 by the end of 2008 and a factor of 22 by the end of 2009, with the highest foreclosures rates in minority communities.

332.    HUD designated high foreclosure rate census tracts in Montgomery County and Prince George's County coincides directly with high foreclosure rates in such communities and neighborhoods and typically have the highest percentages of FHA-protected minority homeowners.  Loans made in such areas serve as a useful proxy to reflect relative numbers of non-prime loans given the far greater percentages on which they have been foreclosed upon, as well as other loans in the same proximity, and given the location and demographics of such census tracts.

333.    Many, if not the majority, of mortgage loans Wells Fargo discriminatorily made to minorities in the highest HUD designated census tracts contained predatory terms, had increased interest rates and other costs for minority borrowers, and/or were underwritten in a predatory manner as alleged herein. Thus, even though many such loans were not strictly "high cost" designated loans, Defendants' discriminatory lending patterns exist throughout Defendants' entire line of non-prime mortgage loan products that Defendants have made since 2000.  As a result, all such loans are at issue in this Complaint and Defendants' loan level data in its LAR will provide the evidentiary matter necessary at trial.

334.    Given that the total percentage of Montgomery and Prince George's County housing units owned and occupied by ethnic/racial minorities during the bulk of Defendants' non-prime lending activity was only approximately 23% and 65%, respectively, the increased percentages and numbers of mortgage loans alleged below that Defendants made to ethnic/racial minorities in the highest HUD designated HFR census tracts -- compared to loans made in

census tracts with a majority of white homeowners – also reflects Defendants targeting of, and tremendous discriminatory penetration into, Plaintiffs' most vulnerable ethnic/racial minority communities for predatory loans.

335.    For example, of the 61,699 loans that Wells Fargo/Wachovia collectively made in Montgomery County between 2000 and 2016, and for which they reported ethnic/racial minority borrower status, 21,746 of them (35%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Montgomery County.  Almost 40% (8,632) of those loans were reported as made to ethnic/racial minority borrowers. Of the 30,972 loans that Wells Fargo/Wachovia collectively made in Prince George's County and for which they reported ethnic/racial minority status, 29,262 of them (94%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Prince George's County.  Almost 80% (23,264) of those loans were reported as made to ethnic/racial minority borrowers.

336.    This discriminatory lending pattern is further reflected in the HMDA data reported by or on behalf of the various individual Wells Fargo and Wachovia subsidiaries and affiliates that originated mortgage loans for, or on behalf of, Wells Fargo and Wachovia.

337.    Of the 33,409 loans that Wells Fargo Bank made in Montgomery County and for which it reported ethnic/racial minority status, 11,275 of them (34%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Montgomery County. Approximately 37% of those loans (4,162) were made to ethnic/racial minority borrowers.

338.    Of the 16,661 loans that Wells Fargo Bank made in Prince George's County and for which it reported ethnic/racial minority status, 15,740 of them (94%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Prince George's County. Approximately 78% of those loans (12,241) were made to ethnic/racial minority borrowers.

339.   Of the 306 loans that Wells Fargo Financial Maryland, Inc., made in Montgomery County and for which its reported ethnic/racial minority status, 181 of them (59%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Montgomery County.   Approximately 56% of those loans (101) were made to ethnic/racial minority borrowers.

340.   Of the 910 loans that Wells Fargo Financial Maryland, Inc., made in Prince George's County and for which its reported ethnic/racial minority status, 889 of them (97%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Prince George's County.   Approximately 91% of those loans (810) were made to ethnic/racial minority borrowers.

341.   Of the 1,296 loans that Wells Fargo Funding made in Montgomery County and for which it reported ethnic/racial minority status, 461 of them (approximately 36%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Montgomery County.   Approximately 32% of those loans (147) were made to ethnic/racial minority borrowers.

342.   Of the 524 loans that Wells Fargo Funding made in Prince George's County and for which it reported ethnic/racial minority status, 475 of them (approximately 91%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Prince George's County.   Approximately 75% of those loans (358) were made to ethnic/racial minority borrowers.

343.   Of the 1,217 loans that Wachovia Mortgage made in Montgomery County and for which it reported ethnic/racial minority status, 464 of them (38%) were made to borrowers

within the highest HUD designated foreclosure risk census tracts in Montgomery County. Approximately 45% of those loans (207) were made to ethnic/racial minority borrowers.

344.    Of the 1,920 loans that Wachovia Mortgage made in Prince George's County and for which it reported ethnic/racial minority status, 865 of them (94%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Prince George's County. Approximately 84% of those loans (729) were made to ethnic/racial minority borrowers.

345.    Of the 2,914 loans that Wachovia Bank, N.A., made in Montgomery County and for which it reported ethnic/racial minority status, 1,049 of them (36%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Montgomery County. Approximately 47% of those loans (494) were made to ethnic/racial minority borrowers.

346.    Of the 2,024 loans that Wachovia Bank, N.A., made in Prince George's County and for which it reported ethnic/racial minority status, 1,928 of them (95%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Prince George's County.   Approximately 84% of those loans (1,629) were made to ethnic/racial minority borrowers.

347.    Of the 4,305 loans that World Savings Bank made in Montgomery County and for which it reported ethnic/racial minority status, 2,093 of them (49%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Montgomery County. Approximately 72% of those loans (1,511) were made to ethnic/racial minority borrowers.

348.    Of the 1,897 loans that World Savings Bank made in Prince George's County and for which it reported ethnic/racial minority status, 1,808 of them (95%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Prince George's County. Approximately 91% of those loans (1,645) were made to ethnic/racial minority borrowers.

349.    Of the 1,682 loans that World Savings Bank, FSB, made in Prince George's County and for which it reported ethnic/racial minority status, 1,630 of them (97%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Prince George's County.   Approximately 91% of those loans (1,483) were made to ethnic/racial minority borrowers.

350.    On its face, the above empirical and statistical data provides *prima facie* evidence of Defendants' discriminatory targeting and discriminatory treatment of, and discriminatory impact on, FHA-protected ethnic/racial minority borrowers in Plaintiffs' communities and neighborhoods.

351.    Similar discriminatory lending patterns are apparent from Wells Fargo's and Wachovia's mortgage loan purchase and funding activity through their network of correspondent lenders.   For example, between 2000 and 2016, Wells Fargo, Wachovia and their affiliates funded, purchased or otherwise acquired at least 34,299 mortgage loans in which they reported borrower minority status.   8,840 of those loans (approximately 26%) were made to minorities, reflecting a statistically significant increase in the number of loans Defendants purchased or funded that were originated to minority borrowers in excess of the Montgomery County demographics of a 23% minority homeownership rate.   In Prince George's County, between 2000 and 2016, Wells Fargo, Wachovia and their affiliates funded, purchased or otherwise acquired at least 9,126 mortgage loans in which they reported minority status.   6,185 of those loans (approximately 68%) were originated to minorities, reflecting a statistically significant increase in the number of loans Defendants purchased or funded that were originated to minority borrowers in excess of the Prince George's County demographics of a 65% minority homeownership rate.

352.   This activity is somewhat more pronounced when examined during the earlier period of 2000 through 2008 while Defendants were making subprime loans in earnest.   For example, between 2000 and 2008, Wells Fargo, Wachovia and their affiliates funded, purchased or otherwise acquired at least 18,497 mortgage loans in which they reported borrower minority status. While 4,766 of those loans (again approximately 26%) were originated made to minorities compared to the Montgomery County demographics of a 23% minority homeownership rate, 35% of the loans were within the highest foreclosure rate census tracts and 35% of those HFR loans were originated to minority borrowers.   Similarly, in Prince George's County, between 2000 and 2008, Wells Fargo, Wachovia and their affiliates funded, purchased or otherwise acquired at least 6,539 mortgage loans in which they reported borrower minority status.   4,686 of those loans (approximately 72%) were originated to minorities, compared to Prince George's County demographics of a 65% minority homeownership rate.   6,155 (94%) of those loans were from within the highest foreclosure rate census tracts and 74% of those loans were originated to minority borrowers.

353.   Over the period from 2000-2016, Defendants are responsible for over 56,700 suspect discriminatory and/or predatory HMDA reported mortgage loans to minorities in Montgomery County and Prince George's County.   Defendants are responsible for many more such discriminatory and/or predatory second lien and unreported HMDA mortgage loans to minorities in the Plaintiff Counties. All of these loans are part of Defendants' continuing nationwide discriminatory housing practice of equity-stripping, which is further conducted through, and reflected in, Defendants' related continuing discriminatory mortgage servicing and foreclosure practices. As further alleged below, since just August 2005 Defendants have initiated foreclosure proceedings on over 7,200 mortgage loans concentrated in Montgomery County and

Prince George's communities with higher percentages of minority homeowners, reflecting approximately 85% of the total foreclosures Defendants have initiated in the Plaintiff Counties.

354.    Publicly reported foreclosure data evidences the impact of Defendants' predatory and discriminatory lending and mortgage servicing practices, in and of themselves and in combination with one another as part of Defendants' stand-alone discriminatory housing practices and equity-stripping scheme.  That data reflects that the average foreclosure rates increase among census tracts in Plaintiffs' neighborhoods as the percentage of minority population increases. It also reflects that Defendants have discriminatorily serviced and foreclosed upon minority borrower homes secured by defaulted higher cost and other non-prime mortgage loans for which Defendants are responsible.

355.    An April 2010 foreclosure study by the National Community Reinvestment Coalition, "Foreclosure in the Nation's Capital: How Unfair and Reckless Lending Undermines Homeownership," found that "[m]inority borrowers are also more likely to face foreclosure than white borrowers, even after controlling for borrower credit risk, loan terms and neighborhood factors."[18]  The report linked this conclusion to its findings that African American and Latino minority borrowers were more likely to receive subprime loans, again, even after correcting for credit risk factors and local housing market conditions.

356.    A study that focused on Prince George's County found that, in even high income neighborhoods, black/African American borrowers were 42% more likely to be in foreclosure and Hispanic/Latinos borrowers were 159% more likely to be in foreclosure, after controlling for a number of demographic, socioeconomic and financial variables. "Analyzing Foreclosures Among High-Income Black/African American and Hispantic/Latino Borrowers in Prince

---

[18] https://ncrc.org/wp-content/uploads/2010/04/ncrc_foreclosure_paper_final.pdf at 20 (last visited May X, 2018).

George's County, Maryland," Anacker, Carr, and Pradhan, Housing and Society vol. 39 no. 1 (2012).

357.    The problem with Defendants' discriminatory servicing practices and foreclosures is not likely to abate in the near future. According to one article, "50 percent of all loans actively in foreclosure at the end of 2017 originated between 2004 and 2008."[19] Since, at least, 2015, Prince George's County has led Maryland in foreclosure events (comprising notices of default, notices of sales, and lender purchases or REO). Since 2015, Prince George's County's foreclosure events have represented anywhere from 20-24% of the total foreclosure events in Maryland.

358.    On those mortgage loans at issue in this complaint (*i.e.*, the loans with an origination date since January 2000) and for which they are responsible, Defendants initiated a disproportionate number of foreclosure proceedings in Montgomery County and Prince George's County in those census tracts with higher populations of FHA-protected borrowers compared to census tracts with lower populations of minority borrowers.  Defendants' foreclosure activity in Prince George's County since August 1, 2005 is numerically, geographically and demographically depicted in the following maps:

---

[19] https://patch.com/maryland/annapolis/maryland-foreclosure-rate-3rd-highest-us-2017-report.



359.     As reflected in the Prince George's County foreclosure map above, from the period August 2005 to January 2018, at least 5,867 of Defendants total 6,001 foreclosure filings in Prince George's County (approximately 98%) were initiated in higher minority census tracts (i.e., where at least 30% of the housing units were minority owner-occupied) as compared to just the 134 foreclosure filings (about 2%) in low minority census tracts (i.e., where less than 30% of the housing units were minority owner-occupied).

360.     As further reflected in the Prince George's County foreclosure map above, the average foreclosure rate (number of foreclosures divided by the number of owner-occupied housing units) over the entire time period dramatically increases in lock-step as the percentage of minority owner-occupied homeownership increases.  This foreclosure activity reflects both the targeting and discriminatory impact of Defendants' foreclosure activity in Prince George's County's minority neighborhoods.

361.     Defendants' foreclosure activity in Montgomery County since August 1, 2005 is numerically, geographically and demographically depicted in the following maps:



362.    As reflected in the Montgomery County foreclosure map above, from the period August 2005 to January 2018, at least 1,374 of Defendants total 2,564 foreclosure filings in Prince George's County (approximately 54%) were initiated in higher minority census tracts (i.e., where at least 25.1% of the housing units were minority owner-occupied) as compared to the 1,190 foreclosure filings (about 46%) in low minority census tracts (i.e., where 25% or less of the housing units were minority owner-occupied).

363.    But more importantly, as further reflected in the Montgomery County foreclosure map above, like in Prince George's County, the average foreclosure rate (number of foreclosures divided by the number of owner-occupied housing units) over the entire time period dramatically increases in lock-step as the percentage of minority owner-occupied homeownership increases. This foreclosure activity again reflects both the targeting and discriminatory impact of Defendants' foreclosure activity in Montgomery County's minority neighborhoods.

364.    As all of the data in the maps reflect, the mortgage loans Defendants originated in Plaintiffs' communities to FHA-protected borrowers were more likely to result in delinquency, default, and foreclosure than the loans Defendants made to Caucasian borrowers, with many of the loans made with the highest HUD designated HFR foreclosure rate areas.  This empirical and statistical information provides direct and *prima facie* evidence of the disparate impact, as well as additional evidence of the targeting and disparate treatment, of Defendants' predatory mortgage lending activities in Plaintiffs' communities and neighborhoods.

365.    While Plaintiffs can provide a list of the addresses of each of the approximate 8,565 foreclosure proceedings Defendants have initiated on mortgage loans originated since August 2005 in Montgomery County and Prince George's County that are reflected in the GIS MAP above, Defendants know from their own lending and servicing data: (i) exactly which loans they made and/or service; (ii) the location of vacant properties where such loans have defaulted; and (iii) the location of all properties they have foreclosed on,  Defendants maintain this information in the ordinary course of their business.

**B.      The Full Extent of Defendants' Discriminatory Housing Practices are Concealed Through Defendants' Underreporting of Minority Status in HMDA Data and Through MERS.**

366.    Defendants underreported race and ethnicity HMDA data on the mortgage loans they originated and purchased and have concealed their lending and foreclosure activity through

MERS.  This skews the discriminatory effect of Defendants' predatory and discriminatory lending and servicing practices at issue here in Defendants' favor.  Thus, only discovery of Defendants' loan level data and mortgage servicing data will reveal the full extent of Defendants' discriminatory housing practices at issue here and the full extent of Plaintiffs' resulting damages.

367.    While the Defendants collectively originated a grand total of 74,483 mortgage loans between 2000 and 2016 in Montgomery County, minority borrower status was not reported in their HMDA data on 12,784 of those loans (approximately 21%), notwithstanding HMDA reporting requirements on the minority status of the borrower.  4,432 of those loans (35%) were "high cost" or made in the highest HUD designated foreclosure rate census tracks, both categories of which were more likely to be made to minority borrowers.  Wells Fargo Bank was the worst offender of the Defendants in volume with approximately 6,126 of the loans it originated in Montgomery County reporting no ethnicity data, 2,271 of which (37%) were designated as "high cost" or in the highest HFR areas.  World Savings Bank and World Savings Bank, FSB were the worst offenders in terms of percentage, with approximately 10% of its originated mortgage loans in Montgomery County (471 of 4,776) reporting no ethnicity data, with 226 of such loans (48%) designated as "high cost" or in the highest HFR areas.

368.    While the Defendants collectively originated a grand total of 37,552 mortgage loans between 2000 and 2016 in Prince George's County, minority borrower status was not reported in their HMDA data on 6,580 of those loans (17.5%), notwithstanding HMDA reporting requirements.  6,244 of those loans (16.6%) were "high cost" or made in the highest HUD designated foreclosure rate census tracks, both categories of which were more likely to be made to minority borrowers.  Wells Fargo Bank was the worst offender of the Defendants in volume

with approximately 3,565 of the loans it originated in Prince George's County reporting no ethnicity data, 3,395 of which (95%) were designated as "high cost" or in the highest HFR areas. Wachovia Mortgage was the worst offender in terms of percentage, with approximately 26% of its originated mortgage loans in Prince George's County (329 of 1,249) reporting no ethnicity data, with 317 of such loans (96%) designated in the highest HFR areas.

369.    Similarly, Defendants have not reported minority data on many of the mortgage loans they funded, purchased or otherwise acquired, including through their affiliate and broker network.  For example, Defendants collectively purchased or otherwise acquired 43,248 loans between just 2000 and 2016 in Montgomery County.  However, 8,949 of those loans (20%) contained no minority borrower status information.  Wells Fargo Funding was responsible for 22,613 of those loans, but did not report on 3,045 of them, 935 of which (31%) were in the highest HFR areas.  Wells Fargo Bank was responsible for 16,697 of the total acquired loans, but did not report on 2,873 of them, 598 of which (21%) were in the highest HFR areas.  For their part, Wells Fargo Financial, Wachovia Bank, Wachovia Mortgage, and World Savings Bank were collectively responsible for 2,563 of the acquired loans, but reported minority status on only 3 loans, while 677 of these loans (26%) were originated within the highest HFR areas.

370.    Similarly, Defendants collectively purchased or otherwise acquired 12,052 loans between 2000 and 2016 in Prince George's County.  However, 2,926 of those loans (24%) contained no minority borrower status information.  Wells Fargo Funding was responsible for 6,523of those loans, but did not report on 928 of them, 857 of which (92%) were in the highest HFR areas.  Wells Fargo Bank was responsible for 4,159 of the total acquired loans, but did not report on 783 of them, 700 of which (89%) were in the highest HFR areas.  For their part, Wells Fargo Financial Maryland (11 loans – 11 not reported, 11 HFR), Wachovia Bank (829 loans, 829

not reported, 779 HFR), Wachovia Mortgage (124 loans – 124 not reported, 119 HFR), World Savings Bank (101 loans -101 not reported, 93 HFR), and American Mortgage Network (7 loans – 7 not reported, 6 HFR) were collectively responsible for 1,072 of the acquired loans, but reported minority status on none of the loans, while the vast majority of such loans 1,008 (94%) were originated within the highest HFR areas.

371.   By not adequately reporting minority borrower data on their mortgage loan originations and acquisitions, Defendants have skewed the data in their favor and further concealed the full extent of their predatory and discriminatory mortgage lending and servicing activities, further necessitating discovery of all of Defendants' mortgage loan data they created and/or maintain in connection with their mortgage lending, securitization and servicing activities at issue here.

372.   Wells Fargo and its joint venture partner First American Title Insurance Corp were founding members, and remain shareholders, of MERSCORP Holdings, Inc., the parent company of Mortgage Electronic Registration Systems, Inc., which operates the MERS System.

373.   As such, Wells Fargo helped fund the development and initial start-up of MERS to act as a nominee for mortgage lenders and lenders' successors and assigns (e.g., securitization trusts) to privately originate, track, assign and/or trade mortgage loans through a confidential computer registry (containing over 70 million mortgage loan records) enabling mortgage lenders to circumvent public lien assignment recording processes.

374.   Wells Fargo and First American are both current members of MERS.   Wells Fargo Bank's Executive Vice President, Kathy Gray, has been and is a member of the MERSCORP's Board of Directors. First American's Executive Vice President and Vice

Chairman, Kurt Pfotenhauer, also is a MERSCORP director and serves as its Chairman of the Board.

375. MERS previously publicly described itself on its website as "an innovative process that simplifies the way mortgage ownership and servicing rights are originated, sold, and tracked. Created by the real estate finance industry, MERS eliminates the need to prepare and record assignments when trading residential and commercial mortgage loans." MERS has touted that its operations are "a national electronic registry system that tracks the changes in servicing rights and beneficial ownership interests in mortgage loans that are registered on the registry."

376. According to MERS' prior public website disclosures, it also provides money savings to lenders by eliminating assignment costs, document correction costs, and tracking fees – "Once the loan is assigned to MERS . . . tracking servicing and beneficial rights can occur electronically for all future transfers. The need for any additional assignments after this point will be eliminated unless the servicing rights are sold to a non-MERS member." MERS has saved industry participants – and denied public recording systems operated by County governments such as Plaintiffs here – a total of over $2 billion in public recording fees.

377. MERS obscures the extent of Defendants' mortgage loan origination, ownership, assignment, securitization, and servicing activities. Loans originated, purchased or acquired by Wells Fargo that were originally closed in the name of MERS, or subsequently assigned to MERS, makes it extremely difficult for Plaintiffs to determine ownership interests in vacant or abandoned properties that have not yet been foreclosed upon to cure building code deficiencies, ensure compliance with building codes, obtain unpaid taxes and/or utility bills, and/or determine the ownership or lien holders to enable in rem or tax foreclosure sales.

378.    Because Plaintiffs do not have access to MERS there was virtually no way for Plaintiffs to identify parties – e.g., mortgage note holders or securitization trustees –legally and financially obligated to pay the costs of maintaining abandoned or vacant properties in the MERS System within its jurisdiction.  As such, MERS' admittedly deliberate circumvention of the public recording process has damaged, and continues to damage, Plaintiffs including by denying Plaintiffs of the revenue from recording fees and related taxes that Plaintiffs otherwise would have received had the various assignments and other changes in title been properly recorded.

379.    More importantly, however, by circumventing public lien holder recording processes by design, MERS obscured Defendants' mortgage foreclosure processes, making it extremely difficult for Plaintiffs – and other interested parties – to identify the predatory lenders "whose practices led to the high foreclosure rates that have blighted some neighborhoods."  Mike McIntire, *Tracking Loans Through a Firm That Holds Millions*, N.Y. Times (April 24, 2009).  It effectively "removes transparency over what's happening to these mortgage obligations and sows confusion, which can only benefit the banks." *Id.*

380.    Mortgage loans foreclosed in the name of MERS, as agent or assignee, may conceal the identity of the loan originator, assignees and/or loan servicer, making it extremely difficult for Plaintiffs to determine the party responsible for originating or servicing a predatory or discriminatory mortgage loan that has resulted in foreclosure.

381.    The majority of foreclosures (estimated at 60% nationwide) are conducted in the name of MERS as designee, assignee, or title holder of Defendants as originator or securitization trustee making it virtually impossible to determine from publicly available data which Defendants hold the mortgages to, are in possession of, and/or are or may be foreclosing on

properties in Plaintiffs' communities and neighborhoods, further obfuscating the predatory and discriminatory lending practices of Defendants and other industry participants.

382.    Complicating the issue, it has been widely reported, investigated, litigated, and publicly acknowledged that the Defendants' and MERS' electronic mortgage lien and assignment records contain errors.  It also has been widely reported, investigated, litigated, and publicly acknowledged that this has been exacerbated by and/or led to Defendants' "robosigning" and other predatory mortgage servicing and foreclosure practices.

383.    Finally, Defendants also used their bank holding company corporate structure to conceal their discriminatory lending practices by shifting loans and loan applications between their mortgage lending operations at their regulated banking entities and their non-regulated mortgage lending subsidiaries and affiliates. According to confidential witness statements provided by former employees of Wells Fargo and cited in another action against Wells Fargo: "It was common knowledge that, to avoid problems, loans from one office were sent to another office to make both look more balanced.  We needed to put some white loans in that [minority] community and some black loans in this community because [otherwise] we'll get some sh!+ from the Fed."

384.    The only realistically feasible way to precisely determine all the properties possessed by, in the control of, or foreclosed upon at the direction, or for the benefit, of Defendants, is through electronic discovery of Defendants' and MERS' mortgage origination, purchase, assignment, securitization, servicing, and foreclosure data that Defendants specifically collect, track, and utilize for their HMDA reporting obligations and their operational activities.

385.    This discovery is necessary to determine the full extent of the predatory and discriminatory loans Defendants have made at issue here and Defendants' complicity in the

continuing predatory and discriminatory equity-stripping scheme alleged, including through the continuing servicing of each such predatory and discriminatory loan.

### C.   Defendants' Predatory and Discriminatory Mortgage Lending, Servicing and Foreclosure Practices Have Harmed Plaintiffs.

386.   Defendants' discriminatory housing practices of equity-stripping – conducted through Defendants' interrelated predatory and discriminatory mortgage lending, servicing and foreclosure activities -- have seriously harmed Plaintiffs' communities and neighborhoods by effectively diluting -- or completely eliminating -- the equity of minority borrowers' homes. This has placed those borrowers in far greater jeopardy of loan default and foreclosure, has reduced monies available for home upkeep and maintenance, and has dramatically increased the numbers and rates of home vacancies and foreclosures that Plaintiffs' communities and neighborhoods are currently experiencing (and will continue to experience into the future).

387.   As further alleged below, this has caused and will continue to cause both extensive non-monetary harm, including an increasing segregative effect on Plaintiffs' communities and neighborhoods where Defendants have concentrated their equity-stripping activities, and financial damages to Plaintiffs.

388.   Home foreclosures disproportionately occur in predominantly minority neighborhoods. *See*, e.g., Juliana Barbassa, Report: Minorities Hit By Foreclosures, USA Today, March 6, 2008; National Training & Information Center, Preying on Neighborhoods, 2007 Foreclosure Update, March 3, 2008 available at https://web.archive.org/web/20080327172821/http://www.ntic-us.org/images/fullyear2007.pdf (last viewed June 20, 2017).  The relevant statistics in the Montgomery County and Prince George's County areas confirm this nationwide trend.

389.     Minority neighborhoods suffer severe deleterious effects from increased foreclosures.  A Woodstock Institute Study has demonstrated that "foreclosures, particularly in lower-income neighborhoods, can lead to vacant, boarded-up, or abandoned properties.  These properties, in turn, contribute to the stock of 'physical disorder' in a community that can create a haven for criminal activity, discourage social capital formation, and lead to further disinvestment . . . and lower property values for existing residential homeowners."  Dan Immergluck and Geoff Smith, There Goes the Neighborhood: The Effect of Single-Family Mortgage Foreclosures on Property Values, Woodstock Institute Study (June 2005) available at http://www.woodstockinst.org/sites/default/files/attachments/TGTN_Report.pdf (last visited June 21, 2017).

390.     As alleged above, Defendants discriminatorily originated, or funded, purchased or otherwise acquired predatory, non-prime mortgage loans on a discriminatory basis in Plaintiffs' communities and neighborhoods, and continue to service, refinance and/or foreclosure on such loans on a predatory and/or discriminatory basis.  Thus, the loan default, home vacancy and foreclosure rates in Plaintiffs' communities with increased ethnic and racial minorities are greater than in comparable white communities.  And, because single women generally received a greater share of such loans than male borrowers, and because minorities received them to a greater extent than non-minorities, the loan default, home vacancy and foreclosure rates in Plaintiffs' communities is particularly high among female African American borrowers of Wells Fargo's and Wachovia's predatory mortgage loan products.

391.     Plaintiffs, which are the embodiment of its residents, neighborhoods and communities, suffers from the segregative effects of the increased foreclosures and vacant properties, securing predatory and discriminatory mortgage loans for which Defendants are

responsible, through increased blight, urban decay, and the perpetuation and increase in racial slum formation including from "white flight," all of which is concentrated in Plaintiffs' neighborhoods and communities with higher percentages of minority homeowners.

392.    Plaintiffs also suffer from the combined racial and gender segregative effect resulting from an increased number of defaults and foreclosures on "high cost" and non-prime mortgage loans Defendants targeted on female borrowers, particularly African American female borrowers, many of which also are concentrated in Plaintiffs' high minority neighborhoods. Plaintiffs have a legitimate interest under the FHA in promoting fair and equal housing opportunities on both a race- and a gender-neutral basis in its communities.

393.    Plaintiffs are harmed even if Defendants' non-prime mortgage loans don't result in foreclosure. Defendants' equity-stripping mortgage loans increase minority borrower borrowing costs, reduce or limit impacted minority borrower's ability to accumulate wealth from the equity in their homes, deplete or eliminate borrower savings, and thereby restrict or reduce an impacted borrower's ability or desire to maintain and/or improve their property. This further leads to deterioration of such property and surrounding property values and results in increased vacancy rates as borrowers with negative home equity are more likely to simply abandon their homes.

394.    As set forth amply above, Defendants' discriminatory lending behavior virtually guaranteed foreclosure. Nowhere is this more evident than Plaintiffs' GIS maps above, which reflect not only greater numbers of foreclosures in higher minority census areas, but also reflect a much higher foreclosure rate, upwards of 8 times higher than census areas that are primarily Caucasian. Although Plaintiffs' GIS maps amply illustrate Defendants' discriminatory

foreclosure behavior, Defendants also discriminate against minorities when receiving mortgage modification requests and post-foreclosure.

395.    In high minority census areas, Defendants routinely reject or deny mortgage modification requests even when the homeowner qualifies for the modification. Mortgage modification requests from borrowers in predominantly low minority census areas are routinely granted.

396.    Further, in predominantly minority neighborhoods, Defendants routinely characterize vacant, foreclosed homes as abandoned rather than vacant. Utilizing this characterization allows Defendants to assert, even when Defendants know it is untrue, that the homeowner has severed all ties and interest to the property, thereby making it easier for Defendants to take the property back. This characterization is not utilized or utilized far less frequently on homes that are not in predominantly minority neighborhoods.

397.    Once the property in foreclosure is vacant, Defendants then charge unnecessary and duplicative fees for "services," such as cutting the grass or inspecting the property. Oftentimes, these "services" are never rendered, making them fraudulent. Charging these fees serves the dual purposes of allowing Defendants to add the fees to the principal and interest owed, and ensuring the borrower can never exercise any right of redemption.

398.    As a result, injuries to Plaintiffs will continue to occur long after the last wrongful act in the Defendants' scheme – the inevitable, if not intended, vacancy and/or foreclosure on the predatory and discriminatory mortgage loan products Defendants sold to homeowners in Plaintiffs' neighborhoods and communities and continued to service when such loans defaulted and through Defendants' foreclosure processes.

399.   Defendants' illegal discriminatory conduct has caused substantial, measurable, economic damages to Plaintiffs directly incurred on vacant and/or foreclosed minority properties for which Defendants are responsible including, but not limited to:

- costs for judicial and non-judicial foreclosure-related processes;

- services required for Sheriff's evictions and foreclosure notices;

- registration and monitoring of abandoned, vacant and/or foreclosed properties;

- inspecting, securing, cleaning, maintaining and/or demolishing abandoned, vacant and/or foreclosed properties;

- police and fire services on abandoned, vacant and/or foreclosed properties for which Defendants are responsible;

- social services to evicted or foreclosed homeowner-borrowers on abandoned, vacant and/or foreclosed properties for which Defendants are responsible;

- reduced property values on foreclosed properties and surrounding properties;

- the loss of various property and concession tax revenue from abandoned, vacant and/or foreclosed properties, including, for example, cable and telephone franchise taxes;

- lost property tax revenue on abandoned, vacant and/or foreclosed properties that have not been recovered via tax lien sales;

- lost revenue from certain utility operations and fees, such as water, sanitation, and telecommunications; and/or

- lost recording fees as a result of the use of MERS to avoid such fees.

400.   In addition, Defendants' illegal discriminatory conduct has directly caused substantial, measurable, non-economic damages to Plaintiffs including, for example, but not limited to, injuries resulting from the deterioration and blight to the hardest hit neighborhoods and communities.

401.   Such injuries arise from both the effect of the foreclosure process itself (lower home values and tax revenues) and from vacant or abandoned properties that either already have been foreclosed upon or are facing foreclosure (i.e., the shadow inventory of foreclosures) as a result of borrower defaults.   Not surprisingly, the brunt of this injury is disproportionately

suffered in Plaintiffs' communities and neighborhoods with relatively higher FHA-protected minority borrowers, however the harm has spread throughout Plaintiffs' communities.

402.    Plaintiffs have incurred out-of-pocket costs with respect to specific vacant foreclosure and pre-foreclosure properties secured by non-prime mortgage loans originated, acquired, serviced or foreclosed on by Defendants on a discriminatory basis because, among other things, Plaintiffs have been required to provide a multitude of services relating to those abandoned, vacant and/or foreclosed properties that would not have been necessary if such properties were occupied.  Plaintiffs also have been required to shift their limited resources to address problems created by such vacancies and foreclosures.

403.    By way of example only, Plaintiffs have sustained financial injuries for providing services to such vacant homes that have not been cared for, have been vandalized and/or have provided a location for illegal activities, all leading to violations of Plaintiffs' building codes, including the creation of physically unsafe structures that threaten public safety.  This, in turn, has led to substantial personnel time and out-of-pocket costs incurred by Plaintiffs' building code enforcement and legal functions having to inspect, investigate and respond to violations at such vacant properties that threaten public safety or address public health concerns; and taking legal action to investigate and prosecute building code violations at the vacant properties. These injuries would not have occurred had the homes been occupied by the Defendants' borrowers who were the subject of Defendants' discriminatory housing practices.

404.    The task of Plaintiffs' legal function in identifying responsible parties in order to take legal action have been made all the more difficult, causing greater financial injury to Plaintiffs, as a direct result of the difficulty in determining the identity of the correct owner of such non-prime mortgage loans.  This is because transfers and assignments of the loans were not

properly recorded by Defendants, including its transferees, assignees, agents and/or trustees of the pools of loans that issued MBS secured by such non-prime loans.

405.    As another example, Plaintiffs' Sheriff's Departments incur significant costs in serving eviction and foreclosures notices and in evicting homeowners, which are directly tied to the foreclosed properties. Plaintiffs' Sheriff's Departments have had to send personnel and equipment to such vacant properties to respond to public health and safety threats that arise at these properties because the properties are vacant.

406.    As yet another example, the Plaintiffs' judicial systems and clerk's offices have been overloaded with foreclosure filings and proceedings – also directly related to each foreclosed property – and Plaintiffs have had to provide supplemental funding.

407.    Using foreclosure property addresses and Defendants' loan application registry, loan servicing and loan default and foreclosure information obtained from Defendants in discovery, Plaintiffs can isolate out-of-pocket and lost revenue damages attributable to each individual property secured by a non-prime loan originated, acquired, serviced or foreclosed on by Defendants on the discriminatory bases alleged herein.

408.    A major source of Plaintiffs' revenue is taxes on real property, particularly residential real estate. The fair market value of the residential real estate in Plaintiffs' jurisdictions have been adversely impacted by home vacancies and foreclosures on predatory and discriminatory mortgage loans, particularly including those loans originated, funded, and/or purchased by Defendants at issue here.

409.    As a result of the predatory loan terms, higher loan costs, and reduced home equity resulting from Defendants' discretionary policies and practices, Plaintiffs' communities and neighborhoods with higher percentages of FHA-protected minority borrowers have

experienced a greater rate of mortgage delinquencies, defaults and home foreclosures on the loans Defendants were responsible for. This, in turn, caused a downward spiral of additional mortgage delinquencies, defaults, and home foreclosures in Plaintiffs' communities and neighborhoods both with higher percentages of FHA-protected minority borrowers as well surrounding areas that have lower percentages of FHA-protected minority borrowers.

410.    As a primary result of Defendants' predatory lending and discriminatory equity-stripping activities, Plaintiffs' tax digests – representing the value of all property subject to tax – have declined and tax receipts have fallen on vacant or foreclosed properties for which Defendants are responsible.

411.    Much of this decline is due to the decline in the value of the residential real estate located in Plaintiffs' communities as a result of the foreclosure crisis caused by Defendants' equity-stripping activities.

412.    Routinely maintained property tax and other financial data allow precise calculation of the property tax revenues Plaintiffs have lost as a direct result of Defendants' discriminatory equity-stripping activities and the resulting property vacancies and foreclosures.

413.    Using well-established GPS mapping techniques that locate specific properties within census tracks, property addresses and mortgage lien and foreclosure data, and well-established statistical regression techniques, Plaintiffs' injuries attributable to lost property tax digest on properties surrounding foreclosed properties relating to Defendants' discriminatory and predatory lending practices also can be calculated.

414.    Defendants are responsible for Plaintiffs' economic damages that they have directly caused through their equity-stripping scheme which can be proximately shown through

the borrower property addresses and the other mortgage lending and servicing information that Defendants' maintain in the ordinary course of business.

415.    Plaintiffs also have been injured as a result of the frustration of the various purposes and missions of its departments and authorities that foster equality and opportunity for affordable housing, revitalize neighborhoods, foster economic development and prosperity in the community, and provide support services for their residents at large. Plaintiffs' authorities and departments have also been injured as a result of having to reallocate their human and financial resources away from their missions and purposes in order to address the foreclosure and home vacancy crisis caused in part by Defendants' discriminatory and predatory mortgage lending, servicing and foreclosure practices.

416.    Importantly, a significant portion of Plaintiffs' out-of-pocket damages that are proximately caused by Defendants' equity-stripping scheme result from abandoned or vacant homes that occur after a defaulted borrower leaves, or is evicted from, the home but before the property is foreclosed upon or acquired.  The longer this period of time, the more costs that are likely incurred by Plaintiffs to address maintenance, code-violation, public health and safety, and/or demolition issues. Using Defendants' servicing and foreclosure data, Plaintiffs' damages at specifically identified properties can be pinpointed in time to when Defendants knew or should have known that the homes were abandoned or vacant, after default or during the foreclosure process, and/or after Defendants acquired title.

417.    Plaintiffs' precise and actual damages can be established from Plaintiffs' records once the addresses of the discrimination-affected properties, and the timing of the loan defaults and foreclosures, can be identified from discovery of Defendants' loan origination, pricing, servicing and foreclosure data.

418.    Plaintiffs' damages, resulting from lower home values and other injuries resulting from the deterioration and blight to the hardest hit neighborhoods and communities, can be established with statistical evidence and expert testimony.

419.    Plaintiffs will continue to incur all of the above types of damages on properties that will become vacant and/or will be foreclosed upon that are secured by a non-prime loan that was issued or discriminatorily serviced by Defendants.

420.    Although nationally there have been well over 6 million foreclosures since 2007, the foreclosure cycle relating to the bulk of the non-prime lending activity is far from complete, with millions more foreclosures likely to come nationwide and tens of thousands more foreclosures locally.

421.    Although many foreclosures on the non-prime discriminatory mortgage loans made during the highpoint of the subprime lending crisis have already occurred, there remain others yet to come as Defendants have intentionally not foreclosed on defaulted loans so as not to become responsible for the costs associated with the ownership and maintenance of foreclosed properties in minority communities. African American and Latino borrowers continue to be disproportionately at risk of foreclosure relative to non-Hispanic white borrowers.

422.    Many of these homes are in the "shadow inventory," *i.e.*, are vacant or are occupied with the homeowner seriously delinquent or in default of their mortgage, but foreclosure proceedings have not yet begun.

423.    Nationally, home prices hit a near-decade low in February 2012, declining approximately 23% since 2007.  As of January 2014, however, Standard & Poor's Rating Service estimated that, nationally, the level of shadow inventory had increased slightly with approximately 51 months of shadow inventory housing supply.  In November 2013, CoreLogic's

shadow inventory analysis revealed that at that time, although levels were the lowest since 2008, there remained 1.7 million properties in the shadow inventory, almost half of which were delinquent but had not yet begun foreclosure proceedings.  While the trend is declining, additional discriminatory mortgage loans continue to go into default, and will continue to do so, particularly with respect to the adjustable rate mortgage loans.  Maryland currently has the third highest foreclosure rate in the nation, and both Plaintiff Counties continue to experience high foreclosure rates relative to other counties.

424.    Consequently, numerous additional delinquencies, defaults, vacancies and foreclosures on Defendants' equity-stripping non-prime mortgage loans continued to occur through 2016 and will occur until the last non-prime discriminatory loan is either repaid or goes into default, resulting in future damages to the Plaintiffs. Plaintiffs are entitled to injunctive relief and the recovery of damages that are about to occur from Defendants' actions.

425.    Finally, because the total number of discriminatory, equity-stripping, non-prime mortgages originated by Defendants, or for which Defendants are otherwise responsible for, as well as the number of foreclosures related to such mortgages have been obfuscated and concealed through the securitization process and the use of MERS, discovery of all of Defendants' loan files for loans made or purchased in Plaintiffs' neighborhoods and communities may be necessary before a precise damages calculation can be made.

## XII.  WELLS FARGO IS LIABLE FOR THE ACTS OF WACHOVIA AS A RESULT OF ITS MERGER WITH WACHOVIA

426.    On December 31, 2008, Wachovia merged into Wells Fargo & Company with Wells Fargo surviving the merger.

427.    In the merger, Wells Fargo exchanged 0.1991 shares of its common stock for each outstanding share of Wachovia common stock, issuing a total of 422.7 million shares of Wells

Fargo common stock with a December 31, 2008, value of $12.5 billion to Wachovia shareholders. Shares of each outstanding series of Wachovia preferred stock were converted into shares (or fractional shares) of a corresponding series of Wells Fargo preferred stock having substantially the same rights and preferences.

428.    Based upon its merger with Wachovia, as the surviving entity Wells Fargo is liable for the wrongful acts of Wachovia and its subsidiaries alleged herein, particularly including World Savings Bank, FSB.

429.    By virtue of the steps taken by Wells Fargo to consummate its acquisition of Wachovia, Wells Fargo also became the successor-in-interest to Wachovia and its subsidiaries.

430.    Wachovia ceased ordinary business on its own account soon after the transaction was consummated.

431.    Wells Fargo assumed the liabilities ordinarily necessary for the uninterrupted continuation of Wachovia's business.

432.    Wells Fargo assumed Wachovia's liabilities for violations of the Fair Housing Act, Wachovia's predatory and discriminatory lending, and for any other matter relating to Wachovia's and its predecessors' mortgage lending, securitization and servicing practices.

433.    There has been a continuity of ownership of Wachovia's assets between Wells Fargo and Wachovia and Wachovia's management, personnel, physical location, and general business operations have been continued by Wells Fargo.

### XIII.  <u>COUNT I</u>
### VIOLATION OF FAIR HOUSING ACT
### 42 U.S.C. § 3601, *et seq.*

**Defendants' Equity-Stripping Scheme Based on Facially Neutral
Loan Origination, Servicing and Foreclosure Policies and Practices
Resulted in Disparate Impact in Minority Neighborhoods**

434.    Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 433 as if fully set forth herein.

435.    Defendants' mortgage lending and securitization acts, policies, and practices, as furthered and continued by Defendants' loan servicing and foreclosure activities (including through reverse redlining and steering), constitute disparate impact discrimination on the basis of ethnicity and/or race because they have a disproportionate, adverse effect on FHA-protected African-American and Latino/Hispanic minority borrowers (including women) in Plaintiffs' communities and neighborhoods by resulting in those FHA-protected borrowers receiving predatory, higher cost, subprime, ALT-A and/or other mortgage loans (including primary, secondary and home equity loans) made on terms less favorable than loans made to similarly situated non-African American or Latino/Hispanic borrowers.

436.    These adverse and disproportionate impacts are the direct result of Defendants' facially neutral policies of making loans destined to fail and giving substantial discretion and incentivizing loan officers, brokers and others responsible for mortgage lending to make and steer people into higher cost loans without regard for whether they could repay the loan or might qualify for better loans.

437.    The predatory and discriminatory discretionary pricing policies and underwriting practices described herein individually and collectively constitute patterns or practices of housing discrimination because, as an integral part of the Defendants' mortgage banking

business models, it was the standard operating procedure of Defendants that had a disparate impact on minority borrowers.

### A.   Defendants' Facially Neutral Loan Origination and Servicing Policies and Practices

438.   Defendants' facially neutral mortgage loan origination (pricing, underwriting and compensation) and servicing (payment acceptance, loan modification, and foreclosure) practices had a disparate impact on minority borrowers.   All of these policies and practices were communicated throughout Defendants' operations and were enabled through the loan-related forms and agreements, including loan contracts, loan applications, and instructions on completing loan applications and contracts, that Defendants disseminated to their employees, managers and correspondent lenders.

439.   Importantly, Defendants' facially neutral discretionary pricing policies permitted Defendant's employees and independent brokers to increase costs of mortgage loans without regard to objective factors.   This subjective decision-making combined with Defendants facially neutral practice of financial incentives encouraged their employees, branch managers and correspondent lenders to approve as many higher cost and subprime mortgage loans as possible, particularly including to FHA-protected minority borrowers, through compensation schemes rewarding fee generation, loan volumes, and overages, while ignoring risk.

440.   The direct consequence of Defendants' facially neutral loan origination (pricing, underwriting, and compensation) practices is that Defendants and their correspondent lenders:

- steered FHA-protected minority borrowers into higher cost, subprime, ALT-A or other mortgage loan products through various practices including failing to advise such borrowers of lower cost alternatives or advising such borrowers not to submit proof of income;

- originated to FHA-protected minority borrowers higher cost, subprime, ALT-A or other mortgage loan products while knowing the increased likelihood of delinquencies, default, foreclosures and home vacancies on such loan products;

- originated to FHA-protected minority borrowers loans that were on terms more unfavorable than loans made to non-minority borrowers who were similarly situated under traditional lending criteria;

- underwrote and originated to FHA-protected minority borrowers higher cost, subprime, ALT-A or other mortgage loan products at borrowers' maximum income/debt ratios while knowing the increased likelihood of delinquencies, default, foreclosures and home vacancies on such loan products;

- underwrote and originated to FHA-protected minority borrowers higher cost, subprime, ALT-A or other mortgage loan products that they would not otherwise qualify for, and were unable to pay for, while knowing the increased likelihood of delinquencies, default, foreclosures and home vacancies on such loan products;

- underwrote and originated to FHA-protected minority borrowers ARM loan products at borrowers' maximum income/debt ratios but at the teaser interest rates rather than the minimum anticipated adjusted rate after the initial teaser rate period expired while knowing the increased likelihood of delinquencies, default, foreclosures and home vacancies on such loan products;

- underwrote and originated to FHA-protected minority borrowers higher cost, subprime, ALT-A and even loans backed by Government sponsored enterprises (i.e., the Federal National Mortgage Association ("FNMA"), the Federal Home Loan Mortgage Corporation ("FHLMC"), and the Government National Mortgage Association ("GNMA"), collectively, the "GSEs") at inflated amounts beyond the fair value of their homes and based on inflated appraisals while knowing the increased likelihood of delinquencies, default, foreclosures and home vacancies on such loan products;  and

- included pre-payment penalties in the loan products issued to FHA-protected minority borrowers.

441.    This resulted in minority borrowers receiving disproportionately more higher cost loans and loans with predatory characteristics than non-minority borrowers. It also resulted in higher concentrations of predatory loans that were more likely to fail in minority neighborhoods.

442.    Defendants' predatory loan origination (pricing, underwriting and compensation) and servicing (payment acceptance, loan modification, and foreclosure) policies and practices were artificial, arbitrary, and unnecessary, because they were not necessary to compensate for additional risk.   Defendants' discretionary pricing practice was artificial, arbitrary and unnecessary in that it permitted pricing on mortgage loans originated to FHA-protected minority borrowers on a subjective basis without regard to objective factors.   Defendants' incentive

policies provided financial incentive for Defendants' employees and independent brokers to exercise the discretionary pricing policy in a subjective manner, without regard to objective factors. These policies increased costs and fees unrelated to any increased risk of the loan, and were, therefore, artificial, arbitrary, and unnecessary.

443. Defendants' pricing policies were artificial, arbitrary and not a business necessity because they violated safe and sound banking practices and regulations, and loan officers and brokers: (1) had the discretion to change pricing; (2) were encouraged to change pricing to maximize loan profitability, and (3) were compensated by Defendants to approve loans rather than ensure that they could be repaid and were in the borrowers' best interests.

444. Defendants' pattern and practice of predatory and discriminatory mortgage origination (pricing, underwriting and compensation) and servicing (payment acceptance, loan modification, and foreclosure) cannot be justified by business necessity, and could have been avoided through the use of alternative business policies and procedures that had less discriminatory impact. Predatory lending practices, which are improper in and of themselves, cannot be justified by business necessity. Higher costs were not charged to compensate for higher risk, but, rather, were exercised in an arbitrary and subjective manner. Defendants failed to have in place fair lending controls to ensure that employees and independent brokers were not exercising subjective decision-making in a non-discriminatory manner.

> **B.    Defendants' Predatory Mortgage Loan Origination Practices and Policies Had a Disparate Impact on Minority Borrowers**

445. Defendants' predatory and discriminatory actions have caused African Americans, Latino/Hispanic Americans, and residents of predominantly African-American and Hispanic neighborhoods in Plaintiffs' communities to receive mortgage loans that were destined or expected to fail, and in fact failed, on levels higher than failed loans made to similarly situated

non-minority borrowers, because loans were made to minorities on more unfavorable terms than non-minority borrowers. Specifically, these mortgage loan failure levels were greater in Plaintiffs' minority communities and led to substantially higher rates of foreclosure than in non-minority areas.

446.    Prior to the predatory and discriminatory lending practices of Defendants alleged herein, Plaintiffs had few, if any, "high foreclosure risk" (HFR) census track areas as defined and designated by the U.S. Department of Housing & Urban Development ("HUD") and the historical annual foreclosure rates were averaging between approximately 1% to 2%.

447.    HUD designated HFR areas reflect neighborhood characteristics that are estimated by HUD to have a high level of risk for foreclosure – *e.g.*, those neighborhoods with a relatively high concentration of higher cost loans, subprime or highly leveraged loans (high LTV and DTI ratios), among other factors.

448.    Subsequent to and during the predatory and discriminatory lending and servicing practices of Defendants (and other industry participants) alleged herein, Plaintiffs experienced a massive increase in the number of higher cost, subprime and highly leveraged loans made within Plaintiffs' neighborhoods and communities with high populations of FHA-protected minority borrowers, leading to numerous HUD designated HFR areas.

449.    Indeed, the level and severity of the risk of foreclosures across the nation and in Plaintiffs' communities and neighborhoods became so great that HUD changed its HFR ranking system from a scale of 1-10 (10 being the highest foreclosure risk areas) to a scale of 1-20 (doubling the prior risk designation and designating 20 as the highest foreclosure risk areas).

450.    The HUD designated HFR areas coincide directly with high minority percentage rate population census tracks in Plaintiffs' communities and neighborhoods.   And the HUD

designated HFR areas coincide directly with high foreclosure rates in Plaintiffs' communities and neighborhoods. Indeed, Plaintiffs' neighborhoods and communities with the highest HFR areas have proportionately the highest percentages of FHA-protected minority homeowners and have experienced tremendously higher foreclosure rates.

451.   HMDA-reported foreclosure data reflects that the average foreclosure rate increases among census tracks in Plaintiffs' neighborhoods as the percentage of minority population increases.  Reflective of Defendants' targeting and redlining of minority borrowers for higher risk non-prime mortgage loans – *i.e.*, higher cost and/or higher leveraged mortgage loans – immediately following the beginning of the boom years in Defendants' discriminatory non-prime mortgage lending, Plaintiffs' communities with the highest percentages of minority borrowers experienced higher initial foreclosure rates on such newly originated mortgage loans. At that time, unemployment levels were low and the economy was growing.

452.   The mortgage loans Defendants originated in Plaintiffs' communities to FHA-protected minority borrowers were more likely to result in delinquency, default and foreclosure than the loans Defendants made to non-minority borrowers, with many of the loans made within the highest HUD designated HFR foreclosure rate areas.  This data also reflects targeting, disparate treatment and disparate impact.

453.   If Defendants had not encouraged and incentivized predatory lending practices, Plaintiffs' communities (and Plaintiffs' higher minority neighborhoods) would not have suffered significantly greater numbers and percentages of loan defaults and foreclosures on Defendants' mortgage loan products than the percentages of minority homeownership reflected in Plaintiffs' demographic data.  But for Defendants' predatory and discriminatory actions alleged herein, the number and concentration of predatory non-prime mortgage loans and the number and

concentration of corresponding defaults, vacancies, and foreclosures experienced by FHA-protected minority borrowers in Plaintiffs' communities and neighborhoods would have been far lower and Plaintiffs' alleged injuries would not have occurred to the extent they did.  And, as further alleged below in Count II, Defendants' actual foreclosure filings over the period reflect a stand-alone continuing discriminatory housing practice.

454.    Individually, and/or collectively, Defendants' acts, policies, and practices violate the Fair Housing Act, as amended, 42 U.S.C. § 3601, *et seq.*, in so far as:

(a) Defendants' acts, policies, and practices have made and continue to make housing unavailable on the basis of race and/or color, in violation of 42 U.S.C. § 3604(a);

(b) Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of race and/or color, in violation of 42 U.S.C. § 3604(b);

(c) Defendants' published policies and statements have expressed and continue to express a preference on the basis of race and/or color, in violation of 42 U.S.C. § 3604(c); and

(d) Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions and privileges on the basis of race and/or color in connection with the making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605.

455.    Defendants' discriminatory acts, policies, and practices as alleged above are continuing and will continue until the last discriminatory, equity-stripping, non-prime mortgage loan that Defendants originate, fund, purchase, and/or service is repaid and closed and/or is foreclosed upon. Defendants' unlawful actions described above were, and are, intentional and willful, and/or have been, and are, implemented with callous and reckless disregard for Plaintiffs' federally protected rights.

456.    As alleged above, each of the Defendants engaged in at least one violation of the Fair Housing Act in the Plaintiff Counties during the two years prior to the initiation of this

lawsuit by servicing and/or initiating foreclosure proceedings on predatory mortgage loans during the two-year period prior to when this action was filed.

457.     Plaintiffs are "aggrieved persons" as defined by 42 U.S.C. § 3602(i) because Plaintiffs, as organizations themselves subject to the provisions of the FHA, have been injured by Defendants' discriminatory housing practices alleged above and also because Plaintiffs believe that they will continue to be injured by Defendants' discriminatory housing practices that are about to occur through the continuation of Defendants' discriminatory housing practices, also as alleged above. Thus, Plaintiffs expressly bring this Count as aggrieved persons in their own right pursuant to the private persons civil enforcement provisions of 42 U.S.C. § 3613(a) for their own organizational harms and other damages arising from Defendants' discriminatory housing practices that violate the FHA.

458.     Plaintiffs have been, and continue to be, adversely affected by the acts, policies, and practices of Defendants, their employees, and/or their agents. Plaintiffs' organizational harm and other injuries are continuing and will increase unless and until Defendants cease their equity-stripping activities, including through their continuing discriminatory and predatory mortgage servicing and foreclosure activities.  Injunctive relief is therefore necessary to prevent further financial and non-financial harm to Plaintiffs.

### XIV.  COUNT II
**(Violation of Federal Fair Housing Act, 42 U.S.C. § 3601, *et seq.*)**
**Defendants' Facially Neutral Mortgage Servicing and Foreclosure Practices**
**Resulted in Disparate Impact in Minority Neighborhoods.**

459.     Plaintiffs repeat and incorporate by reference paragraphs 1 through 433 as if fully set forth herein.

460.     Defendants' mortgage servicing and foreclosure acts, policies, and practices described in greater detail above have had a disparate impact on the basis of ethnicity and/or race

by foreclosing on African-American and Latino/Hispanic (including women's) homeowners to a greater extent than they foreclose on non-African American or Latino/Hispanic homeowners in Plaintiffs' communities and neighborhoods.

461.    Defendants' servicing and foreclosure acts, policies, and practices themselves have had an adverse, disproportionate and/or disparate impact on FHA-protected African-American and Latino/Hispanic minority borrowers (including women) in terms of the relative percentages of foreclosures in higher concentrated African-American and Latino/Hispanic neighborhoods, as compared to the percentages of foreclosures on non-minority homeowners and in neighborhoods with low concentrations of African-American or Latino/Hispanic homeowners.

462.    Defendants' servicing and foreclosure acts, policies, and practices also have had an adverse, disproportionate and/or disparate impact on FHA-protected minority borrowers in Plaintiffs' communities and neighborhoods in terms of the percentage of mortgage loan delinquencies, defaults, home vacancies and foreclosures suffered by FHA-protected minority borrowers relative to the percentages of mortgage loan delinquencies, defaults, home vacancies and foreclosures suffered by similarly situated non-minority borrowers.

463.    Defendants' mortgage servicing and foreclosure acts, policies, and practices constitute disparate impact on the basis of ethnicity and/or race by foreclosing on African-American and Latino/Hispanic (including women's) homeowners to a greater extent than they foreclose on non-African American or Latino/Hispanic homeowners in Plaintiffs' communities and neighborhoods.

464.    Defendants' predatory and discriminatory discretionary mortgage servicing and foreclosure practices individually and collectively constitute patterns or practices of housing discrimination because, as an integral part of the Defendants' mortgage banking business

154

models, they were the standard operating procedure of Defendants that had a disparate impact on minority borrowers.

465.     The facially neutral mortgage servicing and foreclosure practices include engaging in unsound practices with respect to foreclosures and related activities, such as robo-signing, that failed to compel with legal requirements, and determinations regarding timing of foreclosure. Defendants' foreclosure practices and activities themselves reflect *stand-alone discriminatory housing practices*, resulting in disproportionate numbers of foreclosures on minority homes, and disproportionately increasing foreclosure activity in minority areas in Plaintiffs' communities and neighborhoods.

466.     Defendants' predatory mortgage servicing and foreclosure policies and practices were artificial, arbitrary, and unnecessary and do not serve any business purpose.  Defendants' mortgage foreclosure practices were improper in and of themselves because they failed to comply with legal requirements.  Practices that fail to comply with legal requirements do not serve any business purpose.

467.     Defendants' pattern and practices of predatory mortgage servicing and foreclosures cannot be justified by business necessity and could have been avoided through the use of alternative business policies and procedures that had less discriminatory impact. Engaging in improper and predatory mortgage foreclosure practices cannot be justified by business necessity.  Defendants failed to have in place fair lending controls to ensure that employees and independent brokers were not exercising discretion in mortgage servicing and foreclosure in a non-discriminatory manner.

468.     Defendants' discriminatory housing practices in Plaintiffs' neighborhoods and communities is further evidenced by, and explicitly includes, the increased foreclosure rates,

numbers of foreclosures, and clustering of foreclosures on mortgage loans made to minority

borrowers for which Defendants are responsible.

469.    As Plaintiffs allege above, publicly reported foreclosure data evidences that such

activity is disproportionately increased for minorities and is concentrated in Plaintiffs' minority

communities and evidences disparate impact of both Defendants' discriminatory mortgage

lending activity and its current mortgage servicing/foreclosure practices.

470.    Individually and/or collectively, Defendants' acts, policies, and practices violate

the Fair Housing Act, as amended, 42 U.S.C. § 3601, *et seq.*, in so far as:

(a) Defendants' acts, policies, and practices have made and continue to make housing
    unavailable on the basis of race and/or color, in violation of 42 U.S.C. § 3604(a);

(b) Defendants' acts, policies, and practices have provided and continue to provide different
    terms, conditions, and privileges of sale of housing, as well as different services and
    facilities in connection therewith, on the basis of race and/or color, in violation of 42
    U.S.C. § 3604(b);

(c) Defendants' published policies and statements have expressed and continue to express a
    preference on the basis of race and/or color, in violation of 42 U.S.C. § 3604(c); and

(d) Defendants' acts, policies, and practices have provided and continue to provide different
    terms, conditions and privileges on the basis of race and/or color in connection with the
    making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605.

471.    As alleged above, each of the Defendants engaged in at least one violation of the

Fair Housing Act in Plaintiff Counties during the two-years prior to the initiation of this lawsuit

by servicing and/or initiating foreclosure proceedings on predatory mortgage loans during the

two-year period prior to when the initial complaint in this action was filed.

472.    Plaintiffs are "aggrieved persons" as defined by 42 U.S.C. § 3602(i) because

Plaintiffs, as organizations subject to the provisions of the FHA, have been injured by

Defendants' discriminatory housing practices alleged above and also because Plaintiffs believe

that they will continue to be injured by Defendants' discriminatory housing practices that are

about to occur through the continuation of Defendants' discriminatory housing practices, also as alleged above. Thus, Plaintiffs expressly brings this Count as aggrieved persons in their own right pursuant to the private persons civil enforcement provisions of 42 U.S.C. § 3613(a) for their own organizational harms and other damages arising from Defendants' discriminatory housing practices that violate the FHA.

473.    Plaintiffs have been, and continue to be, adversely affected by the acts, policies, and practices of Defendants, their employees, and/or their agents. Plaintiffs' organizational harms and other injuries are continuing and will increase unless and until Defendants cease their equity-stripping activities, including through their continuing discriminatory and predatory mortgage servicing and foreclosure activities.  Injunctive relief is therefore necessary to prevent further financial and non-financial harm to Plaintiffs.

## XV.  COUNT III
### Violation of Federal Fair Housing Act
### 42 U.S.C. § 3601, *et seq.*
### Defendants' Discriminatory Equity-Stripping Scheme Was Intentional and Constitutes Disparate Treatment

474.    Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 433 as if fully set forth herein.

475.    Defendants' predatory and discriminatory subprime and higher cost mortgage lending, servicing, and foreclosure practices and policies were not the result of random or non-discriminatory factors.  Rather, they were the direct and intended result of Defendants' business models, respectively, and their intent was to maximize corporate profits pursuant to those business models by directly targeting minority borrowers through marketing efforts.

476.    Defendants' equity-stripping scheme – conducted through their mortgage lending and securitization acts, policies, and practices as furthered and continued by Defendants' loan servicing and foreclosure activities – constitute intentional discrimination (including through

reverse redlining and steering) on the basis of ethnicity and/or race by intentionally targeting (and "reverse redlining") FHA-protected African-American and Latino/Hispanic minority borrowers (including women) in Plaintiffs' communities and neighborhoods for predatory, higher cost, subprime, ALT-A and/or other mortgage loans (including primary, secondary and home equity loans) made on terms less favorable than loans made to similarly situated non-African-American or Latino/Hispanic borrowers, and/or without regard to such minority borrowers' ability to repay such loans; then charging improper and inflated serving-related fees when such borrowers could not repay the loans; and then foreclosing on such properties to a far greater extent than foreclosures on non-African American or Latino/Hispanic homeowners in Plaintiffs' communities and neighborhoods.

477.    Defendants' mortgage marketing, originations, servicing and foreclosure acts, policies, and practices constitute intentional discrimination on the basis of ethnicity and/or race by foreclosing on African-American and Latino/Hispanic (including women's) homeowners to a greater extent than they foreclose on non-African American or Latino/Hispanic homeowners in Plaintiffs' communities and neighborhoods.

478.    The predatory and discriminatory equity-stripping scheme – conducted through Defendants' mortgage lending, securitization, servicing and foreclosure activities and practices – constitute patterns or practices of housing discrimination because, as an integral part of the Defendants' equity-stripping activities and mortgage banking business models, it was the standard operating procedure of Defendants that constituted the discriminatory treatment of minority borrowers.

479.    Defendants' predatory and intentionally discriminatory actions have caused African Americans, Latino/Hispanic Americans, and residents of predominantly African-

American and Hispanic neighborhoods in Plaintiffs' communities to receive mortgage loans that were destined or expected to fail, and in fact failed, on levels higher than failed loans made to similarly situated non-minority borrowers, because loans made to minorities were made on more unfavorable terms than those to non-minority borrowers. Specifically, these failure levels were greater in Plaintiffs' minority communities and led to substantially higher rates of foreclosure than in non-minority areas.

480.    Defendants' discriminatory acts, policies, and practices as alleged above are continuing and will continue until the last discriminatory, equity-stripping, non-prime mortgage loan that Defendants originate, fund, purchase, and/or service is repaid and closed and/or is foreclosed upon. Defendants' unlawful actions described above were, and are, intentional and willful, and/or have been, and are, implemented with callous and reckless disregard for Plaintiffs' federally protected rights.

481.    Through vertically integrated corporate policies, practices, processes, and/or procedures, each of the Defendants marketed and originated (or provided funding for others to originate and then Defendants purchased) predatory and discriminatory first lien and second lien (*i.e.*, home equity) residential home mortgage loans made to FHA-protected African-American and Hispanic/Latino minority borrowers on terms more unfavorable than those offered and made to similarly situated non-minority borrowers.   This resulted in FHA-protected minority borrowers paying higher interest rates and fees, and/or receiving loans on other more unfavorable terms, such as prepayment penalties, which in turn resulted in more foreclosures in minority neighborhoods.

482.    Individually, and/or collectively, Defendants' acts, policies, and practices violate the Fair Housing Act, as amended, 42 U.S.C. § 3601, *et seq.*, in so far as:

(a) Defendants' acts, policies, and practices have made and continue to make housing unavailable on the basis of raise and/or color, in violation of 42 U.S.C. § 3604(a);

(b) Defendants' acts, policies and practices have provided and continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of race and/or color, in violation of 42 U.S.C. § 3604(b);

(c) Defendants' published policies and statements have expressed and continue to express a preference on the basis of race and/or color, in violation of 42 U.S.C. § 3604(c); and

(d) Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions and privileges on the basis of race and/or color in connection with the making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605.

483.    Plaintiffs are "aggrieved persons" as defined by 42 U.S.C. § 3602(i) because Plaintiffs, as organizations subject to the provisions of the FHA, have been injured by Defendants' discriminatory housing practices alleged above and also because Plaintiffs believe that they will continue to be injured by Defendants' discriminatory housing practices that are about to occur through the continuation of Defendants' discriminatory housing practices, also as alleged above.  Thus, Plaintiffs expressly bring this Count as aggrieved persons in their own right pursuant to the private persons civil enforcement provisions of 42 U.S.C. § 3613(a) for their own injuries and organizational harms arising from Defendants' discriminatory housing practices that violate the FHA.

484.    Plaintiffs have been, and continue to be, adversely affected by the acts, policies, and practices of Defendants, their employees, and/or their agents. Plaintiffs' injuries and organizational harms are continuing and will increase unless and until Defendants cease their equity-stripping activities, including through their continuing discriminatory and predatory mortgage servicing and foreclosure activities. Injunctive relief is therefore necessary to prevent further financial and non-financial harm to Plaintiffs.

## XVI.  <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.

## XVII.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully pray that the Court grant them the following relief:

(1) enter a declaratory judgment that the foregoing acts, policies, and practices of Defendants violate 42 U.S.C. §§ 3604 and 3605;

(2) enter a permanent injunction enjoining Defendants and their directors, officers, agents, and employees from continuing to publish, implement, and enforce their illegal, discriminatory conduct described herein through the foreclosure process and directing Defendants and their directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

(3) award compensatory damages to Plaintiffs in an amount to be determined by the jury that would fully compensate Plaintiffs for their injuries caused by the conduct of Defendants alleged herein;

(4) award punitive damages to Plaintiffs in an amount to be determined by the jury that would punish Defendants for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(5) award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

(6) order such other relief as this Court deems just and equitable.

Dated:  November 20, 2018

Andrew D. Freeman, Fed. Bar No. 03867
Jean M. Zachariasiewicz, Fed. Bar No. 19734
**BROWN GOLDSTEIN & LEVY, LLP**
120 E. Baltimore Street, Suite 1700
Baltimore, MD  21202
Phone: (410) 962-1030
adf@browngold.com
jmz@browngold.com

James M. Evangelista (*pro hac vice*)
jim@ewlawllc.com
David J. Worley (*pro hac vice*)
david@ewlawllc.com
Kristi Stahnke McGregor (*pro hac vice*)
Kristi@ewlawllc.com
**EVANGELISTA WORLEY, LLC**
8100 A Roswell Road, Suite 100
Atlanta, GA 30350
Phone: (404) 205-8400

Sanford P. Dumain (*pro hac vice*)
sdumain@milberg.com
Peggy J. Wedgworth (*pro hac vice*)
pwedgworth@milberg.com
Melissa R. Clark (*pro hac vice*)
Clark, Melissa mclark@milberg.com
Jennifer S. Czeisler (*pro hac vice*)
jczeisler@milberg.com
J. Birt Reynolds (*pro hac vice*)
breynolds@milberg.com
**MILBERG TADLER PHILIPS GROSSMAN
LLP**
One Pennsylvania Plaza, 19th Floor
New York, NY 10119
Phone: (212) 594-5300

*Counsel for Plaintiffs*